IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

PALTALK HOLDINGS, INC. * August 26, 2024
*
VS. * CIVIL ACTION NO. 6:21-CV-757
*
CISCO SYSTEMS, INC. *

BEFORE THE HONORABLE ALAN D ALBRIGHT
TRIAL PROCEEDINGS
Volume 1 of 4

APPEARANCES:

For the Plaintiff: Max L. Tribble, Jr., Esq.
Ryan V. Caughey, Esq.
Amber Brianna Magee, Esq.
Susman Godfrey LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002

Kalpana Srinivasan, Esq.
Susman Godfrey LLP
1900 Avenue of the Stars, Ste 1400
Los Angeles, CA 90067-6029

Mark Siegmund, Esq.
Cherry Johnson Siegmund James, PLLC
The Roosevelt Tower
400 Austin Avenue, 9th Floor
Waco, Texas 76701

For the Defendant: Sarah E. Piepmeier, Esq.
Elise Edlin, Esq.
Nate Sabri, Esq.
Karl Johnston, Esq.
Perkins Coie LLP
505 Howard Street
San Francisco, CA 94117

Ryan Hawkins, Esq.
Abigail Ann Gardner, Esq.
Perkins Coie LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130

Jessica J. Delacenserie, Esq.
Perkins Coie LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101

Andrew T. Dufresne, Esq.
Perkins Coie LLP
33 E. Main Street, Suite 201
Madison, WI 53703

Michael E. Jones, Esq.
Shaun William Hassett, Esq.
Potter Minton PC
102 North College, Suite 900
Tyler, TX 75702

Jonathan Irvin Tietz, Esq.
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005

Court Reporter: Kristie M. Davis, CRR, RMR
PO Box 20994
Waco, Texas 76702-0994
(254) 340-6114

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

(Hearing begins.)

THE BAILIFF: All rise.

THE COURT: Good morning, everyone. You may be seated.

DEPUTY CLERK: Court calls Case 6:21-CV-757, Paltalk versus Cisco. Case called for a jury trial proceeding.

THE COURT: Announcements from counsel, please.

MR. SIEGMUND: Good morning, Your Honor. Mark Siegmund on behalf of the plaintiff. And we're ready to proceed.

MR. JONES: Your Honor, Mike Jones on behalf of Cisco, and we're ready.

THE COURT: And this seems as good a time as any to remind everyone how closing arguments work here, which -- by which I mean if in the mornings I have to deal with exciting things like slides and other objections, that's fine. You get 30 minutes for closing arguments, but in the event that I don't have to do a lot of things in the morning, then you get 45 minutes per side. But that's entirely up to you all to deal with that.

Having said that, what issues do you have for me to take up this morning?

08:37 MR. TRIBBLE: Your Honor, we have objections to some of their slides, and I believe they may have some objections to our slides.

08:38 MR. SIEGMUND: Judge, can I approach and hand them to you?

08:38 THE COURT: Sure.

08:38 MR. TRIBBLE: Thank you, Your Honor. Max Tribble for the plaintiff.

08:38 We object to Slide 8 in Cisco's opening slide deck. And this slide is titled Paltalk Rewrites the Patent. And then they proceed to write in and change where the word "each" appears to "one or more." And it's clear that they're going to argue that each cannot mean one or more, and this Court has ruled a couple of times to the opposite effect.

08:39 In other words, we don't have to rewrite anything. The plain and ordinary meaning of "each" can be "one or more," as this Court has found. And so that's why we object to this slide that we're rewriting the language.

08:39 THE COURT: A response?

08:39 MR. JONES: Your Honor, may I hand up some slides to Your Honor?

08:39 THE COURT: Uh-huh.

08:39 MR. JONES: And they are opening slides.

Your Honor, I -- considering the Court's admonishment, I think you can make one ruling here with regard to Slide 8, and you will also take care of the issues concerning Paltalk's opening Slide 25, Cisco's opening Slide 30, and the Paltalk Scott Schaefer slide, which is 34. And I'll try to do this very expeditiously.

Your Honor, with regard to "each," where I understand we are is that we lost a hearing with regard to a motion for summary judgment, and the Court said in denying that motion that "each" could mean one or more, but did not make a claim construction but expressly told us that it was a term that would be given as plain and ordinary meaning to a POSITA.

Thereafter, there was a dispute between the parties as to whether or not that meant we could do exactly what we're doing now, and we made a motion to clarify and the Court said he had not -- excuse me. The Court said that a claim construction had not been issued, and that was an issue that could be argued. In other words, where we were was the Court had not construed the term "each." "Each" would get its plain and ordinary meaning.

And as I understand the law -- and the Court knows much better than I do. You've been through

many more patent trials than I have. But my understanding was that at that point, "each" had its plain and ordinary meaning. That experts, based upon their reports, could testify as to how a person of ordinary skill in the art would interpret "each" as it was used in the claims.

And that is exactly what we are doing. We are taking the position that a person of ordinary skill in the art, based upon our expert's report, would look at "each" there, and, as the Court told us with regard to our motion for clarification, would interpret it to mean "all" and "every."

They are taking a different position. They are going to take the position that it could be interpreted one or more. But that's where we are.

Now, they want -- and this is where you'll get to Schaefer's Slide 34. They want to tell the jury that the Court has ruled that they're right, that it can include "one or more" -- excuse me -- that it can include "one or more." We think that's a claim construction which the Court said it was not doing. It was not making a claim construction.

We even asked for a Markman at one point. Court said, no, I'm not going to give a Markman, and that it is going to be a fact issue, is what we

understood it to be.

We understood that from the Court's original ruling. We understood that to be where we were after the motion to clarify after the last pretrial conference, and we think what we're doing is very consistent with the Court's ruling. We think what they're trying to do in their slide when they cite the Court, when they cite the Court's ruling with regard to the motion for summary judgment, is a violation of your Motion in Limine No. 17, which says the parties shall be precluded from introducing evidence, testimony and arguments relating to the Court's claim construction order other than the actual adopted constructions.

We have your constructions. That was not part of your constructions. That was part of your reasoning for overruling our motion for summary judgment. Their Slide 34 shouldn't come in. We think if you do that, Judge, it's like you've made a claim construction. We think if you do that with regard to this fact issue, that it's almost like -- you know, with regard to this particular fact issue, we think they're encouraging the Court to put its thumb on the weight and say, well, one party or the other is right about this. So we believe --

THE COURT: I got it.

08:44 MR. JONES: Thank you.

08:44 THE COURT: So what -- let me hear from plaintiff. What do you intend to say about "each" during your opening argument, and maybe that'll help inform me what I should permit the defendant to...

08:44 MR. TRIBBLE: We're planning to tell the jury that the term "each" has its plain and ordinary meaning but not to you or me, to a person of ordinary skill in the art in light of reading the patent specification and claims. It's as simple as that.

08:44 THE COURT: Do you intend to tell them, to say anything about it being one or more or not one or more?

08:44 MR. TRIBBLE: Yes. I do.

08:44 THE COURT: Well, in that case, I'm going to overrule your objection on their slide.

08:44 What else do you have?

08:44 MR. TRIBBLE: We object to Cisco's --

08:44 THE COURT: And, Mr. Jones, does that take care of your problems with theirs as well?

08:44 MR. JONES: I think it does. If you overruled objections to ours, I believe you're sustaining our objections to their Slide 8, Slide 30, and Schaefer's Slide 34.

08:45 THE COURT: I don't think I am. So I'm

08:45 glad I asked.

08:45 MR. JONES: I'm sorry, Your Honor. I didn't mean to be smart with the Court.

08:45 THE COURT: I think I'm going with the hallowed good for the goose, good for the gander ruling, which is, I'm going to let them talk about it in opening, and we'll let you all talk about it in opening.

08:45 MR. JONES: Could I ask one point on that?

08:45 THE COURT: Sure.

08:45 MR. JONES: And it particularly relates to Slide 34 because I think that's where we really joined this issue. Can they refer to what the Court said at the hearing on the motion for summary judgment and say that the Court has said that "each" can include?

08:45 THE COURT: Yes.

08:45 MR. JONES: They can?

08:45 THE COURT: That's why I said it.

08:45 MR. JONES: Just for the purposes of the record, Your Honor, we would object to that. I understand you're overruling my objection. We believe that's a claim construction. We would ask that a Markman hearing take place and that "each" be given a

claim construction, Your Honor.

THE COURT: I think I've done that. And I'm -- I've stated -- that's why I stated at the hearing that "each" can include that.

MR. JONES: Thank you, Your Honor.

THE COURT: So if I didn't make that clear at the time, that's why I was taking the time to say it.

Here are my rulings. I'm going to start with the first motion.

I'm going to find the plain and ordinary meaning "each," "each" has a plain and ordinary meaning which can include one or more. That was the purpose of me saying that.

MR. JONES: Okay. Thank you, Your Honor. I'm sorry for the misunderstanding.

THE COURT: Mr. Tribble, anything else?

MR. TRIBBLE: I believe this may already be covered by your ruling, but if you look at Slide 30.

THE COURT: Okay.

MR. TRIBBLE: We just think it overstates it in a misleading way because it's titled Specific Requirements of the '858 Patent. And what they've done is they've summarized -- in the right-hand column, they've summarized the claim language.

08:47 And so they say it's a specific requirement and that it -- for example, the system creates a multiplexed stream in 5 and 6 of all active speakers. It sends it to all users' devices.

08:47 I mean, if they want to say this is how our expert interprets it, I think that would be consistent with the Court's ruling. But to put it up there as a requirement of the patent, it just seems overstated.

08:47 THE COURT: Got it.

08:47 How is that slide going to be presented? Because I agree with Mr. Tribble that -- well, I feel like you all -- the defense is certainly able to make an argument that that's what you're going to argue, as long as you're not going to say that I've -- that I've construed it that way. If you're simply going to argue that that's what you're arguing, then I'm fine with it.

08:48 MS. PIEPMEIER: Your Honor, good morning. Sarah Piepmeier. Good to see you again.

08:48 That's exactly what I'm going to do, Your Honor. I'm not going to mention a claim construction ruling. I'm just going to walk through the claim and I'm going to say: The words of the claim are what govern. Here's a summary. But the words of the claim govern.

08:48 THE COURT: Here's our position.

08:48 MS. PIEPMEIER: Yes. Thank you.

08:48 THE COURT: That's fine.

08:48 Anything else?

08:48 MR. TRIBBLE: No, Your Honor.

08:48 THE COURT: And anything else?

08:48 MR. JONES: Thank you. I think there are some objections from us, Your Honor.

08:48 THE COURT: Yes.

08:48 MR. JONES: And this objection. And if I would, I'd hand this up to Your Honor.

08:48 This objection is really very simple, Your Honor. There are certain licenses that Paltalk has with Microsoft, Activision, and Sony. These licenses include the '858 patent.

08:48 Both experts have said they are not comparable, they are not relevant, they are not probative.

08:48 Usually in my experience, those type of licenses come in. They want to refer to those licenses I really think to just show Paltalk has some licenses with regard to patents.

08:49 We have told them that's great. If y'all want to refer to them, good. But if you refer to them, then we get to talk about them in the evidence and talk

08:49 about their terms, talk about their amounts, talk about how they treat the '858 patent and in circumstances through which they were entered into.

Our position is just if y'all get to use them and y'all get to use them to bolster your client, then we get to explain the terms of them. And either -- we think they should either stay out completely or come in completely.

Thank you, Your Honor.

THE COURT: A response?

MR. SIEGMUND: Yes, Your Honor.

As Mr. Jones said, they are considered in the expert reports by both experts. They are technically comparable, although both experts said they are not economically comparable. And we are not going to talk about the circumstances of the licenses, if they were the litigation or anything like that, but Cisco has a big slide that says "the '858 patent" going across the top of their timeline; we didn't derive anything from this patent at all. Well, that's plainly not true. There's licenses to that.

So we were just going to simply say, you know, Paltalk has received licenses for its technology. Here they are: Microsoft, Activision, Sony. And that's it, Your Honor.

08:50 THE COURT: Well, but I think what Mr. Jones is saying is that if you talk -- you say that, then they get to tell -- talk to the jury about that.

08:50 MR. SIEGMUND: Understood.

08:50 THE COURT: And so that which is my -- the way I see the world too.

08:50 So if the plaintiff wants to discuss in opening argument that Microsoft, Activision, and Sony licenses for some reason -- is this -- then they get to talk about them during trial. I'm not excluding -- I'm not going to prohibit you from talking about them during opening argument, but then they're in.

08:51 MR. SIEGMUND: Understood.

08:51 THE COURT: Okay. Does that satisfy you?

08:51 MR. JONES: Yes, Your Honor. I understand.

08:51 THE COURT: Any other issues?

08:51 MR. JONES: Just two more. I think they'll be rather brief.

08:51 This deals with Slides 32, 33, and 34, and if you'll look at 34, sir, I think you'll understand exactly what we're talking about here. And this is clearly a discovery issue.

08:51 In discovery in Interrogatory 17, we

asked whether they knew of any embodiments of the patent, and they said they did not by either them or anyone else. HearMe, the predecessor owner of the patent, was expressly dealt with in the interrogatory answer and they did not know.

Mr. Katz is their 30(b)(6) deponent. He also did not know of any products that avoid -- embody the patent when he was deposed.

What they are doing here is they're taking an exhibit from the prior owner of the patent, HearMe, Plaintiff's Exhibit 9, and they are comparing it to the patent. The middle bar is comparing it to the patent and then comparing it to a Cisco product.

Here, the implication is clearly that it's an embodiment, and they're using it for that purpose. There'll be no expert that says it's an embodiment, and the discovery we have has denied that any embodiments existed.

And even further than that, worse than that, is when their corporate representative was asked about this particular document, he said he didn't know anything.

And he could read it, say what was on it, but he didn't know anything about it and couldn't authenticate it. He certainly couldn't tell us that

the product worked the way they said in the document. And for that reason, we believe it should not be used, Your Honor.

THE COURT: A response?

MR. SIEGMUND: Your Honor, we think this is kind of a nonissue, and we are not going to argue that what is depicted on Slide 30 and 31 was practicing -- sorry -- was practicing the patent. We aren't going to make that argument whatsoever.

We're simply saying, hey, we bought this company. This is the technology that they had. And this is kind of how hybrid systems came to be evolved. So it's more of a proffer.

THE COURT: What I have -- I think Mr. Jones is unhappy about on 32 and 33, it looks like it came from a patent. So I'm not sure how that lines up with what you just argued.

MR. SIEGMUND: So just to be clear, Your Honor, you're talking about Slide 32?

THE COURT: I am.

MR. SIEGMUND: Okay. And -- okay. We aren't trying to compare it and say that this practiced the patent, Judge. We're just --

THE COURT: Well, what is the purpose of having the -- what's in this middle of the -- what is

08:54 the purpose of having this here?

08:54 MR. SIEGMUND: The evolution and chronology of how hybrid technology has come about.

08:54 THE COURT: By showing out of the -- out of this -- I mean, this looks like it's out of the patent.

08:54 MR. SIEGMUND: Oh, that's Slide 30, Judge?

08:54 THE COURT: That's Slide 32.

08:54 MR. JONES: Your Honor, if I --

08:54 THE COURT: Maybe I'm just not --

08:54 MR. JONES: Maybe I wasn't clear.

08:54 THE COURT: Maybe I'm having a hard time.

08:54 MR. JONES: If you'll go to 34, what's out of the patent, middle line of 34, those -- and it's the comparison of those -- that document which is Plaintiff Exhibit 9 of the patent that we're objecting to.

08:54 THE COURT: I'm going to keep 34 out.

08:54 Now, I think 34 -- sorry. I wasn't following. I think 34 is the prior two slides and then it adds Cisco.

08:55 MR. JONES: Right. It adds the patent. Yes. That's correct, Your Honor.

08:55 THE COURT: I'm going to exclude that.

08:55 MR. SIEGMUND: And that's this slide right here, Your Honor?

08:55 THE COURT: Right.

MR. SIEGMUND: Got it. Understood.

08:55 THE COURT: Do you have an objection to the other two slides?

08:55 MR. JONES: No.

08:55 THE COURT: Okay. And that -- I didn't understand why you had --

08:55 MR. JONES: As long as they're not going to refer to it as "preferred embodiment," and counsel's told me he will not.

08:55 THE COURT: I was on the wrong slide.

08:55 Yes, ma'am.

08:55 MS. PIEPMEIER: May I make one point about that? Not to step on my colleague's toes.

08:55 We're fine with that with regard to those two slides. We will have an issue with regard to the underlying document, which I believe is PX-9, which I assume they intend to introduce with Mr. Katz.

08:55 So I just want to make it clear, we don't have a problem for demonstrative purposes, but I don't want that to be seen as waiving an objection to PX-9, which we will have.

08:55 THE COURT: What is the objection you're

08:55 going to have?

08:55 MS. PIEPMEIER: The objection that we're going to have -- pardon me, Your Honor.

08:56 The objection that we're going to have to PX-9, Your Honor, is that the witness has absolutely no idea what it is. Mr. Katz was not able to answer any questions about it in deposition. He was designated as the person to talk about this and had no idea what it was.

08:56 And for them to now admit that through him -- when I asked him, I believe he said he'd never seen it before. And so now two years later, he's the only person who's going to be able to put it in. They've put it on the exhibit list for him. And there's a whole bunch of other documents that are in a similar vein to PX-9.

08:56 But when you're designated on that topic, when you say you've never spoken to anyone from HearMe and then you've never seen a document and then you're the one who brings it in two years later at trial, that feels like a violation of Rule 26.

08:56 THE COURT: Well -- and again, I'm a little bit at a loss here because I don't really know what this document is yet and y'all lived with it.

08:56 But it appears to me to be, I mean, just

08:57 a document produced by HearMe from May of 2000. I get that this guy may or may not know.

Mr. Siegmund, can you sit down?

MR. SIEGMUND: Yes.

MS. PIEPMEIER: I have the document, Your Honor, if you'd like to see it, and I can give you just a very brief summary.

THE COURT: I don't want them talking about it if it's not going to come in.

MS. PIEPMEIER: Yeah. May I approach, Your Honor?

THE COURT: Of course.

MS. PIEPMEIER: This is PX-9. I believe this is the one where there's a picture on the back. Just the PX-9.

THE COURT: And let me ask this: I mean, it seems to me this would be a relatively easy document, just a document to get in. But is your problem with the document coming in at all or the fact that they don't have anyone who -- did the person that they're going to put up here, that there's no one they can put on to explain what's in the document any better than I could do, you know, if I read it and tried to explain it? Or is it both?

MS. PIEPMEIER: So, Your Honor, it's

08:58 both. And let me just set the stage very, very briefly.

08:58 HearMe was the prior company, the assets were acquired by Paltalk. The only Paltalk witness who's going to testify, Mr. Katz, testified he never spoke to anyone at HearMe and knew nothing about it. He was designated on these topics, which is why I put these documents in front of him during his deposition. And when I put PX-9 in front of him during his deposition, I asked him, you know:

08:58 Can you see this document?

08:58 Well, it looks like the HearMe website.

08:58 Is there a date?

08:58 Yeah. There's a date on the document.

08:58 Do you have any knowledge at all of what types of products or services are depicted in that diagram? That is the diagram they put on the slide.

08:58 Only to the extent I can read it. VoiceNETWORK host live voice services for your network application servers.

08:59 So he reads from the document.

08:59 And do you know if at the time that this document I guess was printed in 2000, if one of the products or services that HearMe was offering permitted a user or users to participate in an audioconference

that included both computer and telephone connections?

Answer: I don't know.

I can only see the picture has a plain old telephone plus computers that seem to indicate that, but I don't know.

So the picture on the HearMe document from May 15th appears to indicate that the HearMe VoiceNETWORK permitted users to have a combined audioconference using phone and computer; is that right?

That's what it looks like. But again, I'm no expert, and I'm not an engineer.

Your Honor, I put those in front of him because he was designated on whether any products practiced the patent. He didn't know. And for them to now come back and suggest to the jury that HearMe had products that looked like the patent, were part of the evolution towards the patent is -- Your Honor, that's just completely inappropriate.

And I don't know how to cross-examine him on that because if he says, oh, yeah. I didn't know at my deposition, but I spent the past two years studying it, that's completely inappropriate, Your Honor.

So I guess I don't have a problem with him showing a slide, but I do have a problem with PX-9

and its progeny. There's about five more of these same documents where I went through the exact same exercise with Mr. Katz.

Your Honor, I very, very carefully questioned Mr. Katz in deposition to find out what he would say here at trial today, and it really is manifestly improper for him to know nothing about it and then to sponsor those same exhibits at trial.

Thank you, Your Honor.

THE COURT: Mr. Siegmund?

MR. SIEGMUND: Yes, Your Honor.

Mr. Katz did talk to people at HearMe. Otherwise, he wouldn't have been able to buy the assets, for one.

And two, I think there's a little bit of confusion on the deposition exhibit and the trial exhibit because the question was not asked if he had seen this document.

But regardless, Your Honor, I think this is a perfect time where we try to lay the foundation of the document, offer it into evidence, and if you don't agree that we have done that or there's no exception to a rule of evidence, then it doesn't come in.

I mean, that's how we handle that, and I think it'd be helpful for the Court to see the context

09:01 in which we sponsor the document. And that's -- I think that's pretty much our position on that, Your Honor.

09:01 THE COURT: Okay.

09:01 MS. PIEPMEIER: I'm so sorry, Your Honor. Just one point.

09:01 If he lays a foundation based on work that he did after I took his deposition when he was the 30(b)(6) on that, that is a violation of Rule 26, Your Honor.

09:01 THE COURT: Well, so I'm old-fashioned. I get it. So the way I would do it -- and I anticipate it's probably the way you'll do it too -- they can lay the foundation for it, and if you'd like to take him on voir dire to ask him those type of questions to see whether or not the information -- when the information was obtained, you're welcome to do that.

09:02 MS. PIEPMEIER: Okay. Thank you, Your Honor.

09:02 THE COURT: Okay.

09:02 Anything else?

09:02 MR. JONES: It's very brief, Your Honor. I apologize for imposing on the Court so much. And this one is very similar, and I think you can make a decision for us quickly.

This slide deals with this. They start out with revenues for the product they don't accuse of infringing. They're not the accused infringing functionality.

As you see here, the 1.27 billion, they -- in their damages expert's calculation, he starts out at 1.3 billion, which I would think might be enough, but they want to put in 4.2 billion, which is for Webex itself, when the accused functionality is Webex Audio. Webex itself is 4.2 billion; the other is 1.3.

Their justification for doing so is they say it's some kind of check. Our position is that the evidence that our expert submitted as the total amount of revenue should be what's attributable to everybody is attributable to the accused functionality, Webex Audio. And we would just say, let's remove that top line.

Thank you, Your Honor.

MR. SIEGMUND: And I can be brief, Judge.

This is used in Mr. Bratic's apportionment. The 4.2 billion is the product revenue; that is the product we are accusing. This is an odd situation because the Webex Audio revenue is the line item for --

THE COURT: If this is what -- if we're going to hear this from an expert, I'll allow --

MR. SIEGMUND: You are.

THE COURT: -- these to come in.

Anything else?

MR. JONES: No. Thank you, Your Honor.

THE COURT: Are you all ready to do opening arguments?

MR. TRIBBLE: We're ready, Your Honor.

THE COURT: And do y'all intend to do your opening argument after theirs?

MR. TRIBBLE: Excuse me, Your Honor. I didn't hear.

THE COURT: I'm wondering, do y'all want to do it immediately after theirs, or are you going to reserve?

MR. JONES: Yes, Your Honor. We're going to do it immediately after.

THE COURT: Okay. Very good. We'll be back in about five minutes.

MR. JONES: Thank you, Your Honor.

THE BAILIFF: All rise.

(Recess taken.)

THE BAILIFF: All rise.

THE COURT: Please remain standing for

the jury.

(Jury entered the courtroom.)

THE COURT: Thank you. You may be seated.

Jen, would you call the case, please?

DEPUTY CLERK: A civil action in Case 6:21-CV-757, Paltalk versus Cisco. Case called for a jury trial proceeding.

THE COURT: Could I have announcements starting -- I'd like the plaintiff's lawyer to go -- the plaintiff to go first, introduce everyone at your table, and then I'll go to Mr. Jones and ask the defendants to do the same.

MR. TRIBBLE: Thank you, Your Honor.

THE COURT: Mr. Tribble?

MR. TRIBBLE: Max Tribble for the plaintiff Paltalk. With me today is my partner Kalpana Srinivasan and the CEO of Paltalk, Mr. Jason Katz.

THE COURT: Thank you.

MR. JONES: Your Honor, Mike Jones for Cisco. Our lead counsel Sarah Piepmeier, Nathan Sabri, and our corporate representative is Xiao Chang. And also I guess Mr. James over here, he's our technical wizard.

THE COURT: He's the most important on

09:11 your side in a lot of ways.

09:11 MR. JONES: He certainly is, Your Honor.

09:11 THE COURT: Thank you.

09:11 Ladies and gentlemen of the jury, let me introduce myself to you formally. My name is Alan Albright. I'm the United States District Judge for -- we're in the Western District of Texas, which, if you want an idea of how large it is, we are -- San Antonio is in it, El Paso's in it. L.A. is closer to El Paso than San Antonio, so you have an idea.

09:11 And some of you may have driven pretty far. There are 11 counties in our division, so it's quite something to expect people to be here and serve as jurors. And I will say in advance for the lawyers and their clients how grateful we are that you're taking the time.

09:11 We will go relatively long days here so that we can finish this week. But that doesn't mean you won't have some relief. I'll have a morning break. I'll have an afternoon break. I can't read your mind. If you all need a break sooner than I need a break, hand William, or whoever's sitting down there, a note or catch my -- just do something, I will certainly accommodate you if you need a break sooner than you

09:12 need one.

09:12 We're about to hear the opening arguments for both sides. And they're important. I like to think of them as the roadmap the lawyers anticipate that the trial will take. But they're only arguments; they're not evidence yet.

09:12 The evidence won't come until the -- I'm not sure -- either ladies or gentlemen, I'm not sure who's speaking on either side yet, but when they finish their opening arguments, Mr. Tribble will call his first witness and that's when the evidence will actually begin.

09:12 So Mr. Tribble?

09:12 MR. TRIBBLE: Thank you, Your Honor.

09:13 THE COURT: Would you like any warning before 30 minutes?

09:13 MR. TRIBBLE: I would. Maybe a ten-minute warning?

09:13 THE COURT: Surely.

09:13 MR. TRIBBLE: And, Your Honor, I should also introduce Ms. Srinivasan in front of them at trial, our partner Ryan Caughey and our future partner Amber Magee. And Matt Boles is, of course, our graphics viewer.

09:13 THE COURT: Okay.

09:13 OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

09:13 MR. TRIBBLE: Well, good morning, everybody. My name is Max Tribble. And I'm honored to represent the plaintiff in this case, Paltalk. This is the CEO of Paltalk, Mr. Jason Katz.

Mr. Katz, would you stand?

This case is about using someone else's property without paying for it. That's exactly what Cisco did here. Cisco generated billions of dollars of revenue using technology owned by Paltalk and contained in this patent.

Now, during the trial, I think everyone will refer to this patent by the last three digits of the patent number, which is the '858. You will see it referred to as the '858.

And I apologize. We're going to walk through a number of things. I have a very limited amount of time, and so I'm going to try to be as quick as possible. I have a lot of things to talk about. But you're going to hear a lot more about all of this from the witnesses during the trial in this case.

So first let me tell you about Paltalk. Paltalk is an innovative company that hosts videoconferencing. It was founded and home grown by Mr. Katz. And they have a number of related products.

The main one is Paltalk.com, but they have these other products here shown on the screen that are related to videoconferencing, communications over the Internet.

Now, Paltalk was a pioneer in this industry. Here is a Forbes article back in May of 2003 featuring Paltalk and Jason Katz back in the early days.

And since its founding, Paltalk has tried to develop and also to acquire intellectual property related to its videoconferencing field.

And so I want to be clear. Paltalk was not the original inventor on this patent. Paltalk bought the patent from a company named HearMe. HearMe was another pioneer in both videoconferencing, Internet communications, and a number of fields.

And in December of 2001, HearMe was selling and liquidating some of its intellectual property assets, not just patents, but also computer code and other things. And Mr. Katz had the foresight to recognize the enormous value of the application for the '858 patent. It hadn't issued yet, but it had been filed with the Patent and Trademark Office. And so he was able to acquire the patent when nobody else would pay the asking price.

And so here's the timeline. You see that

09:17 February of '98, Paltalk was founded.

09:17 And then certainly May of 2000, HearMe was working on developing what is called a "hybrid audio system." We'll -- I'll explain that in a second.

09:17 And in June of 2000, HearMe filed the application for the '858 patent.

09:17 And then Paltalk purchased that and other IP assets in December of 2001.

09:17 And eventually, the patent at issue issued in January of 2004, and it was after that, years after that, that Cisco bought the Webex company, and the Webex products are the products being accused of infringement in this case.

09:18 Cisco acquired Webex in May of 2007. And as you'll see in a minute, it wasn't until after that that the Webex subsidiary or Webex after had been bought by Cisco. It was only after that that it began developing a hybrid audio system.

09:18 This slide lists some of the Webex products that are accused of infringement here. They do various things. Most of them do videoconferencing, but they all have one thing in common. They all use a functionality called Webex Audio. You'll hear a lot of testimony about that.

09:18 And so Webex Audio, the ability for

people to participate in audio- or videoconference together, this technology, think about it. Even for videoconferences, the audio piece is absolutely essential because if you have a conference -- and their main product is this Cisco Webex. But if you can have a videoconference, I suppose, where you saw everybody, but if you didn't hear what they were saying, it wouldn't be a very productive videoconference and nobody would buy that product.

And in particular, Cisco Webex uses the patented technology. And I'll explain more and our experts will explain later, but by a hybrid system, what we're referring to is some of these users are connecting by computer. Okay?

So you can see the computers connecting. They would be connecting over the Internet. But you see that some people are connecting over the phone lines. In fact, an iPhone, it's a phone and a computer you can connect over the Internet, or if you were somewhere or maybe you were driving -- but if you were somewhere where you didn't have a good Internet connection, it's absolutely essential that for you to participate in the conference, you have to be able to dial in over the phone lines. That's what we mean by a "hybrid system," that you can actually have both, over

the phone lines, by dialing in, or over the Internet or some other network.

And let's talk a little bit about patents. The -- you know, our founding fathers thought that patent rights were so important to incentivize people to invest in research, new inventions, new technologies, that in order to incentivize that, the creation of the Patent and Trademark Office, the protection of the patent rights is actually a right spelled out in our -- the U.S. Constitution. In fact, Thomas Jefferson was the first commissioner of the United States Patent and Trademark Office.

And in some ways, patents are kind of like other property. Patents are intellectual property, but, you know, like real property, like land or a house. That belongs to whoever owns it. They can buy it and sell it. And if someone uses your property without your permission, then that person has to pay for using your property.

And so as I've said, the patent's intellectual property, but in the case of land, suppose somebody had drilled an oil or gas well on your property. Naturally they would owe you a royalty interest. They would have to pay you for their use of your property.

09:22 And by the way, they have to pay a reasonable royalty even if they didn't know it was your property, even if they didn't know of the patent. If they didn't know of the land or even thought it was theirs, they're still required to pay a reasonable royalty for their use of your property.

09:22 And in this case, the patent has a number of benefits that you'll hear testimony about that make it an important feature for doing the kind of conferencing that Webex does.

09:23 The main one or one of the main ones is that both computer users and phone users can participate together, and that's absolutely essential.

09:23 Think about it. If you were a chief technology officer of L3Harris, when you were picking which system to use, you would absolutely require that the system allow access both over phone lines and over the Internet or a network. I mean, Webex's competitors offer that. So why would you settle for anything else?

09:24 But moreover, it just makes sense. Not everybody all the time is going to have access to the Internet, or maybe their bandwidth is slow. And in those cases, they can call in over the phone lines.

09:24 You'll hear testimony about the computational efficiency of the inventions in this

patent give the system -- allowing the servers to offload some of the workload onto the users' computers. And it results in an improvement of the sound quality of the conference.

Okay. And so as Mr. Siegmund told you in jury selection, we're going to talk about three things, the first of which is infringement. And on infringement, you're going to hear from Dr. Scott Schaefer.

Dr. Schaefer, will you stand up?

Dr. Schaefer, I've got some resume points on the slide. I don't have time to go over all of it, but let me just say, he's a professor of computer science at A&M. And in fact, he is head of the Texas A&M computer science department.

And he has numerous degrees and awards. You know, he was a member of the DARPA computer science study panel. DARPA is a defense agency, stands for Defense Advanced Research Product -- Research Product Agency.

And you'll hear about those and the other important work he's done with other institutions. And he will explain to you how that Webex Audio and the Webex products accused in this case all infringe Claims 1 through 5. And he'll walk you through that.

09:25 So here is the claim language. This is important. This is Claim 1. And we've broken it out into separate elements. And you'll see Dr. Schaefer will explain to you how the accused products of Cisco Webex satisfy each and every one of these limitations that are in the claim language.

But this is very important. Look at the wording. Look at the words in this claim. It has a lot of jargon in it that to you and me, this would be impossible to understand and -- such as active speaker, active speaker list, multiplexed stream. These terms like that.

This is something that have meaning to an expert in the field who has studied the entire patent, including what's called "the specification." It's the six-page narrative description and the figures that are in the patent. Even an expert has to study that in order to understand exactly what these terms mean.

And I believe that the Court will instruct you that this type of expert is called a "person of ordinary skill in the art." And you see on the bottom of the pages of the patent. It's not enough to be an expert in the field. You also have to read the entire patent and study it in order to understand the context to know exactly what each of the terms in

09:27 the claim language mean.

09:27 And so you'll hear testimony. There's a disagreement between Paltalk and Cisco. And Dr. Schaefer will testify that when the word "each" occurs in the claim language, it doesn't mean what you might think it means if someone walked up to you.

So like you've heard, you might hear an analogy from the other side that says, well, I promise to give a cookie to each of my children, and I gave the first two a cookie and then I didn't give any cookie to the third one. And you'll say, that's not "each."

But in fact, the Court is going to instruct you that the word "each" has -- to be given the plain and ordinary meaning that it would mean to an expert in this field, a person of ordinary skill in the art, like Dr. Schaefer, who has to have the plain and ordinary meaning that it would have to an expert in this field after reading the patent to understand it.

And in fact, take a look from the patent. Here's some language. This is at Column 5 of the patent. And it's describing one of the embodiments of the invention. And it says specifically that active speaker audio data for each and every active speaker is multiplexed. And you'll hear more about that.

But look at this. Because at back, it

09:29 says: However, as will be apparent to those skilled in the relevant arts -- that means an expert in this field like Dr. Schaefer -- if Party J is an active speaker, then that step will not include Party J's own audio data in the multiplexed packets.

09:30 And again, you'll hear testimony about how this plays into what the word "each" means to a person of ordinary skill in this art.

09:30 And it spells it out further. It says: This is in essence an echo suppression function so that Party J will not hear themselves speak.

09:30 So when people are talking on the conference, the audio streams of the active speakers, the people speaking, or at least some of them, are combined together and sent out.

09:30 And what this says, even though it's "each," the speaker doesn't need to receive back his own audio because he's the one who said it. It's called "echo suppression." The invention wouldn't really work very well if he kept getting this echo. And so you'll hear more about that.

09:31 And so when you hear argument or testimony by Cisco in this case that, oh, "each" means what it always does. You don't need to consider what the patent teaches or consider how it's using it.

That's a red flag. And you need to ask yourself: Is that really what's going on here?

In addition, Cisco Webex infringes the other four claims, Claims 2 through 5. And each of these claims begins with "the method of Claim 1 further comprising the step of" and then it has an additional step.

And that means that each of these claims, that invention, has all of the steps of Claim 1 plus something in addition that's spelled out in these.

And look at it. This is an engineering design document of Cisco Webex. And in here, the engineer literally recognizes that it is impossible to broadcast all speakers' voice packages to all listeners.

Not only does Cisco do it in the same way that is spelled out in the patent, but they recognize that it would be impossible to have a working invention where everyone was getting their own voice sent back to them.

This is Figure 1 in the patent. And we'll walk through this. The patent has figures that show diagrams of a preferred embodiment of the invention.

You'll see here that in Figure 1, it

09:33 clearly shows a hybrid architecture for the conferencing system, where you had both phones and computers connecting over a network.

PSTN right here, that is the phone lines, saying that you can connect over the phone lines or over a network. And it's hybrid because it can do both.

And then this is the same figure. We've just kind of spread it out so that it's horizontal.

And then on the other hand, this is a Cisco system. And the point here is that Cisco Webex is clearly a hybrid architecture. It allows connection both by computers over the Internet or a network and by phones or cell phones connecting over phone lines. Keep in mind, it's not enough to compare the pictures to each other. It's the claim language that has to be met, and Dr. Schaefer will walk you through that.

This -- remember we bought the patent and other intellectual property from HearMe, and this is a document that shows a HearMe hybrid architecture that the company was working on back in 2000.

Okay. So you heard Cisco's lawyer in jury selection talk about, you know, something along the lines of it's not just the patent, you know, who invented it first, who used it first and so forth.

Well, I just want to be very clear on the date that Webex started even thinking or planning to adopt a hybrid architecture like that in the patent.

THE COURT: Counsel, you have ten minutes.

MR. TRIBBLE: Ten minutes? Thank you, Your Honor.

And so this is a Cisco internal document dated July 7, 2007, and it's a Revision 1.0, so it's the very first version, and the title is Hybrid Audio Architecture Design. Which is amazingly similar to the title of our patent, the '858 patent, which refers to a hybrid server architecture, which the application was filed years earlier in June of 2000. Patent issued in 2004, years before Webex even considered adding a hybrid architecture.

And the very first sentence says: The hybrid audio service is a new service that this engineering release will introduce. The service will offer user the capability to join audioconference via voice over Internet protocol -- that's over the Internet -- or PSTN. That's the phone lines. And that's something that Webex didn't even begin planning to do until years after the patent had issued.

And it recognizes some of the benefits of

09:36 this hybrid architecture, improving usability, and it offers Webex a competitive advantage over their competitors.

And so again, we'll walk you through this timeline about what happened when in detail.

And keep this in mind. As this document shows, back in April of 2001, Cisco was actually a customer or a partner of HearMe. And in weighing all this to determine whether we've met our burden of proof on infringement -- our burden is called a preponderance of the evidence.

And so there's going to be evidence on both sides, and if the scales of justice -- if the evidence that Paltalk shows ever so slightly, ever so slightly outweighs any opposing evidence, then we've met our burden of proof and there is infringement.

Now, let's contrast that with Cisco's burden of proof to try and prove that the patent is invalid. Their burden is much higher. It's something called clear and convincing evidence.

Now, I'm not going to go over it now. The Court will instruct you on what the burdens are. But the point is, Cisco bears a much higher burden to prove invalidity than we do to prove infringement. And the reason for that is because patents issued by the

United States Patent Office are presumed to be valid. You saw the video before jury selection about the process an inventor has to go through to file their patent and get it approved by the Patent Office.

As to the validity of the patents, they have experts. But you'll hear from Dr. Madisetti. Again, I'm not going to go over his resume here. Just let's say he is a full professor at Georgia Tech, which is one of the top engineering schools in the world. And he will explain -- these are a bunch of books he's written and textbooks, but he will explain that the prior art that Cisco relies upon that said, oh, the HearMe patent, they -- those inventors weren't first is this reference called Botzko.

And he will walk you through this and explain why the claims covered in the patent don't meet -- excuse me -- that the disclosures in the Botzko reference do not satisfy all elements of Claim 1 or any of the other claims, and therefore, Cisco has failed to prove invalidity.

Finally, you'll hear about damages, Mr. Walter Bratic.

Mr. Bratic, can you stand?

Mr. Bratic, again, a very impressive resume. You know, he's been a CPA licensed in Texas

for decades and went to The Wharton School of Business, and has specialized in analyzing patent licenses, in valuing patents in his career.

And keep in mind, the patent statute specifically says that if there's infringement, the Court shall award the claim of damages that are in no event less than a reasonable royalty for the use made by the invention by the infringer. It's not whether Paltalk used the invention. They didn't. What they did was they recognized the great value of this patent. It was in a field that they were already in, and they bought the patent. The question is how much did Cisco use the invention?

And this is kind of a summary of the analysis for damages, the total Webex revenues during the damages period. The damages period has stopped because the patent expired, and so the royalties stopped back in -- I think it was 2022.

But the total Webex revenues were $4.2 billion. The amount that Cisco itself attributed to Webex Audio was $1.27 billion. That was adjusted down by Mr. Bratic to obtain the Webex Audio gross profits. And it was apportioned to be just a fraction of that because it was apportioned according to the technical benefits of the Paltalk patent versus other

features that are in Webex.

And finally, the ultimate calculation -- again, Mr. Bratic will walk you through this -- the total damages owed by Cisco for its use, and for the billions of dollars that it generated using the patented invention is $102 million. And we're going to talk a lot more about that later.

Again, as the Court instructed you, nothing I say is evidence. Wait and you'll see the documents. You'll hear the witnesses. Nothing that Cisco's lawyer says is evidence either. And I look forward to presenting the witnesses and the documents and the actual evidence at trial.

Thank you.

THE COURT: Thank you, sir.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

MS. PIEPMEIER: Good morning, ladies and gentlemen of the jury. I haven't had a chance to introduce myself to you yet. My name is Sarah Piepmeier. And I'm honored to be here on behalf of Cisco. We appreciate each of you and respect your time, so let me just jump right in.

I'm going to cover five main topics in my 30 minutes with you this morning. And they go in order. Why are we here? Cisco and its witnesses, the

09:43 '858 patent and what came before the '858 patent, why Webex is different, and Paltalk's $102 million damages demand which you just heard about from Mr. Tribble.

So let's start with why are we here? Let's start with the basics, and we'll just kind of orient ourselves. Now, I agree with Mr. Tribble, what I am saying is not evidence, and I hope to guide you through what the evidence will be this week. But I want to start by setting the stage.

So Paltalk asserts the '858 patent against Cisco; you've heard about that patent a little bit. And Mr. Tribble explained that this patent originated with a now-defunct company called HearMe. And the '858 patent covers a specific method of hosting an audioconference, that -- this is one thing he didn't say, no one has used and no one would use because the technology is almost 25 years old.

Now, you heard a little bit about Paltalk's history and various Paltalk products. You're going to hear more about them this morning, I suspect, from Mr. Katz.

And I want to note one thing. Despite offering audio-videoconferencing products, even Paltalk doesn't use the '858 patent. Why? Because it's obsolete technology. In fact, from the time that it

issued until it expired, no one has ever put the '858 patent into a product and it has never been licensed other than part of a large portfolio. It simply hasn't been used.

Now, here's the other fundamental issue, and my -- both my analogy and my fundamental issue have been jumped a little bit by Mr. Tribble, but that's fine. I'm still going to tell the story, the analogy story because I think, respectfully, I tell it just a little bit better than Mr. Tribble does. So I'm going to go through that.

Now, it is our position -- and again, the -- both sides have different arguments on this. It is our position that the only way that Paltalk can have an infringement read is by essentially having a tortured read of the English language.

Now, as a former English major, sort of a closet English major because I'm a high-tech lawyer, that offends me deeply. But in the context of this patent, "each" takes its plain and ordinary meaning, which is "all" or "every."

So let me tell you a little bit about what I mean. Let me tell you how this breaks down. And this is the analogy that has been pre-staged a little bit.

09:46 So I live in San Francisco. I have a niece and a nephew who live in Connecticut, Maggie and John; they're 9 and 11. And whenever I go to visit them, which I like to do a lot because, of course, we all like to go see our nieces and nephews, especially at their age -- they're 9 and 11 right now. It's a pretty cool age. Before I go visit them, I text them and I say, Auntie Sarah's going to bring each of you a present. Now, it's not a cookie, like that would not be enough to fly all the way from California, right? It's like a real present.

09:46 So I text them and I say, Auntie Sarah's going to bring you a little present. And don't you know, when I show up at that airport in Hartford, Connecticut, I better have a present for Maggie, and I better have a present for John. Because I made that mistake once before, and let me tell you, I have not heard the end of it. Everyone knows what the word "each" means.

09:46 And what I find so telling about plaintiff's presentation just now is that they admitted that they have to change the meaning of the word "each." They admitted that. You heard that from Mr. Tribble.

09:47 He told you, he put a red flag up and

said, essentially, ignore what counsel is going to tell you. In a sense he's saying ignore common sense. Ignore the English language. He is admitting that they are changing the meaning of "each." And what they are changing it to is "one or more." And why are they doing that? They are doing that because that is the only way that they can find a read on Webex.

So with that in mind, let's turn briefly to Cisco. And I should say, I don't want to get into specifics too much here, but the way they do this is essentially rewriting the patent. They're literally scratching out the word "each" and writing in "one or more." I don't want to get too far into the specifics of the patent at this point.

So Cisco -- let's talk about them for the moment. Let's talk about my client that I'm honored to be here to represent. They are a true American success story. Cisco was founded in 1984 by Sandy Lerner and Len Bosack; you see them there on the slide. They met in the 1970s at Stanford as students. They fell in love, they got married, that whole story, and then they worked in the early '80s as Stanford University scientists. And they were in different labs. And picture this, this is the early '80s and they're in different labs. And they're trying to find a way to

talk between the labs.

And so what do they do as innovators? They create the first local area network; it's called a LAN. They created a local area network so that the different labs at Stanford could talk to each other.

And LANs are everywhere now, right? There's a LAN in this courtroom. There's probably a LAN in your workplace. Some of us have LANs in our homes.

Cisco's foundational networking innovations are kind of like the hidden pipes underlying the Internet. You don't always see them, but you certainly know if they failed.

Now, today, after 40 years of steady growth, Cisco employs tens of thousands of people throughout the United States, and it makes products and services used all over the world, some of which you see here on Slide 11.

I asked -- you can say Cisco's history of innovation is perhaps best showed most clearly by the fact that it has 14,000 issued U.S. patents of its own. As you'll hear, more than 700 of those patents relate to Webex. That's the technology that we're talking about here.

And of those 740 patents that Cisco has

on Webex, it has 412 patents of its own on audio. Now, audio is what Mr. Tribble just talked about. That is what they are accusing here. Cisco has its own 412 patents on audio features. There are so many innovations within Cisco's audio that they have patented that. And that tells you what drives demand to our Cisco products.

Now, you're going to hear from Cisco witnesses. It's not just about how great their products are. You know, everyone's going to say their products are good.

You're going to hear from Cisco witnesses who share their experience working for a company named the best place to work year after year by Fortune Magazine. In fact, in 2022, Cisco was voted the number one best place to work in the United States by Fortune.

And that success, again, isn't because of great products, the power of the Internet. You will hear from Cisco witnesses about how Cisco invests millions every year in giving back to their local communities. And this People magazine article that I have here on Slide 14 shows Cisco as number one in an article on 100 employers who put their communities first.

Now, I talked a bit about Cisco. Let's

09:50 turn back to Webex. The product that's -- that Paltalk accuses of infringement.

09:50 Webex was founded as a company in 1995, long before HearMe applied for the '858 patent. Cisco acquired Webex in 2007, and you just saw a document a moment ago that came right after that acquisition.

09:51 Now, we know, of course, Webex was innovating and had its own products and technology before that acquisition. 2007 is when Cisco acquired it. But Cisco brought Webex into the Cisco fold, kept those products, enhanced them, and it has become a core part of Cisco's products offerings.

09:51 Now, Webex is award-winning. Whether you like using it, if you've used it or not, Webex certainly has won a lot of awards. I put those up on Slide -- or some of them, I should say. They didn't all fit. But I should put them up on Slide 16 so that you can see what drives demand for Webex.

09:51 Now, Paltalk accuses a specific method of hosting an audioconference, and you heard a little bit about it just a moment ago. It's with participants who dial in using a plain old telephone and those who use a computer to join.

09:51 We sometimes call the plain old telephone method PSTN. We sometimes call the computer method --

excuse me -- VoIP.

Now, here's the important part. The evidence will show that that ability to join an audioconference using a plain old telephone in a computer has been around for decades. If that's what the invention is, that's not what here we invented. And it's important to keep that in mind as we go through this.

What they actually accuse is a very specific way of doing that, and we'll talk about that a little bit more later.

Now, I've done a lot of talking here, obviously. But I'm not the important person here. And what I say, again, is not evidence.

Who's important? The Cisco witnesses are important. And I want to introduce them to you.

This week you'll hear from Mr. Amit Barave. Mr. Barave has a master's from the University of California and is a vice president of product management at Cisco.

He's been the product manager of Webex for the past ten of his 23 years at Cisco. And he's actually currently on a plane from California. And he'll testify about the Webex products and the various features that drive demand for Webex.

09:53 Next, you'll hear from Mr. Nathan Buckles. Now, he lives just a couple of hours north of Waco in McKinney. He has a computer science degree from the University of Texas at Dallas, and he is a distinguished engineer who has worked at Cisco for a quarter of a century. And he might not have known that I was going to describe it that way, because it does sound like a long time.

09:53 But for the last decade, he has worked at Webex, and he is the lead engineer responsible for how Webex transmits and receives audio and video.

09:53 Next, you'll hear from Mr. Aaron Belcher. He is a principal engineer and the head architect for Webex. He has been with Cisco for over two decades and has been working on Webex specifically for the last ten years. He came in from Washington State and is going to explain how Webex processes audio.

09:53 Now, let me take a step back before I introduce the three industry experts.

09:53 It occurred to me, as I was preparing these little blurbs, that each of these fact witnesses from Cisco has been at Cisco over two decades and has ten years of experience on Webex or more.

09:54 Now, I think that says something about Cisco, that you've got these senior engineers and

executives who have spent 20 years at Cisco, who have stayed there for 20 years, which is somewhat unusual in this day and age, who are coming to Waco to explain to you how Webex works.

And who better to do that than somebody who lived and breathed Webex either on the technical side or the product management side for ten years? They're the right people to tell you how Webex works.

Now, you'll also hear from these -- our industry experts.

Mr. Dean Willis earned his undergrad and master's in computer science from A&M, and he is a renowned leader in the area of Voice over IP, which is VoIP, conferencing and multimedia systems.

Since the early '90s, he's worked with numerous companies in that field, and he's going to explain why Webex does not infringe.

You'll also hear from Mr. James Bress, an electrical engineer with over 40 years of experience in the relevant technology. He's designed relevant systems and tested them throughout the years.

He has traveled from Florida to explain the technology that came before the '858 patent and why that that patent was known to those in the art before it was filed.

Last, but not least, you'll hear from Ms. Lauren Kindler. She has a bachelor's in economics from Tulane and a master's from SMU. And she's an expert in the area of economics and patent valuation for the past two decades.

She's come down from Dallas, and she's going to explain how the market would value the '858 patent. And in addition, the errors, the fundamental errors in Mr. Bratic's calculation.

So let's turn to the moment for -- to Paltalk and the '858 patent and what came before. We're going to shift gears for a moment.

So as you know, the plaintiff here is Paltalk Holdings, but as Mr. Tribble explained, the '858 patent came from a company called HearMe.

Now, HearMe was, like many Silicon Valley startups, a company that rose real fast and fell real hard in the late '90s and early 2000s.

Paltalk bought the assets of HearMe, which included everything from servers to patents to applications to trademarks with domain name for a very small sum that we'll discuss later because it's confidential.

Paltalk has been around for 20 years, and it has acquired a series of companies during that time.

09:56 I'm sure you'll hear a lot about that.

09:56 But here's one thing you won't hear from Mr. Katz. You won't hear how Paltalk has used the patent in any way. In fact, from the time it was acquired until Paltalk used it to sue in 2021, the patent essentially sat on a shelf.

09:56 Now, I want to note -- in fact, I should go back one. You see five inventors here on the slide. These are inventors with HearMe. And none of those inventors joined Paltalk when they came over.

09:57 The inventors didn't come over. We'll hear about how they shelved the products. They had no role with Paltalk at all going forward.

09:57 In fact, no one used the '858 patent at all, at all until Paltalk pulled it down, dusted it off in 2021, and asserted it against Cisco.

09:57 And speaking of Paltalk's lawsuit, y'all remember the analogy that Mr. Siegmund used during jury selection about someone who's using your land? And you heard it a little bit again today.

09:57 But during jury selection, Mr. Siegmund said if someone is using your land without permission, you can go try to talk to them. You can reason with them. And if that doesn't work, then maybe you have to sue.

He contrasted that to a patent case, and what he said, well, in a patent case, there's no patent to lease. You have to sue.

But here's the fact that he glossed over in that explanation. He glossed over one key fact. Paltalk never reached out to Cisco before suing. Paltalk never sent Cisco a letter. Paltalk never tried to negotiate. Paltalk never picked up the phone.

The first thing that Paltalk did, their first step, as soon as they dusted off the '858 patent was run to court, pay the couple-hundred-dollar filing fee and filed this lawsuit. It was right as the patent was about to expire.

Paltalk has never once offered Cisco a license, but today Paltalk is asking you to award it $100 million.

So we talked a bit about how the '858 patent came to be, as much as we know anyway, because we're not going to hear from the HearMe inventors. They're not coming here this week.

But let's talk about what was happening in the industry before the '858 patent and why that patent is invalid.

Now, I recall you saw the patent video earlier. You've heard about the role of the USPTO and

09:59 the examining patent applications.

09:59 So you may wonder, as I would if I were in your shoes, how is it that the USPTO can issue a patent -- it's that nice stamp, that gold stamp that people hang on the wall -- and then a jury comes in and invalidates that patent. How could that happen?

09:59 Well, that's why we have jury trials. That is the job of the jury. A defendant who's accused of infringement has the right by law to come to a jury and say, this patent shouldn't have issued in the first place.

09:59 And why might that happen? Well, that might happen because people make mistakes. You've got a human being, an examiner. It's not AI. It's not a bot. You've got a human being sitting there examining the patent, and they make mistakes. They overlook things. No process is perfect. And so that is why we have a system where the jury takes another look.

09:59 Now, you also might remember from the patent video that you can't just -- the patent can't just be something that's obvious to people of skill in the art. Right? It can't be something that was already known.

10:00 And I mentioned Mr. Bress earlier. He's been in this industry for decades. And he will tell

10:00 you that what Paltalk claims was new was already new in the industry before HearMe filed this application.

10:00 And he's going to talk to you about Mr. Botzko and Mr. Botzko's team and this patent right here, the Botzko patent.

10:00 Now, there's no dispute that the Botzko came almost three years before the '858 patent. That's just not something that can -- it came way before.

10:00 And so the question is: What did the Botzko patent disclose? And as you'll hear from Mr. Bress, what the Botzko patent did is it talked about having a call with devices like telephones and computers on a local area network at the same time.

10:00 And it also talked -- and I don't want to get too far in the weeds here -- about how you process the data to allow those two things to happen simultaneously. That is what you're going to hear from Mr. Bress, and you're going to hear how Botzko came first.

10:01 Now, let's turn to the '858 patent, stepping away from Botzko a minute. Let's go to the '858 patent.

10:01 Paltalk's counsel described that to you a moment ago, and you heard a lot about using computers and telephones to participate in an audioconference. I

10:01 think he used the term "VoIP" and "PSTN."

10:01 You may have the impression that the invention at issue is simply allowing an audioconference with computers and telephones. But that -- that idea, allowing a telephone conference with telephones and computers, was known long before the '858 patent. The '858 patent is something much more specific than that. They did not get a patent on just allowing a phone and a computer to have an audioconference.

10:01 And so before I walk through the patent, I want to show you a little animation that I prepared that I think explains it.

10:02 Now, I want to be clear here. Again, as we've said, these are my words. You should look at the patent claim. I prepared this animation because I think it helps explain what's going on because the claim, as Mr. Tribble said, is a mouthful. But obviously the words of the patent are what govern here.

10:02 So what do I have here on Slide 27? I have an animation that shows two users at the top in green on the left and the right who are what we call VoIP users. They've got some kind of a computing device, whether it's a computer, computer phone, et cetera. And then on the bottom, I have two PSTN

users. They're using the old-school telephones. In fact, one of those is like a rotary phone that has that super satisfying, you know, noise when you slam it down back when you could hang up on people.

Now, let's walk through what the patent is talking about. This is an overview of Claim 1. For the users that are participating by VoIP, what's happening -- and this is a summary. This is not the language of the claim -- is that the patent's saying you multiplex all active speakers' data into a multiplexed stream. I understand that's a mouthful. What does that mean?

When you think about multiplexing, one way to think about it -- and again, you could view the words of the patent, but one way to think about that is coupling together multiple audio streams into a flow of data. You can think of it that way. But again, the claim words are what matter.

So the claim is telling us, multiplex all active speakers into a multiplexed stream and then send that to all VoIP users. That's Claim 1.

It is the same process for users who are participating by telephone, except it's called a combined packet. It's, you know, a different technical formulation, but that's the process. Is you gather

together all the audio from the active speakers, you put it in a stream, you send it to all of the VoIP users. Same thing on the bottom.

So why is this old patent that nobody's ever used relevant to Webex? Well, the short answer is it's not, but let me share with you why. And Cisco witnesses will explain and the evidence will demonstrate, Webex just doesn't work in the specific way claimed by the patent.

Now, that brings me to the burden of proof. You saw a scale with a feather on it. I would submit that you should listen to the Judge's instruction on what the preponderance of the evidence means and not be overly influenced by an animation with a feather on it. But Paltalk's counsel did tell you about the preponderance of the evidence.

Now, this is important. What that does not mean is that you can simply show more than half the claim elements are met. You saw Claim Elements No. 1 through 8 in Mr. Tribble's presentation. Preponderance of the evidence doesn't mean there's five of them.

What preponderance of the evidence means is that you have to believe it is more likely or not that Webex has every single one of those eight claim elements in Claim 1. That is what this means. The law

10:04 requires Paltalk to prove that for every single element.

10:05 So I'm going to -- that's an abstract concept. I'm a very visual person, as you may have been able to tell. So I'm going to show you what I mean with a sample claim.

So we've got a sample claim up here on Claim -- on Slide 29. Somebody's got a patent on a soccer ball. There are four elements on that. There's eight elements in Claim 1 that we're talking about here, but in this sample there's four. It is made of leather, it is stitched together, it is filled with compressed air, and it is spherical. That is your patent on a soccer ball.

THE COURT: Counsel, you've got ten minutes left.

MS. PIEPMEIER: Thank you, Your Honor.

Now, they're trying to sue a football company, makes a football and the football might have three of those elements, right? It's made of leather, it's stitched together, and it's filled with compressed air. But it's oval. In that situation, that is not the preponderance of the evidence. That is no infringement.

And I want to be clear here. What I am

10:05 saying -- you should listen to Judge Albright's instructions, but what I am saying here is not attorney argument. That is what the law requires. You have to prove by a preponderance of the evidence for each of the elements of the claim.

10:06 Now, here is Claim 1. I've color-coded it a little bit. I want to be clear: My summary is not the claim language. It is for convenience.

10:06 But what Claim 1 is talking about here, just at the highest level, is that the system is receiving audio from each client. The system is determining which clients are kind of the old-school telephone ones and which ones are the computer ones. The system is determining which of them are active speakers. And then the system is creating -- we saw that multiplexed stream earlier -- and sending it to all users' devices that connects audio, and then it's doing the same thing for the devices that cannot use audio, plain old telephones, but it's putting them into a packet.

10:06 That is essentially what's happening in Claim 1. So again, look at the claim language. My summary is for convenience and just to make it easier.

10:07 But here's the problem for Paltalk. Webex never sends a multiplexed stream to all clients

10:07 who can mix, as required by Limitation 6. They also don't do the combined packet for Limitation 8. And for good reason. That may have worked 25 years ago, but Webex has a much more advanced way of doing it. Now, the Cisco witnesses I just spent all this time bragging on, they're going to explain it better because this is what they do. Here's a quick summary.

Instead of creating a multiplexed stream and sending it to everyone, Webex creates a unique stream for each participant, and that allows Webex to optimize the audio for everyone. You couldn't do that 20 years ago. 20 years ago we had dial-up modems. This is a whole different situation. Webex shouldn't and doesn't want to operate the way things could have been 20 years ago.

Now, I want to mention one other thing, which is, that I just talked about Claim 1. I'm obviously running out of time, as Judge Albright just mentioned, so I'm not going to go through the dependent claim. I'm just going to mention one thing about them.

10:08 The way -- you will be instructed by Judge Albright and you should listen to him, but the way this works is if a defendant, if Cisco does not infringe Claim 1, they cannot as a matter of law infringe the dependent claims.

10:08 So I've just demonstrated quickly why I believe and why Cisco believes it doesn't infringe Claim 1. If it doesn't infringe Claim 1, as a matter of law, it can't infringe Claims 2 through 5.

In the interest of time, because I'm running out of time, I will talk about that here, and I'm sure you guys are not going to be upset to hear a little bit less from me. But I wanted to just make that point that the same argument will hold for the dependent claims.

Now, I want to address one other thing, and this goes back to the red flag. Paltalk's counsel told you that you should ignore our evidence because we're essentially contorting the patent in some way.

I want to be clear. HearMe is the one who wrote this patent. HearMe decided what words to put in the patent. HearMe chose the word "each." It's not Cisco's burden to transform that claim into something that works. Paltalk is asserting the patent; it's their burden. But what Paltalk doesn't get to do is change 25 years later the words of that patent. They don't get to redefine the word "each."

Now, you recall that Paltalk's counsel put up a slide. It had an oil rig and "Webex" on it. You heard this, in fact, at the jury selection as well.

And they suggest that Cisco is in a sense building its house, which is Webex, on the Paltalk lot, which is the '858 patent. But what's actually going on here is Paltalk is rewriting the patent. It's changing the meaning of a common word in the English language. And it's simply building its fence around Webex.

Now, I don't get to move my fence around someone else's house, accuse them of building on my lot, and then kick them off their own land. HearMe made a contract. It negotiated the claims with the U.S. government through the patent prosecution process, and more than 20 years later, Paltalk doesn't get a redo on those terms because they don't capture Webex.

Now, let's talk about the 102 million that brings me to today. The evidence will show that Cisco does not infringe Paltalk's patents. So it's our hope that you don't reach the issue of damages. But this is a large damages ask, and I think it's important to address it at least briefly.

Ms. Kindler's going to explain to you why this large demand simply doesn't reflect the market value of this antiquated technology, this old-school technology from the days of dial-up modems. As I mentioned, Paltalk bought the assets of an entire company, HearMe, for a very small amount, and we'll

10:10 discuss that later. We're all very familiar with
10:10 property that depreciates in value and certainly with
10:11 inflation these days.

10:11 But the evidence will show that 102
10:11 million is simply not a realistic market value for a
10:11 license to a patent that Paltalk bought as just one of
10:11 a part of a portfolio along with source codes,
10:11 trademark, and computer equipment. The expired patent
10:11 simply didn't contribute anything valuable. It's not a
10:11 coincidence that it sat on the shelf for more than
10:11 15 years.

10:11 And so Ms. Kindler will walk you through
10:11 her analysis which demonstrates what the market would
10:11 have valued the specific invention of the '858 patent
10:11 to arrive at a fair license. She will also explain in
10:11 detail why Mr. Bratic's analysis grossly inflates any
10:11 negligible value of this whole technology.

10:11 So that brings me to my summation. And I
10:11 want to thank you for your attention during the last
10:11 30 minutes. I want to thank you for serving and doing
10:11 your civic duty this week. I'm going to close here
10:11 with three thoughts that I hope to revisit with you
10:11 when the evidence closes.

10:11 First, the evidence will show that Cisco
10:12 does not infringe the asserted patent because Webex is

10:12 missing two key elements, at least two key elements. But I didn't have a chance to cover all of them this morning.

10:12 Second, Cisco will show by clear and convincing evidence that the asserted claims are invalid because they were obvious in light of the Botzko reference. And for these reasons, Paltalk should not be awarded any damages.

10:12 Thank you very much for listening.

10:12 THE COURT: Thank you, ma'am.

10:12 First witness?

10:12 MR. TRIBBLE: Your Honor, Paltalk calls Mr. Jason Katz.

10:12 Oh, Your Honor, at this time we would like to invoke the rule.

10:12 THE COURT: It'll be done.

10:12 (The witness was sworn.)

10:13 DIRECT EXAMINATION

10:13 BY MS. MAGEE:

10:13 Q. Good morning, sir.

10:13 Please introduce yourself to the jury.

10:13 A. Good morning, everybody. My name's Jason Katz. I'm the chairman and CEO of Paltalk.

10:13 Q. Mr. Katz, have you been with us since opening?

10:13 A. I have.

10:13 Q. Okay. And where do you currently live?
10:13 A. I live in Long Island, New York.
10:13 Q. Have you been to Texas before?
10:13 A. Many times. Yes.
10:13 Q. Okay. Tell the jury a little bit about your background.
10:14 A. My background is I was born and raised in New York City, not a great place, for me, anyway. I like the suburbs better.
10:14 My education, I went to high school, public high school in Long Island.
10:14 I then went to the University of Pennsylvania in Philadelphia.
10:14 After that I went to law school, New York University Law School.
10:14 Got married 1992. Been married 32 years. I have three kids and a new grandson.
10:14 And then I started Paltalk in 1998, and I've been working on that earnestly ever since.
10:14 Q. Okay. Mr. Katz, you mentioned that you went to law school.
10:14 Are you currently a practicing attorney?
10:14 A. I am not.
10:14 Q. Did you take the bar exam after law school?
10:14 A. I took the bar exam. I passed the bar exam.

I was admitted to practice in New York but then retired from the law.

Q. Okay. And what did you do after graduating from law school?

A. After law school, I had -- I had an economics degree in college. So I was sort of business-facing. I went to law school. For me, I thought it was a great education. My father had done that also. And he was a nonpracticing attorney. So I thought it'd be a great background.

I had a chance to go into business with sort of someone I knew in New York. And we formed a small company. It's here on the screen called M.J. Capital. It was a commodity and stock brokerage company. I did that for five years.

Q. Okay. And why did you leave M.J. Capital, sir?

A. In 1993, I mentioned I was married in '92, and we had a child in 1993. She was born quite ill. Ill and spending time in ICU for a period of time, which had a huge impact on me personally and sort of didn't feel like I could go back to doing what I was doing before.

I actually considered going to medical school, if you can believe that, after all of that, watching

10:16 what the doctors did with those, you know, newborns.

10:16 So ultimately, M.J., J, that's me, and M went his way, the one other person we employed. And then I moved on to something else.

10:16 Q. Okay. What did you do next?

10:16 A. Well, next, I actually got a job taking care of a computer network. And in 1993, I mentioned my daughter was born in 1993, in April. So after she came home finally and was settled, I went to work for the small company. And I took -- I actually -- you know, I liked personal computers.

10:16 I liked the Internet in the very early days. And I took care of the computer network. You know, it was newly connected. It was sort of an antiquated network, but it needed printers. It needed software on everybody's computer. It needed to be backed up. And it even needed to be connected to the Internet for various updates to the hardware and everything and software. And that's what I did.

10:17 Q. Okay. And what interested you about those early computers, Mr. Katz?

10:17 A. Yeah. I was in college when the first PC arrived in 1984. Very rudimentary, floppy disks, very large five-and-a-quarter floppy disks. Didn't do much.

10:17 But I thought it was very interesting. I got

into spreadsheets early on. So I just -- I thought that the technology was really advancing, and I saw the Internet come and sort of led me along the way to end up starting Paltalk.

Q. Mr. Katz, what was your experience with computers in your personal life at this time?

A. I got -- I got a computer when I went to law school actually in 1985. That was the first one I had. Before that I was typing papers on a typewriter. I'm sure a lot of people were. So that was a leap forward for me. So I always had a personal computer after that.

And then, you know, at M.J. we had computers as well, and I had facility with them. And then, you know, the job from 1993 to 1998, constantly upgrading the hardware and software that was at my job.

Q. Did you use computers to communicate in any way?

A. Yeah. We did. I did. So I was an AOL customer. I guess a lot of people were, America Online. It feels like some people thought AOL was the Internet. You know, they sent the CDs around. I don't know if anybody remembers that. But they would mail them to your house literally.

So that's the way I connected initially, and

they had a really cool feature which was called AOL IM. So you could instant-message people. You got a little buddy list. You could define who was on it, friends, family, whoever.

And it was, to me, pretty revolutionary. I didn't have to coordinate talking to a cousin that was in another country or friends and family. And if they were online, we could -- you could chat. So I did that.

Q. Okay. Mr. Katz, were you able to voice-communicate at this time?

A. Well, so AOL certainly didn't have the capacity to do that, and so one particular day I was text-chatting and it was 1998. My -- I have -- we have three kids. So my bigger son was two years old, and I was typing, texting, by AOL IM. And my two-year-old -- and we all know two-year-olds. He just jumped on me, and I literally couldn't type.

I'm like trying to type and I couldn't, and I had sort of a eureka moment, was, why am I not talking instead of typing?

And, you know, I was surprised. I researched that idea and nobody was doing it. There was no product that -- the big presence of that instant messaging is important because there was a presence

manager. You knew when someone was talking.

So there weren't -- nobody was doing it. I decided to try and do it myself. And I was 35 years old. I just had -- we had our third child who was just born, and I've been working at this ever since.

Q. Okay. And, sir, did these ideas lead to the formation of Paltalk?

A. 100 percent they did. So, you know, when that happened and I did the research, I decided to start a company to produce my software that basically looked just like that AOL Instant Messenger, but the deep thought would be to talk to someone you clicked on.

Of course you need a microphone. Of course you need speakers. I heard that it was a dial-up world. That's true. That's how we all connected, with that screechy sound. But what was great about it was it enabled you to talk to people worldwide for free.

Okay. Everybody knows just how expensive long distance is, international calling. If you go online with the Internet, you could talk to anybody in the world worldwide.

So fortunately for me, I knew somebody who produced some coding. I don't do any coding. I don't know how to code. And then he knew somebody who also knew. And basically, I had three people. One to do

the service side of the software, one person to do the client side of the software, and one person to make a web page. And we worked that way, you know, through 1998 and launched the first version of the software in January 1999.

Q. Okay. Mr. Katz, I'm going to back up for a second.

When did you form the Paltalk company?

A. Yeah. 1998. Sort of right after my son jumped on me, I knew that it would be a good idea to make it a corporation. And, you know, I didn't raise money from anybody.

And people didn't work full time either. They all had full-time jobs. Everybody that was working on this project with me in 1998 had a day job, and they worked on this at night. And we'd meet once a week to do it.

So I started and I formed the company in '98. First software was January of 1999.

Q. Okay. Mr. Katz, how many employees did you start out with in 1998?

A. Zero. Just self -- I was -- as I just described, everybody had a job. They were just working and paying them literally by the hour as an extra moneymaker for them.

Q. And how many employees does Paltalk have today?

A. We have 17 right now.

Q. Is Paltalk profitable?

A. Paltalk's -- I mean, I've been in business since 1999. So Paltalk has historically been profitable. Otherwise, I wouldn't be here, is what I would say. It's not easy running a business.

In 2016, after, you know, 18 years of this, we decided to merge the company into a small public company. The biggest reason for that was people had invested in 1999 and 2000, after we grouped and we really didn't talk about it, but I put the software on the Internet.

There's a website called download.com. People could go there and download software. It was free. So I have to say, I was mildly surprised. A lot of people did download the software, and it just started to spread because they realized they could talk for free worldwide using their Internet connection.

So off of that, I did raise some money and the next year raised some money again. And all those investors from 1999, which is thousands, they never were able to sell any shares to the company even though I'd been around such a long time.

10:24 So we merged into a public company. It was a small public company. We were 80 percent of a new company, so I could control it. They had their own business, very -- it was a dating business, very complicated, convoluted, bad business, honestly.

10:24 So I worked through the problems of trying to merge the companies, and eventually we did -- I just sold off that dating business. Those people went their own way. And then we -- what's called up-listed to the NASDAQ. So we were in a -- sort of a bulletin board listing, and we up-listed to the NASDAQ, which is a national exchange which is where we are now.

10:25 Q. And, Mr. Katz, have the last three quarters been different with respect to Paltalk's profitability?

10:25 A. Yeah. They've been difficult. You know -- you know, I think I pride myself on I'm conservative. I think that's how we lasted all these years.

10:25 I think, you know, as we'll see and we'll talk about it, you heard and saw in opening, I saw it too, you know, HearMe was a tremendously successful company. It had raised ridiculous amounts of money. Over $270 million went into HearMe. They were sort of the -- you know, the -- by far the industry leader in what I was trying to do.

10:25 And I was -- you know, I was aware of them,

but we were in a different sort of space. They weren't doing exactly what I was doing. It was audioconferencing related to videoconferencing by acquiring Webex.

So it's been more difficult, but we have a good balance sheet. We have money on our balance sheet. So we think with the NASDAQ listing, we're in a good position moving forward.

Q. Okay. Mr. Katz, you saw in opening a slide with various Paltalk products.

Of these products, which product has the largest amount of users?

A. Oh, Paltalk is by far the biggest one. So that's the one I started. And then each of the other four are other products that I bought over time and then grew.

Q. And are these products conferencing products?

A. So Paltalk and Camfrog and Tinychat are all videoconferencing products, but they're consumer based. It's more like people can meet each other around interests on the Internet, sort of like Facebook groups but with audio and video.

Vumber is a calling product. It allows you to have another phone number on your cell phone, if you want one, without a SIM, without an extra chip or

anything. I bought that 12 or 14 years ago.

And ManyCam is a neat one; we bought that a couple of years ago. It enables you to just change the background on your camera. So say you're at work and you want to have your work background. Say you're at home and you have a different background. Say you don't want any of those backgrounds you just want to show mountains behind you, you can do all of that. And that was a very good fit for our other video chat products.

Q. Okay. Mr. Katz, I want to take a look at the Paltalk product in particular.

Is this an image of a Paltalk chat room?

A. It is.

Q. Okay. Walk me through this image.

A. So the way we implemented this, again, very -- you know, it's different. It's a consumer product. It's where people are sort of meeting each other. And they can do it with voice, they can do it with video. And they can do it in much larger groups. So I think 50, even 100, 150 can be in a conference.

People choose if they want to be on camera; they don't have to be. People choose if they want to view other people; they don't have to. And then you can type. So there's a text scroll that runs through

10:28 the product; you can see that sort of in the middle. And, you know, that's sort of the way it works.

10:28 And it has worked more or less that way for a long time. Difference is, we've been -- really improved the quality of the audio, the quality of the video. The hands-free. You can hands-free now; you don't have to touch any buttons. And yeah, it's a pleasant -- it's a pleasant way to interact with it.

10:28 We also introduced a few games, so if you want to play backgammon with somebody, you can play backgammon. If you want to play chess. So honestly, I'm very proud of it. It's been around 25 years, and it came out of my head.

10:29 Q. Okay. And how do users join a Paltalk chat room?

10:29 A. They go to the website, Paltalk.com. They download the piece that accompanied our software, and then they have to install that program on their computer. They can also do it with a smartphone, with an Android or an Apple phone and go to the App Store.

10:29 Q. And how many people use Paltalk chat rooms in a given year?

10:29 A. Total across everything is probably a million, million and a half now. But it's -- you know, I've been -- I've been around a long time. It's been

downloaded more than 200 million times and in 150 countries. We vocalized the software into other languages. When we started, I didn't think -- really didn't think about it. It just was English. The world doesn't only speak English; the world speaks a lot of things. So unless you show it to them in their language, they're never going to use the software. But that's why we have people, users all over the world.

THE COURT: Counsel, would this be a good time to break?

MS. MAGEE: Yes, Your Honor.

THE COURT: Ladies and gentlemen of the jury, we're going to take our morning recess.

I have a couple of instructions for you that I'm going to spell out now. And from now on, after now I'm going to say, just remember my instructions, what they are.

Number one, you're not to talk about the case with each other or anyone else. When you get home tonight, obviously, if your spouse says where were you, you were in court. But we want you to come to the resolution of this case only after you've heard all the evidence. So this week, you can talk about college football or whatever it is you all talk about -- I've never been on a jury -- but not the case.

10:30 Number two, I understand from my college-aged sons there's something called social media. I'm unfamiliar with it myself. But if you're on it, that's fine. Please don't post anything about the trial while you're sitting on the jury.

10:30 Finally, we've already heard some interesting information. We want you to formulate your decisions based on what you hear in the courtroom. Please don't do any independent research on someone you may see on the witness stand or something you may hear about. You've heard about VoIP, and you say, I need to know more about VoIP. The lawyers are going to do a very good job of explaining what that means, so please don't do any independent research.

10:31 And I'm done preaching to you.

10:31 So we'll be in recess for 10 to 15 minutes, and then we'll come back in and we'll resume with this witness.

10:31 THE BAILIFF: All rise.

10:31 (Jury exited the courtroom.)

10:31 THE COURT: Anything we need to take up?

10:32 MR. TRIBBLE: Not right now, Your Honor.

10:32 MS. PIEPMEIER: Not at this time, Your Honor.

10:32 (Recess taken.)

10:48 THE BAILIFF: All rise.

10:48 THE COURT: Please remain standing for the jury.

10:48 (Jury entered the courtroom.)

10:48 THE COURT: Thank you. You may be seated.

10:48 Thank you. You may be seated.

10:49 BY MS. MAGEE:

10:49 Q. Mr. Katz, are you ready to resume?

10:49 A. Yes.

10:49 Q. Before the break, you took us through the early days of Paltalk.

10:49 Who funded the development of the first Paltalk product?

10:49 A. I did for that first year.

10:49 Q. And once Paltalk launched its initial software, was that product successful?

10:49 A. I think it was successful. As I said, it was -- we put it on the site called download.com, which was a free software site that anyone could go to and was downloaded, I think, 20,000 times in the first couple of months it was available.

10:49 Q. And did Paltalk add video capabilities at some point?

10:49 A. We did. We -- I always imagined video. As I

10:50 pointed out, it was a dial-up world. Cameras weren't available very much, not a lot of bandwidth. But by 2001, so two and a half, two years after I launched a first version, we put video in.

10:50 Q. Okay. And why the addition of the video?

10:50 A. I think most people would agree it's just nice to be able to see people as well as hear them.

10:50 Q. Okay. And since the initial product, has Paltalk revised its product offering?

10:50 A. Constantly. We've had to do that. Obviously it's a competitive world, so many other softwares out there, so many other things to do. So we've made the audio better and better, and we've made video better and better. The initial video was like cartoon frames refreshing literally. I mean, you could see something, but it wasn't like it is now, which is, you know, a very nice image.

10:50 We also made it hands free so you don't have to touch any buttons. And we put the games in as well so you could play games with other people. So at that point...

10:51 Q. Okay. Mr. Katz, who is the plaintiff in this case?

10:51 A. Paltalk Holdings, Inc.

10:51 Q. And what's the relationship between Paltalk

Holdings, Inc. and Paltalk, Inc.?

A. So Paltalk, Inc. is the parent company, and Paltalk Holdings is a subsidiary that I formed when I bought the patents and patent applications in 2001.

Q. And who manages Paltalk Holdings?

A. I do.

Q. How many patents does Paltalk Holdings have?

A. Currently nine.

Q. Okay. And which Paltalk entity owned the '858 patent?

A. Say again?

Q. Which Paltalk entity owned the '858 patent?

A. Paltalk Holdings.

Q. Okay. Mr. Katz, please turn to the PX-16 tab in your witness binder, sir.

A. Okay.

Q. Have you seen this document before?

A. Yes.

Q. What is this document?

A. This is the '858 patent.

Q. Okay. Did the PTO award this patent to Paltalk Holdings, Inc.?

A. Yes.

Q. And does this document set out the PTO's activities?

A. Yes.

Q. And how do you know that the PTO awarded Paltalk this patent?

A. It says United States Patent, and it's got a number and it's got the date on the patent, January 27th, 2004.

MS. MAGEE: Your Honor, plaintiff offers PX-16.

MS. PIEPMEIER: No objection.

THE COURT: Admitted.

BY MS. MAGEE:

Q. Okay. Mr. Katz, what's the title of the '858 patent?

A. I don't know. I have to put on my glasses. Sorry. Let's see.

Hybrid Server Architecture for Mixing and Non-mixing Client Conferencing.

Q. And do you have a general understanding of what the '858 patent relates to?

A. I do generally.

Q. And what is that understanding, sir?

A. As the patent points out -- and I think you saw a lot of this morning too -- it is an architecture whereby computers and phones can interact in the same conference. Obviously it's a lot more than that, but,

10:53 you know, I'm not a super expert on this.

10:53 Q. Okay. Sir, please turn to PX-17 in your witness binder.

10:53 A. Okay.

10:53 Q. Have you seen this document before?

10:53 A. Yes.

10:53 Q. And what is it?

10:53 A. It's an Assignment of title for the application that was the '858 patent application, and this was the assignment that came from HearMe to Paltalk Holdings after we bought the patent and patent applications.

10:54 MS. MAGEE: Okay. Plaintiff offers PX-17.

10:54 MS. PIEPMEIER: No objection.

10:54 THE COURT: Admitted.

10:54 BY MS. MAGEE:

10:54 Q. Mr. Katz, does this assignment give Paltalk the rights to the '858 patent application?

10:54 A. Yes.

10:54 Q. Okay. And does this document make the '858 patent the property of Paltalk Holdings, Inc.?

10:54 A. Yes.

10:54 Q. Okay. And who did Paltalk acquire the '858 patent application from?

10:54 A. HearMe, Inc.
10:54 Q. And what was HearMe, Inc.?
10:54 A. HearMe, Inc. was a public company in the late '90s that I was aware of. As I said, I launched Paltalk, the first version in the beginning of 1999, and HearMe was I think already a public company with a very large amount of investment and a very valuable market cap in the late '90s, and they were in audioconferencing.

So I was quite aware of them since I was doing basically a similar thing. Not exactly the same thing but similar.

Q. Okay. And did Paltalk have a general understanding of what HearMe was prior to buying some of HearMe's assets?

A. Absolutely. Yes.

Q. Okay. Did you have an understanding of the kind of products that HearMe offered prior to buying any of its assets?

A. Yes.

Q. And what kind of products did HearMe offer generally?

A. They were voice-conferencing products. So they had a module that they sold to websites. So ESPN -- I'm just making up -- ESPN, CNN, whatever. And

10:55 if you put their module -- installed their module on your website, the user could come to the website, download some software, and then you could talk to other users who had done that.

So it was sort of like we -- what we were doing, but we were doing it at Paltalk.com. They were actually bringing the functionality to the other website. They also had other conferencing, voice-conferencing solutions that they offered.

Q. Okay. And, Mr. Katz, how common were these voice-conferencing solutions in the late '90s?

A. Very uncommon. I mean, as I said, computers were not really ready for audio. You know, you had to get a microphone, sort of like this one, plug it into a sound card. Lots of computers didn't even have sound cards. Most of them came with speakers. So that meant they had a sound card. You could get on a microphone. They definitely didn't have cameras. So it was quite uncommon.

Q. Okay. Mr. Katz, you heard in opening that the HearMe patent, the '858 patent, was some sort of an old, antiquated technology.

Was that, in your view of the '858 patent, when you acquired it?

A. It was an application. When I acquired the

10:57 patents, they were four issued patents. There were eight pending patents. They were principal assets I was interested in. I was interested in them because I started this company. And, you know, we were doing well. But we didn't have any patents.

So I was aware of HearMe. I was aware of how much funding they had. I was aware that they were very smart people. And when the opportunity came to buy that property, I thought it was literally once in a lifetime.

Q. Mr. Katz, did you agree with the characterization that the HearMe technology patents are old, antiquated technology?

A. Totally the opposite. It was cutting edge, innovative, incredibly -- they were very smart people. I don't think you get to be a public company worth a billion dollars unless you're doing something pretty special.

Q. Okay. And, Mr. Katz, are you aware that HearMe had customers and partners in the early 2000s?

A. Yes.

Q. And was Cisco one of those customers and partners?

A. I believe so.

MS. PIEPMEIER: Objection, Your Honor. I

10:58 apologize. I move to strike that answer.

10:58 THE COURT: On what basis?

10:58 MS. PIEPMEIER: Your Honor, he has absolutely no foundation whatsoever to provide that testimony regarding HearMe.

10:58 THE COURT: Overruled.

10:58 BY MS. MAGEE:

10:58 Q. Okay. Mr. Katz, I'd now like to step back into the year 2000, if you will.

10:58 What was the landscape like of technology companies in 2000?

10:58 A. So 2000 was sort of the turning point. Technology was completely the rage in the late '90s. Yahoo was blowing up. AOL was blowing up. Everything was blowing up in a good way.

10:59 And then into the end of 2000, beginning 2001, the public markets just were, you know, mercilessly negative. Everything was bad. Everything was down. So it was a really, really difficult environment in 2001, and then later 2001, even worse.

10:59 Q. Okay. And what is that later 2001 period called?

10:59 A. Well, the sort of prior period would have been called the Internet boom. I call it Internet 1.0 because that was the first rise. And that was the --

you know, bubble bursting on the Internet at the end of 2001.

Q. And how was Paltalk doing during this time?

A. Well, that's interesting. Again, we were a smaller company. I'm conservative. I was always about making money. I think honestly, that's why I made it through that period of time, 2008, '9. Again, it was a tough time in the world, and we've always made it through.

So I was on the notion that we had to make money. So when -- I describe we launched the video in Paltalk in 2001 and we started charging a subscription for it.

So the software was still free. You could use everything, but if you wanted to do other people's video, you paid a small monthly or annual fee. And just by doing that, we started making money.

Q. Mr. Katz, do you have a general understanding of how HearMe fared during this same time period?

A. I do.

Q. What is that understanding, sir?

A. So HearMe was like one of the high fliers of the late '90s into 2000s, and then they hit a really hard time, as most other technology companies did. And in 2001, later in 2001, they announced they were

11:00 liquidating all of their assets.

11:01 Rather than file for bankruptcy, they did still have cash. I think they wanted to just produce as much cash as they could, pay off everything they could, and then actually, the shareholders could get some money back too.

11:01 Q. And in 2001, was Paltalk interested in buying any of HearMe's assets?

11:01 A. We were.

11:01 Q. And why?

11:01 A. As I said, I knew it was the very smart people. I am sort of a financially-facing person. So I was very aware of the public company HearMe as well. I knew how much money had been invested. So I approached them sometime earlier in 2001, probably the first half of 2001, to see if we could buy any of their IP.

11:01 Q. And did Paltalk buy HearMe's IP at that point?

11:01 A. No.

11:01 Q. Okay. Why not?

11:01 A. Because they -- they said, basically, unless you are making an offer that starts with seven figures, we're not even talking to you and you're not worth our time.

11:02 And we sort of had -- you know, we had seven

figures, but we were just starting to make money. So I -- I made a decision early not to pay that much money at that time.

Q. And did Paltalk ultimately purchase some of HearMe's assets later on?

A. We did.

Q. Okay. Mr. Katz, find tab PX-12 in your witness binder, please, sir.

A. I have it.

Q. Okay. Have you seen this document before?

A. Yes.

Q. And what is this document?

A. This is the actual asset purchase agreement that was executed when Paltalk bought the HearMe assets at the end of 2001.

MS. MAGEE: Plaintiff offers PX-12.

MS. PIEPMEIER: No objection.

THE COURT: Admitted.

BY MS. MAGEE:

Q. Mr. Katz, did Paltalk purchase all of HearMe's assets under this agreement?

A. No.

Q. Okay. Find Index D, Mr. Katz. Skip back.

A. D?

Q. Yes, sir. D as in door.

11:03 And, sir, it's actually up on the screen for you.

11:03 A. Oh, better. Thank you. Much better. I see it.

11:03 Q. Okay. Mr. Katz, what kind of assets did Paltalk acquire from HearMe?

11:03 A. So, you know, the principal thing I was interested in were the patents and the patent applications. HearMe literally said, we'll give you the source code. That is the code that the -- you know, enabled you to build the software programs that I was talking about before.

11:03 So they included some source code as well. And they were literally trying to get rid of their computers, server computers. We were using significant numbers of server computers to do the audio and video for Paltalk.

11:04 So actually, we got those machines and put them right into service, you know, in the data center. They also gave us the HearMe name and the trademark, which I thought was valuable, because they had so much traffic to it. It's hard to generate traffic, you know, to a website. Also a couple of other domains.

11:04 Q. How much did Paltalk pay HearMe under its asset purchase agreement?

11:04 A. 145,000.
11:04 Q. And were there risks to Paltalk associated with this transaction?
11:04 A. Definitely.
11:04 Q. And what were some of those risks, Mr. Katz?
11:04 A. You know, any of the patents could end up being invalidated. All of the applications could have not actually been granted.

11:04 You know, we continued to prosecute. When you get a patent application, you interact with the Patent Office. You're prosecuting them. So there were no guarantees of anything.
11:05 Q. And did the $145,000 purchase price reflect those risks?
11:05 A. Oh, it was -- you know, it was a very -- it was a fire sale. I mean, they were going out of business. And they were just selling for whatever, you know, they could get. And notice the date on the document, December the 19th.

11:05 I remember finishing that deal right at the end of December. It was just nuts. So yeah. The price was cheap. Very inexpensive.
11:05 Q. Did Paltalk value the assets purchased from HearMe at more than $445,000?
11:05 A. 145.

Q. Sorry.

A. Yeah. I valued them -- I mean, it's hard to say this, but they were of extreme value to me because I had a public -- not public -- a private company at that point, public company now, that didn't have any patents. And this was not only patents, but they were patents in our area. They were similar to what we were doing as a competitor that I was aware of. So it was a unique singular opportunity to do something, and that's why we did it.

Q. Why did Paltalk pay $145,000?

A. As I said, they asked for seven figures, you know, some months before. And then I think that the fire sale was just getting to the end. They were just selling off everything. And I'm sure they asked me for more, and I'm sure I offered less.

And I was going to pay as little as I could pay for it because, you know, the cash was dear to me, and we needed it to pay our own employees and run our own business.

Q. And would you have paid more than $145,000?

A. Definitely.

Q. Why?

A. Because it was invaluable property. It was -- they were extremely smart people. They had four issued

patents. I knew it was expensive just to -- if you go through the process of just trying to get your own patent, it takes years and it takes a lot of money. Because there's a back-and-forth with the Patent Office. You're paying lawyers. So it was worth -- you know, I couldn't even put a price on what it was worth to us to own that.

Q. Was the patent application associated with the '858 patent part of the assets Paltalk acquired from HearMe?

A. It was.

Q. Did Paltalk ever perform any sort of evaluation for that patent application?

A. Valuation or evaluation?

Q. Valuation.

A. No. We didn't -- we didn't perform valuations on anything. I knew I was getting a ridiculous deal, and I was happy to get it.

Q. Okay. What did Paltalk do to the assets it acquired from here?

A. Well, as I said, it's a lot of work. Once you get the patents, you've got to stay up with filings, issued patents. And then if you have applications, you have to have, you know, a patent attorney do the back-and-forth with the Patent Office. So we continued

to -- to make sure that all the patents were paid up and the fees associated with them ongoing. We continued to prosecute all the other applications.

Q. Did Paltalk offer any HearMe products after the acquisition?

A. We did.

Q. Which products are those?

A. So we didn't take their source code. We decided because of the HearMe name, a lot of money behind it, and there'd been a lot of traffic to it to relaunch a videoconferencing solution at HearMe.com. So unlike the Paltalk software which was the software download, you go to the website, you download it and install it, this was web based. So you just went to HearMe.com.

But it was in 2000 -- we launched out I think in around 2006, and the Internet still wasn't ready to do video- and audioconferencing very well. So we did get customers that was a different, very different product from Paltalk. Paltalk was a consumer product, not really facing for businesses. This was really sort of like what Webex was doing and the other softwares that do that now. It was pointed at people who would pay to videoconference.

Q. Mr. Katz, we heard in opening that the

11:09 '858 patent allows computers and phones to join an audioconference. Does Paltalk offer any products that allow computers and plain old telephones to join an audioconference?

11:09 A. No.

11:09 Q. Why not?

11:09 A. Because -- and really, again, it's my judgment. People who use Paltalk are online. You know, we like large screens because you're seeing a lot of video. We enable you to blow up the video too so if you want to see something larger than those little boxes, you can do that, don't move them around and shuffle them. And therefore it's -- the video is really critical in that sort of scenario. Someone's not calling in from another country to do -- to be in a conference like that because they can't see what's going on.

11:10 Also say you're playing a game. If you're playing chess, you're playing cards, you have to see. So I just made the judgment that wasn't something to put in there.

11:10 MS. MAGEE: Your Honor, may we approach?

11:10 THE COURT: Sure.

11:10 (Bench conference.)

11:10 MS. MAGEE: Your Honor, ordinarily the

11:11 Court's MIL No. 13 would preclude mentioning any party's other litigations. However, in opening, Ms. Piepmeier consistently raised the theme that Paltalk did not contact Cisco before filing this lawsuit.

If asked, this witness will testify that he didn't do that because he's aware of the risks of Cisco filing declaratory judgment actions when parties reach out to them about, you know, potential infringement. So I'm asking to broach the subject with Mr. Katz because they opened the door.

MS. PIEPMEIER: I'm sorry. I'm not sure I'm following what you are asking to...

MS. MAGEE: I mean...

THE COURT: She's going to ask him why he didn't contact you, and his response is going to be he was afraid you would file -- Cisco would file a declaratory judgment action.

MS. MAGEE: They put in a slide in opening and everything else --

MS. PIEPMEIER: Your Honor, I think that's completely inconsistent with what he said. I think that's completely inconsistent with what he said in deposition, and that's a totally different thing. And I also don't think I opened the door at all. It's

just a fact that he never filed.

That is just a fact in the case. It is not an argument about you should have done it or you shouldn't have done it. It's literally just a fact in the case that they didn't do it. This is the date that they filed suit. I don't know how else to show a timeline other than to show the date that the suit was filed.

THE COURT: You can have him explain why he did not give them notice.

MS. MAGEE: Thank you, sir.

(Bench conference concludes.)

BY MS. MAGEE:

Q. All right. Mr. Katz, you heard in opening this idea that Paltalk did not reach out to anyone at Cisco before filing this lawsuit.

Do you recall hearing that, sir?

A. Yes.

Q. And did Paltalk reach out to Cisco before filing this lawsuit?

A. No.

Q. Why not, sir?

A. Because I was aware of the risks of doing that. If I reached out to Cisco, they very well could have just sued us. So -- and again, my judgment, it

was better to do it the way we did it because if we got sued, it was a different set of risks.

Q. And, Mr. Katz, why did Paltalk ultimately file this lawsuit?

A. Well, because we believed that the '858 patent was being infringed.

Q. And what are you seeking if in fact Cisco is using Paltalk's patent?

A. A reasonable royalty which is I think what the law is.

MS. MAGEE: Okay. Thank you.

I pass the witness.

CROSS-EXAMINATION

BY MS. PIEPMEIER:

Q. Good morning, Mr. Katz. We're just going to hand out the binders.

A. Thank you.

Q. Everyone has what they need? Okay, great.

Good morning. I think it's still morning. My name is Sarah Piepmeier, and it is good to see you again. I have some questions regarding your testimony just now.

You introduced your background earlier, but I want to confirm, you don't have an engineering degree, correct?

A. Correct.

Q. And you have no training at all in computer programming?

A. Correct.

Q. You testified a moment ago on direct examination about how hard it is to get a patent or keep up with the filings or something like that.

Do you recall that?

A. Yes.

Q. Okay. But you're not a named inventor on any patent?

A. No.

Q. So you've actually never done that yourself?

A. My company has.

Q. Sir, I'm sorry. I asked you a question. If you could listen to my question, I'd appreciate that.

THE COURT: Counsel, counsel, I know a lot of different ways of doing this. If I think he needs to be more direct in his response, I can assure you, I will take care of that.

MS. PIEPMEIER: Thank you, Your Honor.

BY MS. PIEPMEIER:

Q. Let me ask my question again.

You personally, Mr. Katz, have never filed for a patent application as an inventor, correct?

A. I haven't, but again, my company has with people who work for me. So I guess I could have been on that patent, but I wasn't. I wasn't involved with -- I was involved at a high level in the invention, but -- so my name isn't on it, but I was involved in the process of it.

Q. I'm sorry. I'm confused as to what patent we're talking about here. The question -- so let me try to ask you a very clear question here.

You, Jason Katz, are not a named inventor on any patent; is that right?

A. That is correct.

Q. Thank you.

Now, you testified on direct that you came up with the idea to add the ability to communicate via audio to kind of a buddy list with AOL as an inspiration; is that right?

A. Correct.

Q. And you're proud of that invention?

A. I'm very proud of it. Yes.

Q. I could tell.

A. Yeah.

Q. Yeah.

But you never filed a patent on that idea?

A. I didn't.

Q. And to be clear, the buddy list concept that you spoke about, speaking to somebody on the buddy list, that's not the invention of the '858 patent, correct?

A. That's correct.

Q. And you testified a moment ago you considered intellectual property that Paltalk acquired, that it bought, to be a valuable asset?

A. Correct.

Q. You agree with that.

But you would agree that in the whole history of Paltalk, Inc., Holdings, whatever, it has never offered a product that used the '858 patent?

A. That's correct.

Q. It could have done so?

A. I think it could have done so.

Q. But you didn't?

A. We didn't.

Q. And you think the '858 patent is valuable, though?

A. Yes.

Q. Okay. But you never put out a product using it?

A. Yes.

MS. PIEPMEIER: Now, I'd like to bring up

11:17 on the screen DX -- I think it's DDX-2. If we may.

11:17 Thank you.

11:17 BY MS. PIEPMEIER:

11:17 Q. I am a chronological learner. That's the way I think -- I even read legal cases in a chronological order. So I'd like to go through kind of a timeline. You just put one up. It may be kind of similar to what you put up.

11:17 So Paltalk's products launch in 1999; is that correct?

11:17 A. Correct.

11:17 Q. Okay.

11:17 MS. PIEPMEIER: And of course I left the clicker. Let me grab it. Excuse me.

11:17 BY MS. PIEPMEIER:

11:18 Q. And the product that you launched allowed audio- and videoconferencing for free on the Internet, correct, in 1999?

11:18 A. Audio.

11:18 Q. Audio. Video was added later?

11:18 A. Correct.

11:18 Q. And you testified -- we've already gone through this -- in 2001, Paltalk, Inc. purchases HearMe?

11:18 A. HearMe assets. Yeah.

11:18 Q. The HearMe assets. Thank you for that correction. That's right.

11:18 Now, you testified on direct that you thought the assets were valuable, including the intellectual property. You used the servers, all of that; you thought they were valuable, right?

11:18 A. Correct.

11:18 Q. And at the time, you testified that they were -- before the fire sale, they were asking for seven figures?

11:18 A. Correct.

11:18 Q. And you thought it was valuable assets?

11:18 A. Correct.

11:18 Q. You had seven figures?

11:18 A. Correct.

11:18 Q. You did not pay seven figures?

11:18 A. I did not.

11:18 Q. You paid 145 --

11:19 A. Correct.

11:19 Q. -- thousand.

11:19 And for the 145,000, in addition to pages of appendices of servers, et cetera, that we saw a moment ago, Paltalk acquired four issued patents and eight pending patent applications?

11:19 A. Correct.

11:19 Q. One of those applications ultimately issued as the '858 patent?

11:19 A. That's correct.

11:19 Q. And the HearMe patents and patent applications, you put those in a subsidiary, Paltalk Holdings?

11:19 A. Correct.

11:19 Q. You talked about on your direct a moment ago the risks of acquiring patent applications.

11:19 Do you remember that?

11:19 A. Yes.

11:19 Q. And one of those risks is that -- or strike that.

11:19 There's also risks to acquiring patents, correct?

11:19 A. Can you say that again? I'm sorry.

11:19 Q. So there's risks to acquiring patent applications.

11:20 Wouldn't you agree there's also risks to acquiring patents?

11:20 A. Yes.

11:20 Q. And one of those risks is that they could later be invalidated, right?

11:20 A. Yes.

11:20 Q. Now, HearMe had a set of products at the time

11:20 of the acquisition: VoiceCREATOR, VoiceNETWORK, and
11:20 VoiceSERVER; is that correct?
11:20 A. I believe so. Yes.
11:20 Q. And you talked about HearMe products on direct just a moment ago?
11:20 A. Yes.
11:20 Q. You would agree with me that Paltalk, Inc. basically shelved those products after invention?
11:20 A. I disagree with that.
11:20 Q. And have you ever testified the opposite of that?
11:20 A. I had a deposition in this case, for example.
11:20 Q. Okay. And I'd like to show you your testimony in your deposition. You have it in your binder. There should be a deposition transcript. We'll also put it up on the screen, but I want to make sure you have the cite before we go anywhere. On Page 125, starting at Lines 21 to 126, Line 7.
11:21 And I want to give you a chance to look at it before I read it.
11:21 Question: After the acquisition to the extent that VoiceCREATOR, VoiceNETWORK, and VoiceSERVER products still existed, neither Paltalk, Inc. nor Paltalk Holdings put forth those products in any form.
11:21 I asked you that question. Oh, I said:

Is that right?

Do you see that?

A. That's right.

Q. And you answered, let's follow along: That's right. We never did.

Did you say that?

A. Yes. And then I answered --

Q. And then I asked you a question: You shelved them essentially?

And then you answered: Basically. My memory was that they were CDs that were conveyed, and they went into storage somewhere. And we certainly never used them.

You testified that, correct?

A. That's correct.

Q. So you shelved the HearMe products that Paltalk acquired: VoiceCREATOR, VoiceNETWORK, and VoiceSERVER?

A. I said I disagree with that characterization of what I did. We received source code. We never reconstituted the source code. We didn't have any of the server -- we didn't have anything to do that. It would have been a monumental task to try and do that.

The $250 million investment company that had tons and tons of engineers, we were a little company.

So I couldn't do that really. I didn't have the money.

Q. Thank you, sir.

Now, let's refer back to the deposition you just gave, the deposition we just looked at.

MS. PIEPMEIER: If we could put it back on the screen.

BY MS. PIEPMEIER:

Q. I asked you, speaking about these products: You shelved them essentially? And you -- let me finish, sir.

You answered: Basically. My memory was they were CDs that were conveyed, and they went into storage somewhere. And we certainly never used them.

A. Correct.

Q. Okay. Thank you.

Now, you never spoke to a single person who created any of that IP or any of those products, correct?

A. I spoke to Jim Schmidt, who was the active CEO. I don't know if he ever created anything. I didn't speak to anybody else.

Q. You would agree with me that Jim Schmidt was the guy liquidating the company?

A. Correct.

Q. You never spoke to a HearMe employee or patent

inventor other than Jim Schmidt?

A. I didn't.

Q. And Jim Schmidt was the guy liquidating the company, not the guy who created those valuable products or the IP, correct?

A. To my knowledge, that's right.

Q. The only person you spoke to was the person who you were going to write a check to?

A. Correct.

MS. PIEPMEIER: Let's go back to DX-2, if we may, please.

BY MS. PIEPMEIER:

Q. Now, let's move forward on the timeline.

In 2004, the '858 patent issues; is that correct?

A. Correct.

Q. And that's the first time that you recall reading the '858 patent, correct?

A. Correct.

Q. Jumping forward 12 years, in 2016, Paltalk, Inc. merged with Snap Interactive, correct?

A. Correct.

Q. And Snap was an Internet dating service, kind of like match.com, right?

A. Correct.

Q. Through that merger, Paltalk gets 80 percent of the stock?
A. Correct.
Q. And you sold the product off?
A. In 2019. Yes.
Q. The people went their own way. That's what you testified?
A. Correct.
Q. Now, 2020 is the next time that you recall reading the '858 patent, correct?
A. Yes. I think that's right.
Q. So the patent issues in 2004, and you don't look at it again until 2020?
A. I think that's correct.
Q. And in 2021, 17 years after the patent issues, Paltalk first begins investigating Cisco?
A. Approximately, you know, in that time period as you said, 2020 to 2021. That's right.
Q. Well, it's 2021. That's -- is when you first -- sometime in 2021 is when you began investigating Cisco, correct?
A. I don't agree precisely with that. It was sometime in that period, though.
Q. Okay. Could you please turn to Page 36 of your deposition to Line 16 to 23? I'll give you a

11:26 minute to look at it. And then follow along and tell me if I read this right.

11:26 When did you -- you, as Mr. Katz -- and/or Paltalk first begin investigating bringing a suit against Cisco? Again, I am looking for a date -- I'm just looking for a date or a ballpark, not any communications with counsel.

11:26 Answer: Sometime in 2021 is what I could say. I don't have a firm date.

11:26 So did I read that correctly?

11:26 A. Correct.

11:26 Q. So in your deposition, your answer was that you began investigating Cisco in 2021?

11:26 MS. MAGEE: Objection, Your Honor, improper impeachment. Mr. Katz' answers are consistent.

11:26 THE COURT: Overruled.

11:26 BY MS. PIEPMEIER:

11:26 Q. Could you answer the question?

11:26 A. Sure. I said there in my deposition, I don't have a precise date, but it was somewhere in that neighborhood.

11:26 Q. Of 2021?

11:26 A. Sure.

11:26 Q. That's what we're looking at on the screen

11:27 highlighted in yellow, correct?

11:27 A. Yes.

11:27 Q. That's what you told me then?

11:27 Right?

11:27 A. Yes.

11:27 Q. Not 2020.

11:27 Thank you. Let's move on.

11:27 Now, you testified on direct examination that Paltalk never sent a letter to Cisco before it filed this suit, correct?

11:27 A. Correct.

11:27 Q. And you testified that you were afraid -- strike that.

11:27 You testified that the reason that you didn't send the letter is that you were afraid Cisco would file what you -- I believe you referred to it as a DJ; is that right?

11:27 A. I don't think I said a DJ.

11:27 Q. Filed suit?

11:27 A. Yeah. That they were suing.

11:27 Q. So you were afraid that Cisco -- and let me be clear about this. Your concern, if you sent Cisco a letter saying, hey, look at this '858 patent, can we come to a deal, is that Cisco would go to a venue, whatever venue, and file an action saying, no. We

                                                                    don't infringe. And your patent's invalid, correct?

A. Correct.

Q. So you thought that Cisco would file a defensive action to defend its rights after being accused of infringement.

That was your concern?

A. Beyond that or anything else. You know, as I said, little company, very expensive litigation. So my judgment was it was best to do what we did.

Q. Now, you're a lawyer?

A. I am trained as a lawyer.

Q. Yeah. You're retired, though?

A. Retired from the law.

Q. And you never practiced as a patent litigator?

A. Oh, no. I didn't.

Q. So you're not familiar, if I understand or I assume, with the fact that just sending somebody a letter saying, hey, we have a patent, can we talk about it, doesn't give them the ability to run to court and file another action.

You're not -- you're just not familiar with that, correct?

A. You know, I disagree with that.

Q. You disagree with my statement of it? You disagree -- or you disagree with your familiarity?

11:29 A. I disagree with your characterization of what I know and I don't know.

11:29 Q. Okay. So let me phrase that a different way then. You believe that if Paltalk sent Cisco a letter saying, hey, can we talk? Can we come to a deal here? I've got some intellectual property that I think is super valuable, and I think we should talk about it. You might be interested in it. It's your legal judgment as a lawyer and a former member of the bar that that would give Cisco the ability to run to court and file a lawsuit against Paltalk? That's your -- that's what you're telling the jury, right?

11:29 A. I'm not saying it would give them the ability. I don't know that one way or the other, but I do know I believe that I could be sued, so that's why we didn't do that.

11:29 Q. But you don't know?

11:29 A. I don't know; not precisely I don't.

11:30 Q. And you didn't tell me that in your deposition?

11:30 A. If you can point me to it, I'm happy to look at it. I don't remember; it was a long day.

11:30 Q. Right.

11:30 You would agree with me, though, that Paltalk's first communication to Cisco was simply

filing the lawsuit?

A. That's correct.

Q. Because it was your judgment that you didn't want to try to have a negotiation, you didn't want to sit down with Cisco at a table?

A. I believe there were risks in that. So that's why we took the action that we took.

Q. And in all of your time as an executive at a -- at a tech company and currently a public tech company, you're aware that many companies sit down at a table and negotiate and come to a license, right?

A. In the way you described it, I'm not aware.

Q. You're not. You've never seen it?

A. I've never seen a little company like us go to a big company and say, hey, we have patents. You might want them, and the other big company say, yeah, oh, great. Yeah. Sure. No. That's not --

Q. You've never seen that?

A. Never seen it.

Q. But you're not a patent litigator?

A. I'm not.

Q. And you don't represent companies as a patent litigator?

A. I don't.

Q. Right. And you don't, you know, obsessively

11:31 follow patent litigation news like some of us who are patent litigators, right?

A. No, but I --

Q. So you don't know whether that happens; you simply don't know?

A. I don't know, but I'd just like --

Q. You don't know, correct? Yes or no?

A. Can I answer?

THE COURT: Counsel, again, let him answer the question. And if he isn't being responsive, I'll take care of it.

A. As we all know, I bought four patents in 2001 and many pending patents.

THE COURT: Okay. You've answered the question.

THE WITNESS: Okay.

BY MS. PIEPMEIER:

Q. Now, let's move on to July 26, 2022. That's the date that the '858 patent expired, correct?

A. Correct.

Q. And today in 2024, Paltalk has a suite of products. I couldn't fit them all in that tiny area, so I apologize; I picked three of them.

But you have a suite of products today, right?

A. Correct.

Q. And you would agree -- and I think you testified this on direct, but I just want to make sure -- that of all the companies that Paltalk has acquired, of all the products it's acquired, Paltalk has never offered a product allowing the use of a phone and a computer in audioconferencing, correct?

A. To dial in; we did offer one to dial out.

Q. But you never offered a -- strike that.

Paltalk has never offered a product that you believe practices the invention of the '858 patent?

A. That's correct.

Q. And you gave an example on your direct of the importance using, you know, your Paltalk itself product as an example of why you wouldn't want to do that, because the video's so important, essentially; is that right?

A. I said to Paltalk.

Q. Correct. And that's not Paltalk's only product, though, correct?

A. Sorry?

Q. The product that you discussed with your counsel with the big video, how you could make things bigger, and you said, you know, I don't need the invention for that, that was one of the products that you offered, correct?

A. Correct. Paltalk.

Q. Okay.

A. The Paltalk product.

Q. That's the Paltalk product?

A. Correct.

Q. And over the course of the past 20 years since the patent has issued, Paltalk has had numerous other products, but none of them have used the '858 patent here, correct?

A. That's correct.

Q. Now, during the life of the '858 patent, Paltalk has never sought to license that patent itself, correct?

A. Correct.

Q. And the first lawsuit that Paltalk ever filed on the '858 patent was against Cisco?

A. Correct.

Q. And you didn't testify on direct about anyone who's ever asked Paltalk for a license to the '858 patent other than as a part of the large portfolio, part of the large portfolio?

A. Correct.

Q. So during the entire life of the '858 patent, no person or entity has ever come to Paltalk and requested a license to the '858 patent?

11:34 A. Correct.

11:34 Q. And in the years that Paltalk was in this business and had this patent, the '858 patent, you would agree that Paltalk never generated any revenue or other benefit from the '858 patent?

11:34 A. I would disagree with that.

11:34 Q. Could you please turn to Page 205 of your deposition, Lines 13 through 16?

11:34 Question: Has Paltalk ever generated any revenue or other benefit from the '858 patent?

11:35 Answer: No. I don't believe.

11:35 You gave that answer when I deposed you; isn't that correct?

11:35 A. I did.

11:35 Q. And so let me ask again.

11:35 In the years that Paltalk has been in business, has Paltalk ever generated any revenue or other benefit from the '858 patent?

11:35 A. We have.

11:35 Q. But that's not what you told me at deposition?

11:35 A. That's true. I refreshed my recollection, as you've just pointed out and asked me a question. It was part of other licenses, and I had forgotten that.

11:35 Q. So -- so when I deposed you, you were the corporate representative for Paltalk and we

discussed -- strike that.

And you were disclosed as the person who was going to provide Paltalk's answers and describe what Paltalk was going to say at trial.

Do you remember that?

A. Yes.

Q. Okay. And I asked you questions, and you answered them under oath and truthfully?

A. Yes.

Q. And now sitting here today, two years later, you are giving me a different answer because you simply remembered something different?

A. That's right. I had forgotten they were part of the other licenses that we had done.

Q. Has Paltalk -- but you would agree with me that Paltalk has never generated any revenue or benefit from the '858 patent standing alone?

A. That is correct.

MS. PIEPMEIER: Now, we can take down the timeline.

BY MS. PIEPMEIER:

Q. You testified earlier about the '858 patent. And there's five named inventors on that patent, correct?

A. I believe that's right.

11:36 MS. PIEPMEIER: And let's pull up PX-16, please. And let's -- got that on the screen. Thank you.

11:36 BY MS. PIEPMEIER:

11:36 Q. Now, you see the five named inventors listed there, right?

11:36 A. Yes.

11:36 Q. Okay.

11:36 MS. PIEPMEIER: And actually, let's take off the -- thank you very much.

11:36 BY MS. PIEPMEIER:

11:36 Q. Let's start -- let's go down the list.

11:37 You've never spoken to Frank Chu?

11:37 A. No.

11:37 Q. You've never spoken to Virgil Patrick Dobjanschi?

11:37 A. No.

11:37 Q. You've never spoken to Corey Gates?

11:37 A. No.

11:37 Q. You've never spoken to Katherine Kwan?

11:37 A. No.

11:37 Q. You've never spoken to Daniel Wright?

11:37 A. No.

11:37 Q. In fact, you're sure that no Paltalk employee has ever communicated with any of those inventors,

right?

A. I think that's right.

Q. And the inventors of the '858 patent, none of them are here to speak with the jury this week in Waco?

A. If you say so; I don't know that.

Q. And you don't care what their opinion is of this lawsuit, correct?

A. No. I care whether there's infringement by Cisco of this patent that Paltalk Holdings owns.

Q. You would agree with me -- my question is a little more specific.

You agree with me you don't care what their opinion is of this lawsuit?

A. No. I don't. That's right.

Q. And sitting here today, Mr. Katz, beyond the fact that the PTO issued the lawsuit and your discussions with your lawyers which are privileged, you can't say if the '858 patent is valid?

A. I think I saw Mr. Tribble earlier say there's a presumption of it being valid once you get a patent from the Patent Office.

Q. Understood. And you personally can't say beyond the presumption that Mr. Tribble talked about that the '858 patent is valid?

A. No. Not beyond that.

11:38 Q. And you don't know whether Claim 1 of the '858 patent, you don't know whether there was any prior art to Claim 1?

11:38 A. I'm not -- you know, I'm not a person of skill in the -- in the art. So no. I don't know.

11:38 Q. You don't know whether Claim 2 was known in the prior art?

11:38 A. I don't know.

11:38 Q. And because nobody at Paltalk has ever spoken to the inventors, it's fair to say that none of them, nobody at Paltalk has ever asked the inventors if this patent is valid?

11:39 A. I haven't. That's true. But their names are on the patent that submitted to the Patent Office, and it was granted.

11:39 Q. And no one at Paltalk has ever asked any of the five inventors if they searched for prior art before they filed for the patent?

11:39 A. Never talked to them.

11:39 Q. No one at Paltalk has ever asked them what they invented?

11:39 A. Never talked to them.

11:39 Q. No one at Paltalk has ever asked any of the five inventors if they meant one or more when they wrote the word "each"?

A. Correct.

Q. Paltalk relies exclusively on its paid experts to tell the jury what this patent covers, correct?

A. Correct.

Q. Now, you consider the intellectual property that Paltalk owns to be a valuable asset; I think you said that a few times on direct. I assume you agree with that?

A. I agree.

Q. Okay. And please turn to in your binder DX-296.

A. Okay.

Q. And do you recognize this document?

A. Yes.

Q. Is it Paltalk's 2021 Form 10-K filed with the SEC?

A. Yes.

Q. And you were president and CEO of Paltalk during that year, correct?

A. Yes.

Q. You provided information that was used in that filing to the SEC?

A. Yes.

Q. And to the extent you saw anything inaccurate, you corrected it before it got filed?

11:40 A. I would hope so if I saw it.

11:40 Q. At least as of 2022, you were not aware of anything inaccurate?

11:40 A. No. I'm not aware of anything inaccurate.

11:40 MS. PIEPMEIER: Okay. Your Honor, at this time I'd like to admit DX-296 and publish it.

11:40 MS. MAGEE: No objection.

11:40 THE COURT: Admitted.

11:40 BY MS. PIEPMEIER:

11:40 Q. Now, we have up here on the screen the cover page that you were just looking at.

11:40 MS. PIEPMEIER: Let's go to Page 54, Page F4, and we can blow up the table at the top. Thank you.

BY MS. PIEPMEIER:

11:41 Q. Now, in 2022 -- I'm sorry. Strike that.

11:41 In 2021, the year it filed suit against Cisco, Paltalk filed a form with the SEC stating that the value of its entire patent portfolio was 50K.

11:41 Do you see that?

11:41 A. Well, that's not what that means, but --

11:41 THE COURT: You need to answer her question. She asked you a yes or no question about what it states. Answer her question.

11:41 A. I don't -- I'm just saying, I don't think that

I can respond to the question the way you phrased it because this has to do with something else.

BY MS. PIEPMEIER:

Q. You can say no to it.

A. So say the question again so I can be precise, please.

Q. Let me restate the question.

In this SEC filing, Paltalk told the United States Securities and Exchange Commission that the carrying amount, that is the value of its patents, was $50,000; is that right?

A. Carrying amount I think is correct.

Q. Now, let's shift gears again.

You would describe Paltalk --

MS. PIEPMEIER: We can take that down.

BY MS. PIEPMEIER:

Q. You can describe Paltalk as a videoconferencing company, right? You would say that?

A. Correct.

Q. And as the CEO of a videoconferencing company, you have probably viewed just about every videoconferencing platform that there is out there, right?

A. Many of them.

Q. And you'd agree that all videoconferencing

11:42 products you use are pretty good?

11:42 A. Yes. Most of them are pretty good.

11:42 Q. Aside from this lawsuit, you're generally familiar with Cisco, correct?

11:42 A. Generally familiar, yes. Correct.

11:42 Q. You've used Webex. You just can't remember when?

11:42 A. Correct.

11:42 Q. And because you don't remember when, you don't know if Webex offered the ability to host an audio conference with a plain old telephone and a computer on the same audio conference before Cisco acquired Webex. You have no idea?

11:42 A. I don't know that.

11:42 Q. Could be that it did?

11:43 A. Could be.

11:43 Q. You don't see Cisco's Webex as competing with any products or service that Paltalk offers today, right?

11:43 A. I don't agree fully with that.

11:43 Q. Well, you think you're in a different niche?

11:43 A. A little bit of a different niche, so more indirectly than directly.

11:43 MS. PIEPMEIER: Could we please put up --

BY MS. PIEPMEIER:

11:43 Q. Or please turn to your deposition, Page 106, Lines 13 to 18.

11:43 I asked you: So as the president and CEO of Paltalk, Inc., you don't see Cisco's Webex as competing with the products and services that Paltalk, Inc. offers today?

11:43 Answer: No. I think we are in a different niche.

11:43 A. Correct.

11:43 Q. And you would agree with me that nobody from Paltalk itself will speak as to why Paltalk believes Cisco infringes its patent?

11:43 A. Nobody from Paltalk, Inc. That's correct.

11:43 Q. Nobody from Paltalk Holdings?

11:43 A. Nobody.

11:43 Q. Paltalk will leave explanation of why it believes Cisco infringes to lawyers and paid experts?

11:44 A. Correct.

11:44 Q. You would also agree with me that nobody at Paltalk knows what a reasonable royalty percentage could be?

11:44 A. Correct.

11:44 Q. Again, you'll leave that to Paltalk's paid experts?

11:44 A. Correct.

11:44 Q. Paltalk has no patent -- no policies on patent licensing?
11:44 A. Correct.
11:44 Q. No practices or conventions for licensing patents?
11:44 A. Correct.
11:44 Q. Now, during your direct, you testified, I believe, about PX-208 -- or actually, I can't believe -- remember if you actually testified about it, but it was in your direct binder.
11:44 MS. PIEPMEIER: Can we pull up --
BY MS. PIEPMEIER,
11:44 Q. Or actually, can you turn to that in your direct binder if you don't have it in front of you?
11:45 A. In my direct binder. Sure.
11:45 Q. And with apologies, I can't remember if you've already discussed this, but it's in your direct binder.
11:45 A. 208, correct?
11:45 Q. Yes. Tab 10 it looks like, maybe.
11:45 A. Yeah. I have it.
11:45 Q. And do you recognize this document?
11:45 A. Yes.
11:45 MS. PIEPMEIER: I can't recall, Your Honor, if this is already admitted, but if not, I would like to publish it and admit it.

MS. MAGEE: No objection, Your Honor.

THE COURT: Did you say no objection?

MS. MAGEE: No objection.

THE COURT: It'll be admitted.

MS. PIEPMEIER: Let's go to Slide 3 -- strike that.

Actually, let's stay on this Slide 1.

BY MS. PIEPMEIER:

Q. So this is an investor presentation from Paltalk on about October 2023, just about ten months ago.

A. Correct.

Q. And you were involved in giving this -- preparing this presentation?

A. Yes.

MS. PIEPMEIER: Let's turn to Slide 3.

BY MS. PIEPMEIER:

Q. Paltalk's entire market cap you see on Slide 3 is 18 million; is that right?

A. As of that date. Correct.

Q. As of that date, that was the market's best estimate of what your entire company is worth?

A. Correct.

Q. And that is a fraction of what you're asking Cisco for in this lawsuit; is that correct?

11:46 A. That's correct.

11:46 MS. PIEPMEIER: Thank you.

11:46 I pass the witness.

11:46 REDIRECT EXAMINATION

11:46 BY MS. MAGEE:

11:47 Q. Okay. Mr. Katz, do you recall giving testimony a little while ago that no one at Paltalk is going to offer opinions about the infringement of the '858 patent?

11:47 Do you remember that line of questioning?

11:47 A. Yes.

11:47 Q. Okay. Did Cisco give you or anyone else at Paltalk the documents to be able to evaluate whether Cisco infringes?

11:47 A. No. They didn't give me anything.

11:47 Q. Do you recall a similar line of questioning about whether anyone at Paltalk would be able to speak to the reasonable royalty? Do you remember those questions?

11:47 A. Yes.

11:47 Q. Did Cisco give you any documents to be able to discuss what a reasonable royalty might be?

11:47 A. No.

11:47 Q. Cisco did not -- did Cisco give you such confidential documents?

11:47 A. No.

11:47 Q. And, Mr. Katz, you recall both in opening and a minute ago questions about whether or not Paltalk reached out to Cisco about negotiating a license.

11:48 Do you remember that?

11:48 A. Yes.

11:48 Q. Okay. And since you filed this lawsuit in July of 2021, has Cisco taken a license to the '858 patent?

11:48 A. No.

11:48 MS. MAGEE: Your Honor, may I approach?

11:48 (Bench conference.)

11:48 MS. MAGEE: Your Honor, ordinarily the Court's MIL No. 6 would preclude any reference of any IPRs or re-exams. But Ms. Piepmeier --

11:48 THE COURT: Not coming in.

11:48 MS. MAGEE: Okay.

11:48 (Bench conference concludes.)

11:48 BY MS. MAGEE:

11:49 Q. Lastly, Mr. Katz, do you recall being asked questions about the $145,000 you paid for the -- for obtaining the assets? Do you recall?

11:49 A. Yes.

11:49 Q. Okay. And again, Mr. Katz, what went into that purchase price?

A. Which assets?

Q. I'll ask a better question, Mr. Katz.

Did that purchase price reflect how Paltalk valued the HearMe assets?

A. No. I said that a bunch of times. I think it was just an extreme fire sale based on the way the world was and where HearMe was, and their liquidation was a once-in-a-lifetime sort of opportunity.

Q. And lastly, Mr. Katz, back on the subject of Paltalk not having to reach out to Cisco, do you recall those questions?

A. Yes.

Q. Okay. Mr. Katz, it is your belief that there would have been -- is it your belief that there would have been consequences for Paltalk had they reached out to Cisco initially?

A. Yes. Negative consequences for Paltalk.

MS. MAGEE: Okay. I pass the witness.

MS. PIEPMEIER: No further questions.

THE COURT: You may step down, sir.

Ladies and gentlemen of the jury, we'll go ahead and take our lunch break. If you all would be back by 1:15, we'll get started again.

Unfortunately, for some reason, a lot of things are closed on Mondays for lunch near the

11:50 courthouse. So you're sort of on your own. After today, there's a food court right across the street that's pretty convenient that you can get to pretty quickly.

11:50 So please do your best to be back by 1:15. Please remember my instructions about not discussing the case with anyone.

11:50 THE BAILIFF: All rise.

11:50 (Jury exited the courtroom.)

11:50 THE COURT: Thank you. You may be seated.

11:51 Who do we -- who will we be seeing this afternoon from the plaintiff?

11:51 MR. SIEGMUND: Your Honor, after this, we have I believe four depositions that we're going to play. I believe will take about an hour, and then it'll be --

11:51 THE COURT: Juries love long depositions.

11:51 MR. SIEGMUND: I know they do, Judge. Luckily, it's not too bad.

11:51 And then after that, it'll be our technical expert.

11:51 THE COURT: Okay. Very good.

11:51 So no chance we'll finish your case today.

11:51 MR. SIEGMUND: No, Your Honor.

11:51 THE COURT: So this may or may not hold. Typically the way it's --

11:51 This doesn't need to be on the record.

11:51 (Off-the-record discussion.)

11:53 (Recess taken.)

01:28 THE BAILIFF: All rise.

01:28 THE COURT: Please remain standing for the jury.

01:28 (Jury entered the courtroom.)

01:28 THE COURT: Thank you. You may be seated.

01:28 Counsel?

01:28 MR. SIEGMUND: Yes, Your Honor. Paltalk calls Nathan Buckles by video deposition. He's a Cisco engineer, and his testimony is relevant to infringement.

01:29 THE COURT: Ladies and gentlemen of the jury, let me explain to you how our system works. When you're preparing a case to get it ready to come to trial, you have the opportunity to ask people to take a deposition.

01:29 A deposition is where the lawyers for both sides show up. There's a court reporter -- probably not as great as my court reporter, but a court

reporter. And the witness is sworn, and then each side gets to ask them questions and they are under oath.

That's the most important part, is just like the witnesses who are here in person are under oath, the next four witnesses you see by deposition will also be under oath. But we're in Waco. You know, there are folks who can't get to Waco for a trial. And so the lawyers can provide you with their video --

By video?

MR. SIEGMUND: Yes, Your Honor.

THE COURT: Okay. They'll show you the videotaped depositions. The most important thing for you to remember, and I'll give you an instruction to remind you of this at the end of the trial, the fact that the witness is not here should play no role in the amount of credibility you give the witness or witnesses because they have been sworn.

Now, again, I'm not telling you to believe them, I'm not telling you not to believe them. That's why y'all are here as judges with each witness. Just don't hold it against them that they're here by video and not in person.

Counsel?

(Video deposition of Nathan Buckles played as follows:

Q. First of all, could you state your full name

for the record?

A. Sure. My full legal name is Carl Nathan Buckles.

Q. Who's your employer?

A. My employer is Cisco Systems.

Q. You've been working with Cisco for almost 25 years?

A. Yes. It's about 23. Yeah.

Q. And your title is distinguished engineer; is that right?

A. That's correct.

Q. You understand that you are testifying as a corporate representative of Cisco's on certain topics, right?

A. That's correct. I do understand that. Yeah.

Q. Do you see Topic 20 on the screen, sir?

A. I do.

Q. 20(a) -- or Topic 20 says: The defense has asserted in this case by Cisco, including but not limited to, A, Cisco's basis or bases for denying infringement of the patent-in-suit.

Do you see that?

A. Yes.

Q. And you are prepared to give testimony on that topic, right?

A. That's correct.

Q. What did you do to prepare to give testimony on Cisco's behalf on this Topic 20(a)?

A. I met with Cisco counsel as well as Brick Zhang and Wilford Wang.

Q. The source code that you reviewed in preparation for this deposition was a set of source code that was presented to you for -- for review.

Is that -- is that fair to say?

A. That's correct.

Q. Okay. It wasn't source code that you on your own volition went out and identified for review from the source code repository, right?

A. That's correct.

Q. Certain Webex products include audioconferencing functionality, right?

A. We should be -- probably be specific about what you mean by audioconferencing.

Q. Let me ask the question in the converse.

Are there any Webex products that do not include audioconferencing functionality?

A. Yeah. Again, I'm not sure we have the same understanding of what you mean by audioconferencing. So it's a bit hard to give an accurate answer.

Q. Do you have any understanding of what the term

"audioconferencing functionality" means as Nathan Buckles?

A. I do.

Q. And what does it mean to you?

A. So to me, an audioconference is the exchange of audio information between two or more parties in a -- in a online meeting.

Q. You've seen this document before, right, Mr. Buckles?

A. I've seen parts of it, yes.

Q. You've not seen the entire '858 patent?

A. No.

Q. You've never read the '858 patent from start to finish?

A. That's correct.

Q. What parts have you seen and what parts have you not seen?

A. That's a difficult question to answer because I haven't heard -- or the latter part is difficult to answer because I haven't seen the whole thing. It's hard to say what I haven't seen. I have seen the claims section, I believe, is what it's called --

Q. Okay.

A. -- where the claims are enumerated, and I've seen some of the diagrams. I don't know where in the

document those come from necessarily.

Q. So you reviewed the claims of the patent and you reviewed certain of the diagrams.

Is this the first time you're seeing the patent itself?

A. Do you mean this particular, like, title page or --

Q. Yeah.

A. I can't say for sure. I may have seen the abstract before, but it's hard to be sure, because since I've seen the claims, I can kind of -- they're very similar to the abstract. So I can't be sure if I've actually seen the abstract before or if it's just familiar.

Q. You have no basis to believe that the '858 patent is invalid, right?

A. As I said, I haven't read the entire patent, and I don't know what legal sort of requirements have to be met or not met for a patent to be valid. So I don't hold any personal opinion about its invalidity.

Q. And I would like for you to identify for me which of the patent drawings you've reviewed before today, to the best of your recollection.

Did you review these two drawings on Page 1?

A. No.

01:35 Q. Did you review this drawing on Page 2?

01:35 A. No.

01:35 Q. Did you review this drawing on Page 3?

01:35 A. No.

01:35 Q. Did you -- before sitting here today, had you reviewed Figure 3 on Page 4 of the patent?

01:36 A. No.

01:36 Q. Before sitting here today, have you reviewed Figure 4, which is on Page 5 of the patent?

01:36 A. No.

01:36 Q. Okay. So you actually haven't reviewed any of the drawings or figures on the '858 patent; isn't that right?

01:36 A. If that's all of them, yes. I thought there was a different one maybe on the first page that looked familiar, but perhaps I was misremembering.

01:36 Q. Sir, do you recognize the text beginning on Page 6 and then continuing to Page 9 to be a specification of the patent?

01:36 A. Yeah. I have -- I have not reviewed all of this, but I have seen some of it.

01:36 Q. Okay. Are there any parts that you recall reviewing from Columns 1, 2, 3, 4, 5, 6, or 7 of the '858 patent?

01:37 A. We went -- we went through those fairly

01:37 quickly, but at the bottom of Column 7, where it states "what is claimed is" --

Q. Yep.

A. -- that's the part that I know for sure that I have reviewed.

Q. From Column 1, which is on the left there, that starts with background of the invention, all the way through the "what is claimed is" language on Page 9 in Column 7, what parts of that portion of the patent, if any, have you read and reviewed?

A. I don't think I've read or reviewed anything in that -- in that section you just identified.

Q. Okay. Have you in connection with -- or did you ever ask to review anything in the '858 patent except for the claims?

A. I have -- I have not.

01:38 Q. And you're aware that this '858 patent is a public document, right?

A. Yes.

Q. You have not gone, then, on your own volition and pulled up the '858 patent and read anything other than the claims which begin on Page 9, right?

A. I have not gone and retrieved this packet -- or sorry -- this patent document or read through it. No.

01:38 Q. Is it your testimony on behalf of Cisco today that this '858 patent is not infringed by Cisco's Webex products?

01:38 A. Yeah. Sorry. I can't provide you with a legal opinion on that, but I can provide facts around the behaviors of -- of Cisco's Webex systems related to this patent.

01:38 Q. Webex Meetings allows users to participate either with a computerized device, like a smartphone or a PC, or alternatively, with a standard telephone, like a PSTN telephone. Isn't that right?

01:39 A. That's not a -- that's not a complete list, but yes. All of those are capable of participating in Webex Meetings. Yeah.

01:39 Q. Webex Meetings allow various types of devices to participate in the meeting, right?

01:39 A. That's correct.

01:39 Q. And a PC can participate in a Webex meeting, right?

01:39 A. Yes.

01:39 Q. PSTN telephones that cannot do mixing themselves are able to participate in Webex Meeting audioconferences, right?

01:39 A. That's correct.

01:39 Q. Well, Webex Meetings servers do have the

01:39 capability to mix audio, right?

01:40 A. That's correct. Some of -- some of them do.

01:40 Q. You use the word "multiplexing" or "multiplex" in your business, right?

01:40 A. Yes. We sometimes use that term.

01:40 Q. What do you understand it to mean?

01:40 A. Even within Cisco, it has had different meanings over time. So we'd have to talk about a specific situation to sort of have a firm definition.

01:40 Q. In what instances would a PC-based client require mixing?

01:40 A. So the -- the determination to -- to use mixing or not is based on multiple factors, including the capabilities of the physical client itself, the networks and systems in between that client and Webex, and the overall user experience that we want to deliver to that particular client. All of those are factors in determining -- sort of mixing and non-mixing isn't really a standalone factor itself.

01:41 Q. Can you confirm, sir, that Webex Meetings is capable of determining, in at least some instances, which clients have the capability to mix multiple audio streams and which do not?

01:41 A. Yeah. In some but not all instances.

01:41 Q. You reviewed this Claim 1 to the '858 patent,

01:41 right, Mr. Buckles?

01:41 A. Yes.

01:41 Q. Is it -- is it Cisco's position that Webex Meetings does not infringe Claim 1 of the '858 patent?

01:41 A. Yes.

01:41 Q. What are the bases of that contention?

01:41 A. Yeah. So I can't provide the -- the legal basis, but I can answer -- you know, provide facts about the way that Webex Meetings behaves relative to what's described in the claim.

01:42 Q. So you're not prepared to provide the bases why Cisco believes Claim 1 is not infringed?

01:42 A. Yeah. I believe that's best presented by Cisco counsel.

01:42 Q. So the preamble to Claim 1 says: A method of providing audioconferencing for a plurality of clients using varying equipment and protocols.

01:42 Do you see that?

01:42 A. Yes.

01:42 Q. You would agree that Webex Meetings does provide via conferencing -- or is capable of providing audioconferencing for a plurality of clients using varying equipment and protocols?

01:42 A. Yeah. I think that's a somewhat vague description, I think. So it's hard to be definitive.

01:42 Q. And there are also some situations that I'm looking at now, Part 1 here or the first clause here, where Cisco Webex Meetings receives an audio packet from each of the plurality of clients who are participating in an audioconference; isn't that right?

01:43 A. Just to be clear, the question was Cisco Webex Meetings receives audio package from each of the plurality of clients?

01:43 Q. Yes. There are situations where that happens.

01:43 A. Yes.

01:43 Q. Okay. And there are situations where Cisco Webex Meetings then determines which of the plurality of clients participating in an audioconferencing session is an active speaker, right?

01:43 A. We should probably discuss what we mean by "active speaker."

01:43 Q. Okay. Do you have any testimony on behalf of Cisco as to whether Cisco Webex Meetings in any instances determines which of the plurality of clients in an audioconferencing session is an active speaker?

01:44 A. Yes. With the caveat that "active speaker" can mean different things to different people. Some people define it as very clearly being speech, and other people would define it perhaps more as any form of noise. So there is some -- some ambiguity there.

Q. Well, as Cisco uses the term. There are instances where Webex Meetings determines which of the plurality of clients in an audioconference is an active speaker, right?

A. Yeah. I think that -- that's reasonable to say.

Q. And there are also circumstances where Cisco Webex Meetings determines which of the plurality of clients in an audioconference is an active speaker and forms an active speaker list; is that right?

A. There are -- there are instances where, yes, clients who are determined to be active speakers are grouped together in some way.

Q. Are there any instances where Cisco Webex Meetings determines that a plurality of the clients in an audioconferencing system has the capability to mix multiple audio streams?

A. So again, we do use the capability of client mixing multiple audio streams in some scenarios, but it's not based strictly on the capability of those clients to do so.

Q. Are there any instances where Cisco Webex Meetings makes a determination of whether one or more clients in an audioconference has the capability to mix multiple audio streams?

01:46 A. Yeah. Again, that -- that determination is based on multiple factors.

01:46 Q. What determination?

01:46 A. The determination of whether the client should be delivered mixed or unmixed audio streams.

01:46 Q. Understood. And one of those factors is the physical capabilities or characteristics of the client device, right?

01:46 A. In some cases, but not in others.

01:46 Q. No. 5 says: Multiplexing said packets of audio data received from each client on said active speakers list into a multiplexed stream.

01:47 Do you see that?

01:47 A. Yes.

01:47 Q. Do you understand what that means?

01:47 A. Again, I think there are multiple different versions or meanings behind the use of the term "multiplexing." So we'd have to discuss it, what -- what it means in this context.

01:47 Q. Do you have any testimony about whether Cisco Webex Meetings infringes Claim 5 of the patent? The answer can be no. I'm just trying to understand your testimony for trial.

01:47 A. No. In terms of infringement, I don't -- I'm not going to offer a legal opinion on that, but I can

answer specific questions about the way the system behaves.

Q. And you didn't consult any other parts of this patent, including the patent specifications, to try to get a better understanding of what Claim Element [5] means, right?

A. I think, yeah, like I said earlier, I have only seen the claim section for the most part.

Q. Do you have any understanding, based on how you've used the words "multiplexing" and "multiplexed" and "stream" in the ordinary course of your business, whether Cisco Webex Meetings multiplexes packets of audio data received from clients in an audioconference on the active speaker list into a multiplexed stream, whether that ever occurs?

A. Based on how I would define the terms "multiplexing" and "multiplexed stream," I would not describe the behavior of Webex -- Cisco Webex Meetings in that way.

Q. Could you elaborate?

A. So again, a stream is a very particular concept within the realtime media standards. It has -- it determines certain aspects of the way the media is transmitted, like the way the security is done, the way that, like, you determine whether packets are lost in a

network and things like that. And the way that Webex Meetings uses multiplexing does not leverage the multiplexed stream concept, as I would define it.

Q. But Cisco Webex Meetings does have multiplexing capabilities with respect to audio conferences, right?

A. Yes. I think that -- that's fair to say with the caveat that, again, multiplexing can take many different potential forms.

Q. Do you have a description in the way -- of the way that Cisco Webex Meetings delivers multiplexed audio to clients? Can you describe that for me?

A. Sure. There's multiple levels of multiplexing in a Webex meeting. We -- for example, we multiplex the audio and video delivered to a client onto the same network. So those are sent across the same network between the server and the client.

And we also multiplex multiple audio streams to -- again, to a receiving client. We also multiplex -- in some cases, video being sent from a client is multiplexed onto the network towards the server. So there are a lot of different usages of multiplexing. That's why it's a bit difficult to always have a common understanding. It's a very overloaded term.

01:50 Q. There are instances where Cisco Webex Meetings does mix audio before transmitting the audio in a packet back to some or all clients in a conference, right?

01:51 A. Yes. I think that's an accurate answer.

01:51 Q. Yeah. And my microphone. And then there's -- I assume that Webex has a feature to eliminate that echo from the conference?

01:51 A. Yeah. To the -- to the question of does Webex have a feature to eliminate that echo, yes. We do. It's called audio echo cancellation, or AEC, a typical abbreviation for it.

01:51 Q. When there's a determination at the server level of who the active speaker is, how is that determination made?

01:51 A. It does vary a little bit from server to server and has varied over time. There's lots of tuning of those sorts of parameters, how fast it should react, how long it should stay, different things like that.

01:51 But essentially, the system is examining the audio that it's receiving, and it is looking as best as it can for whether that audio contains useful noise, and within the context of a meeting useful noise is largely people talking, although not exclusively.

01:52 And then if -- if a person is talking, then the server will, again, do that correlation of audio to video and try to draw that blue or green box around that portion of the video.

01:52 Q. And talking now about Webex Meetings, there are instances where audio clients use SIP to connect with Webex Meetings, right?

01:52 A. Yes. Audio clients, audio/video clients, different -- yeah. Clients have different levels of capability.

01:52 Q. You would agree that a client using a telephone and the H.323 protocol is capable of participating in a Webex Meetings audioconference, right?

01:53 A. Yes. With the -- with the caveats that I described earlier.

01:53 Q. Does Webex Meetings use a metric of loudest audio to determine the active speakers?

01:53 A. In combination with -- with some other factors. So the determination of loudest audio can be quite complex.

01:53 For example, you can imagine that someone has a noisy fan in their home office, right? Now, that's -- that's loud, but it's not useful loud. So there is some devil in the details in terms of the

01:53 determination of loudest and what we -- what we intend
01:54 to deliver. But at a high level, you could best
01:54 describe the goal as saying if someone is making --
01:54 speaking within a meeting, you want to be able to hear
01:54 them.

01:54 Q. And does the CMS server store an active
01:54 speaker list in connection with an audioconference?

01:54 A. I don't know the full details of the CMS code,
01:54 but in terms of a -- or how those -- that sort of
01:54 concept is tracked. But at a high level, it would
01:54 have, again, the notion of wanting to deliver the most
01:54 relevant or most useful audio to the clients that are
01:54 connected to it.

01:54 Q. Has Cisco made any efforts to design around or
01:54 otherwise avoid infringement of the '858 patent?

01:54 A. No.

01:54 (End of video deposition.)

01:55 MR. SIEGMUND: Thank you, Your Honor.

01:55 Paltalk next calls Mr. Aaron Belcher,
01:55 another Cisco engineer. And his testimony's relevant
01:55 to infringement by video deposition.

(Video deposition of Aaron Belcher played as follows:

01:55 Q. As you heard from your counsel, my name is
01:55 Bryce Barcelo, and I represent Paltalk in this case.

01:55 Would you mind stating your full name for the

01:55 record?

01:55 A. My name is Aaron James Belcher.

01:55 Q. Okay. And have you reviewed the patent-in-suit?

01:55 A. I have reviewed the claims in the patent-in-suit. Not -- yes.

01:55 Q. And so did you actually look at the actual patent-in-suit?

01:55 A. The claims of the patent-in-suit. I focused specifically on the claim. I didn't read every word in the rest of the document.

01:55 Q. What did you do to prepare for today?

01:56 A. I mean, nothing specific related to this topic. I mean, I'm the head architect for the Webex Meetings and messaging BU. So as part of my daily job, I pay attention to changes that are made.

01:56 Q. And when was the last major change to the UX in this area?

01:56 A. Yeah. When was the last major change in the UX in this area? Yeah. I mean, the -- the product's been basically functioning the same in this area for as long as I can remember. We -- we have always been an audioconferencing, you know, application that supports PSTN.

01:57 Q. And how would you describe or define

01:57 multiplexing?

01:57 A. So multiplexing is a pretty vague term. Multicast is a standard. You know, there is an RFC describing it. Cisco is very involved in that. Multiplexing is a more generic term. It's a lot vaguer. So I need -- need some context where you want to define multiplexing in.

01:57 Q. So with -- with regards to audioconferencing, how would you define multiplexing?

01:57 A. So with regard to audioconferencing, how would you define multiplexing? So yeah. I -- we do have a product that multiplexes video, and it might be helpful for me to describe that and then go from there, and then describe how -- yeah. So we have a product that has two video streams -- screens, and the -- what happens is the server detects that the client has two video streams, and instead of sending that one video stream, the server does a composed video that has a complete layout on both video streams. And over that one connection to the -- that video device, we send two video streams, and we call that multiplexing.

01:58 But it's -- it's all -- it's done in a transcoder, where the transcoder knows it's talking to a device that has two screens, and it's, you know, creating two separate video screens -- the things for

01:59 it. So that duplex video is the way we think about it. "Multiplex video" is a term we use to describe that specific thing. We don't have anything similar to that for audio, so, you know, it's hard to -- to describe what...

01:59 Q. And what role does H.323 play in audioconferencing for Webex?

01:59 A. It's a very small role. There's some older clients that still talk about protocol.

01:59 Q. And so it's a legacy compatibility protocol? Would that be fair to say?

01:59 A. Correct.

01:59 Q. Do the Webex products receive audio packets from clients?

01:59 A. Yeah. It's vague. Do the Webex products receive audio packets from clients? Yes. It's vague. But yes. We do.

02:00 Q. And what is -- what does the term "mux" mean to you?

02:00 A. Context?

02:00 Q. Sure. You can go to the next slide if you need context for the term "mux."

02:00 A. Oh, next slide, Slide 4?

02:00 Q. Yes.

02:00 A. I don't know what that means for sure. I

02:00 don't want to speculate in that context.

02:00 Q. Do you know what the term "mux" means in any context?

02:00 A. So -- so I have heard it before, I think. I -- you know, if I saw it in context, I would understand what it means. But I can't think of like a definition of what mux means.

02:01 Q. So you are not familiar with mux as a shorthand term for multiplex?

02:01 A. No.

02:01 Q. You've never -- you've never seen that association between those two terms?

02:01 A. No. I mean -- yeah. It could be used that way, but I have never seen that association.

02:01 Q. Okay. Does the CMS mix audio streams before sending them to the phones?

02:01 A. Yes.

02:01 (End of video deposition.)

02:01 MR. SIEGMUND: Paltalk next calls Mr. Steven Boyles. He's a principal at Five Corners, and his testimony is relevant to damages by video deposition.

02:02 (Video deposition of Steven Boyles played as follows:

02:02 Q. Mr. Boyles, do you understand today that you're appearing as Cisco's corporate representative

02:02 for a number of topics?

02:02 A. I do.

02:02 Q. Now find Topic 30. I'll read this one and let you take the heavy lifting there, but Topic 30 says: Sales of software incorporating the accused functionalities and attendant sales data.

02:02 Did I read that correctly?

02:02 A. I believe so.

02:02 Q. Mr. Boyles, do you have an understanding of what is meant by accused functionalities as it appears in Topic 30?

02:02 A. Again, I have a broad understanding as to what it relates to.

02:02 Q. And what is that broad understanding?

02:02 A. That it pertains to the audio portion of the sales.

02:03 Q. What do you mean by "audio portion," Mr. Boyles?

02:03 A. Well, when referring to, I guess, Webex products, it's the audio portion of the product functionality as opposed to the meetings or polling or visual portions or anything else that's not related to sound.

02:03 Q. Mr. Boyles, do you know if Cisco keeps track of the number of users of its Webex products?

02:03 A. I have seen no indication that within at least the finance group, there's any tracking mechanism of number of users.

02:03 Q. Mr. Boyles, do you know how much revenue Cisco earned from the Webex Meetings meet option in 2021?

02:04 A. I have not analyzed the data that's been produced or tried to break it down between meet, enterprise, or other.

02:04 Q. And, Mr. Boyles, you don't know how many users Cisco has for Webex Calling basic, do you?

02:04 A. I have not seen -- I have not seen any documents reflecting the number of users.

02:04 Q. You haven't seen any documents reflecting the number of users for any Webex product; is that correct?

02:04 A. Correct.

02:04 Q. And, Mr. Boyles, I'm looking now at B-13 which says U.S. Revenue. I don't see any U.S. revenue listed until we get to Q1 of fiscal year 2018.

02:05 Do you know why those rows are blank for fiscal years '15 through '17?

02:05 A. I do.

02:05 Q. And why is that?

02:05 A. The Cisco data that anybody has access to is purged after a certain number of years. And so the U.S. portion of the Webex revenue, we only have access

to it back to fiscal year 2018. Prior to that, someone at Cisco's going to have to go into some sort of archive. We have to first of all identify where the archive might be attributed to the U.S. only revenue and try to extract that information. It just hasn't been able to be done yet because there isn't specific IT support available to do that any longer.

Q. Mr. Boyles, have you ever seen any surveys completed by Cisco or Webex customers about how much they value Webex Calling, for example?

A. I have not.

Q. Mr. Boyles, have you ever seen any financial analyses or reports that Cisco uses to measure the performance of Webex?

A. Beyond what we have reviewed today, I'm not aware of anything additional.

Q. Does Cisco track revenue at a more granular level than that, like with respect to revenue from Webex Events, Webex Calling? Do you know the answer to that question one way or the other?

A. Well, the information in Exhibit 16 and related exhibits is the most granular level you could imagine reporting this information. It's -- not only is it by product, sometimes it's by elements of a product.

02:07 Q. And, Mr. Boyles, you previously discussed that Cisco does not track, for example, its R&D expenses by product; is that right?

02:07 A. Correct. That's my understanding.

02:07 (End of video deposition.)

02:07 MR. SIEGMUND: And, Your Honor, plaintiff would move to admit PX-139 and PX-154.

02:07 MR. SABRI: No objection, Your Honor.

02:07 THE COURT: Admitted.

02:07 MR. SIEGMUND: That's all the video depositions, Your Honor.

02:07 THE COURT: Thank you.

02:07 Who will your next witness be?

02:07 MR. CAUGHEY: Plaintiff calls Dr. Scott Schaefer.

02:07 (The witness was sworn.)

02:08 DIRECT EXAMINATION

02:08 BY MR. CAUGHEY:

02:08 Q. Good afternoon.

02:08 A. Good afternoon.

02:08 Q. Could you please state your name for the record?

02:08 A. Sure. My name is Scott Schaefer.

02:08 Q. How are you doing today?

02:08 A. Okay.

Q. I see on the screen and I think it's probably on the jurors' screen the cover slide. Have you put together a slide deck to assist with your testimony today?

A. Yes.

Q. Okay. And we will walk through this over the next while.

MR. CAUGHEY: And if we could go -- I don't have the clicker. Hold on, I'm sorry, that's going to be useful --

BY MR. CAUGHEY:

Q. More than one slide, right?

A. It is.

Q. Okay. Now, this is the first slide of the deck with Dr. Scott Schaefer.

Would you tell the jury a little bit about yourself?

A. Sure. So I grew up around San Antonio, Texas, and for my undergraduate, I went to Trinity University, which is a small school in San Antonio, and I got a bachelor of science in computer science and mathematics from there.

After that, I went to Rice University in Houston, Texas, and I got a master's of science in computer science as well as Ph.D. in computer science

from there.

After I left Rice, I went to Texas A&M in College Station. And I became assistant professor there. And I was promoted to associate professor, eventually full professor and became the associate department head, and I've been department head of computer science and engineering the last five years now.

Q. Let's add a little daylight to a little bit of that. Could you tell the jury what's involved or what was involved in your working toward and receiving a Ph.D. in computer science from Rice?

A. Yes. Well, I guess I could talk about degree requirements and so forth. I've taken a set of graduate classes and so forth to all factors of the academic aspect, but I also had to do original research and computer science. I had to publish that research, within that research. And I guess those were some of the main qualifications, but there were other aspects to the degree as well.

Q. You mentioned that you're the department head at Texas A&M in computer science. What responsibilities does that entail?

A. Well, I basically run the department. So I have to do things like hiring faculty. For example, I

02:10 get to evaluate faculty candidates and hire them. I'm
02:10 responsible for the budget of the department.
02:10 Responsible for the overall strategic directory of the
02:11 department.

02:11 I have to evaluate faculty on an annual basis, and I have to evaluate them for promotion and tenure
02:11 and things of that nature as well. Those are I guess
02:11 just some of the things that you have to do as the
02:11 department head, but basically I'm responsible for the
02:11 entire department.

02:11 Q. Do you teach?

02:11 A. I do, although not right now this semester.

02:11 Q. What -- can you give us -- the jury some
02:11 examples of classes you've taught as the computer
02:11 science professor at Texas A&M?

02:11 A. Sure. I taught a bunch of classes, I guess,
02:11 at A&M. I taught an introduction to computing class
02:11 for like just starting out students in their major. I
02:11 taught a data structures and algorithms class. I
02:11 taught -- let's see. A computer graphics class. I
02:11 taught an upper-level seminar class for our more
02:11 advanced students. I taught some graduate classes in
02:11 geometric modeling and so forth at the graduate level
02:11 as well.

02:11 Q. And the last box here, that reflects an award

02:11 you've won for teaching?

02:11 A. Right. Yeah. I won actually several awards for teaching, but that one I think is maybe referring to the Association of Former Students Distinguished Teaching Award at the university. It's one of the highest awards actually given by the university for teaching.

02:12 Q. Now, on this next slide, it's fairly dense with information.

02:12 But have you ever done any private sector work in addition to your faculty position at Texas A&M?

02:12 A. Yeah. I actually worked for a bunch of different companies.

02:12 Q. Could you give some examples to the jury of some of the computer science-oriented work in the private sector?

02:12 A. Sure. So I guess the ones that are listed here, I worked at Microsoft Research for a little bit. And I also worked at -- let's see. This one's Southwest Research Institute in -- it's a place in San Antonio, Texas, where I did radio direction finding algorithms.

02:12 Q. And we heard that acronym DARPA before.

02:12 What sort of work did you do for that defense research agency?

02:13 A. So that was the department -- DARPA computer science study panel. We went to various -- we went to various military agencies. Sorry. I had to think about it. I had to get clearance to do this and I had to think what I can talk about.

02:13 Basically, we were trying to help aspects of the U.S. military solve technological problems. I think that's how I can put it.

02:13 Q. And now, probably right on the other end of the spectrum, I see a cartoon mouse in the third row which my children would be much more interested in.

02:13 What's the story with Ratatouille?

02:13 A. Yeah. That's a picture from one of the Pixar movies. Some of the research I did was about ways of animating and forming shapes, basically, and Pixar implemented a variation of that technique actually as part of their animation pipeline. And Ratatouille was the first movie that it actually got used on.

Q. And it says you've published papers in the field of computer science.

You just gave a couple of examples of your scholarship and published work.

02:13 A. Well, I don't know how much you really want to get into it.

02:13 Q. Not too much.

A. Not too much. I published a lot in different areas. One actually was that technique that got used in Ratatouille, for example. But I've published other stuff that's been used in a variety of different products that you actually might have come across.

Q. And I think the jury heard in one of the opening statements that you've been retained and are presented as an expert here to offer some testimony on the topic largely of infringement and technical issues.

What are the questions that you considered in connection with your analysis on this case?

A. Right. So the questions that you see there really is does Webex infringe upon the '858 patent? And what is the importance of Webex's infringing and noninfringing features?

Q. In addressing those questions, what materials did you consider?

A. I looked at a lot of stuff, actually. So I looked at the patent and its file history, claim constructions, the plain and ordinary meaning of claim terms in light of the patent specification. I looked at a lot of source code in this case, the accused products, documents that were provided by Cisco, documents provided by Paltalk, other publicly available material like the websites and so forth, the pleadings,

discovery responses. I read lots of depositions, and I had interviews with Dr. Madisetti and Dr. Bratic as well.

Q. We've heard and seen, I think, some images of the Webex audio conferencing product itself.

Have you used that product?

A. Yes. I have.

Q. Have you brought those -- that -- those experiences using the product to bear on your opinion in this case?

A. Yeah, of course.

Q. And could you -- we'll get into it in more detail, but could you just give the jury just a couple of sentences on what Webex is from the user's perspective?

A. Yeah. So Webex is a product that allows you to have videoconferences with a number of users. You can join in from maybe a computer or you can call in with a phone, and you can talk to each other. And at least the ones that are connected via a computer can see each other, if they have audio or video cameras and so forth that are connected. It lets them meet together, basically.

Q. All right. Can you -- in case folks have used other ones, can you give another example or two maybe

about similar platforms?

A. So other ones that you may have seen or heard of or something are things like Microsoft Teams, for example, or Zoom. Those are fairly popular ones that people also use.

MR. CAUGHEY: At this time, Your Honor, I move to qualify Dr. Schaefer as an expert in computer science and engineering.

MR. SABRI: No objection.

THE COURT: Admitted.

(Clarification by Reporter.)

BY MR. CAUGHEY:

Q. Now, we're going to start on your slides I see with the first question. Does Cisco infringe the '858 patent? And therefore, we'll start naturally with the '858 patent.

What do you see on the screen here, sir?

A. This looks like the first part of the '858 patent as well as Claim 1 of the '858 patent.

Q. And what do you understand these sort of claims of the '858 patent to be?

A. I understand the Claims 1, 2, 3, 4, and 5 are asserted.

Q. Okay. And the 2, 3, 4, and 5 aren't on the screen, but you've analyzed those claims?

A. That's correct.

Q. In -- in addition to the claims which we see here, what -- what else is contained in a patent? We'll look at some of that now, but what are the other parts of the patent?

A. So there's lots of different parts of a patent. I guess you can see the abstract here, for example, on the first page. It's sort of a small summary of the patent. That's usually followed by a list of figures. There's some of them on this page that you see. After that there's usually a description --

Q. Could I pause you for one second here?

MR. CAUGHEY: Mr. Boles, can you pull up PX-16 so the jurors can kind of follow along with this description?

A. Okay.

BY MR. CAUGHEY:

Q. There we go.

A. Correct. So there's --

Q. There's the first page, right?

A. There's the first page, abstract and images. That's usually followed by several more images, for example. And then after that, there's usually a description of background of the invention. I guess

you can see here would be a summary of the invention and a description of the figures.

And this is what we get as the preferred embodiments. So it's a description of one way that you might interpret the claims of the invention, one or more of the ways, I suppose, that you might implement the claimed invention in this case. It's not the only way to do it, but it's an example.

And then after that, it would be followed by a list of claims.

Q. And the claims start at the bottom there of this, I guess, last page or second-to-last page.

A. Yes. That's correct.

Q. With the number 1?

A. Usually they start at No. 1. Yes.

Q. Excellent. Good place to start.

MR. CAUGHEY: You can pull that down, Mr. Boles.

BY MR. CAUGHEY:

Q. So with that in mind -- there we go.

Now, I understand your slides march through a whole bunch of analysis in this regard, but for the jury's help, I think you start at the conclusion.

What is your conclusion?

A. Sure. My conclusion was that Claims 1

through 5 are infringed by Cisco's Webex.

Q. And before we get to the details of those Claims 1 through 5, I see you prepared something with a background of the invention. It looks like we start right where we left off of the patent a little bit.

Could you describe in light of this background of the invention, PX-16, the patent, some of the background of what this patent was dealing with?

A. Right. So the background here's talking about sort of traditional audio conference. So it's talking about utilizing telephones, so like regular telephone to dial into this server to have an audioconference over what's referred to as the public -- I guess here it says public service telephone network, which is often abbreviated as PSTN, actually. So you kind of see like that as PSTN probably a lot throughout this case.

Q. And it says also Plain Old Telephone System.

Is that like the traditional telephone, the rotary phone, something like that?

A. A traditional phone, yes. Connecting through the phone network.

Q. And when I -- for example, on my iPhone, if I dial a phone number, can that connect to the PSTN network as well?

A. Right. Yes. So cellular provider but yes.

Q. So the next slide shows something starting with kind of a grainy big old box up to a computer from a little bit later probably.

What are you depicting here?

A. So this is looking at some of the -- I guess the evolution basically of phones and audio products and so forth starting with various sort of simplistic versions of a wireless phone to like a video phone, for example, to a phone that -- I had one of these phones actually in my house. And eventually getting towards like computers to do audioconferencing.

Q. In the patent we saw the term "PSTN," or plain old telephone service. And I think you mentioned there was a rotary phone -- could you describe -- or just a traditional phone.

Could you describe for the jury what you're depicting here with this slide?

A. Right. So this is connecting over like the regular telephone network. Right? So we talked about the PSTN. That's the telephone network in this case. Phones would connect across this network in order to talk to one another.

But there's downsides of doing things this way. So it's expensive, the way that this network is

set up. I remember having long-distance fees, for example. And so, you know, communicating over long distance or geographically disparate regions was difficult, expensive, and things like the speed of this network was not super great either.

Q. This slide mentions expense, speed and long instance. The next slide talks -- jumps forward back to the '858 patent and the problem that you said solving it, what you called hybrid audio.

Can you first explain to the jury what you mean -- or what the patent means, I suppose, by hybrid audio?

A. Right. So in this picture that you see here --

Q. There you go.

A. So there's like telephones connecting through the PSTN. We talked about that. That was the phone network from before. But computers connect through a different type of network. And you can use a different type of communication, actually. So this wide area network here is really just another word to substitute the word "Internet" here, right, so this is the Internet.

And it's showing these things connecting to this server over here, and it's allowing these phone

02:22 clients and these computer clients to all participate in the same audioconference together.

02:22 Q. And could you describe what the mixer is and what the hybrid MCU is?

02:22 A. The hybrid MCU server is going to be a lot of what the patent's talking about in this case, but the mixer is going to be something that takes in audio signals, and it's called mixing, mixes them together in this case. Basically it's taking two different audio signals, two or more audio signals and combining them together to form a single audio signal. So that's what mixing is.

02:23 Q. And one thing, to follow up from your answers. A lot of what the patent is directed to is over here at the hybrid server on this, on this diagram.

02:23 And first, this is a diagram from the patent?

02:23 A. This is Figure 1 of the patent.

02:23 Q. Okay. And the hybrid MCU server, that's -- you said "server." What do you mean by that? How would that compare to, for example, Cisco's Webex server? I know we're going to get into more detail on this, but...

02:23 A. They're basically referring to similar things here. So one or more devices, that's representing the sort of -- well, we would call these sort of backside

processing or backhand processing happening.

Q. And then the clients, the folks that log on to the conference, they're over here on the left with their computers and phones?

A. Yes. That's right.

Q. Okay. Next you have included in your slides another figure from the specification.

MR. SABRI: Your Honor, I'm going to object. This is outside the scope of his report. This section isn't discussed.

MR. CAUGHEY: The patent is discussed obviously throughout his report. But in Paragraphs 24 and 34, Dr. Schaefer discusses how he reviews the patent and all its claims in light of the review of the specification. And additionally, in his multiple depositions, he was asked at extraordinary length about Column 5 and other aspects of the specification.

MR. SABRI: He never cites Column 5 in his report a single time, Your Honor. Just saying he talks about the patent doesn't cut it.

THE COURT: Is he saying anything you haven't heard at the deposition?

MR. SABRI: I suspect he is. Of course, I can't know till he says it, but I do think he's going to get into what was not in his report and was not in

02:25 his deposition.

02:25 THE COURT: Could you ask the question again?

02:25 MR. CAUGHEY: Sure. I think the first -- the question pending was just whether this was a figure from the patent, but...

02:25 THE COURT: I'll overrule the objection to that question.

02:25 A. Can I answer it?

02:25 BY MR. CAUGHEY:

02:25 Q. Yes.

02:25 A. This is Figure 3 from the patent.

02:25 Q. And what is this figure depicting?

02:25 A. This figure is depicting -- well, it's what would be called a flowchart. So if I can explain a flowchart very briefly.

02:25 So a flowchart would start at the top here, and it has different elements associated with it. And those are statements, things that you should do. But some of them might be questions like the diagrams that you see. And so when you see a question, depending on the outcome of that question, you might go down the "yes" branch or the "no" branch that comes out of that particular diamond.

02:25 So, for example, where it says time to update

02:26 active speakers right here, if the answer is yes, you would go to the right; if the answer's no, you would go down here.

02:26 Q. And on the right, that's text taken from the patent specification?

02:26 A. Yes. This is Column -- part of Column 5.

02:26 Q. And does that describe how to navigate this flowchart?

02:26 A. Yes.

02:26 Q. Now, you've highlighted the first sentence as well as the diamond marked 310. Could you help walk the jury through how the flowchart works in this patent?

02:26 A. Sure. So what it's doing here is it's asking -- it starts at J is equal to 1, you see it on top, and it's going through all of the clients connected here. And it's asking whether you're done processing all of the clients. In other words, you've gone through all of them at this point. If the answer is yes, you just stop.

02:26 Q. And so the server's received the audio at that point?

02:26 A. Yes. That's actually up here. It's at the top.

02:26 Q. Okay. Keep going. I'm sorry.

A. So we received audio from different clients, potentially updated an active speaker list, as was shown here. We're down here. So it's done sending to all parties. If the answer is no, then it goes through this process in here. You can see it's happening in a loop. So it's going to go through all of these different clients here.

Q. Now, the highlighting moves down to diamond 312 which says Party J mixing client.

Would you continue your progression through this?

A. Right. So this here is asking whether the party that we're about to send to Party J, it is sending there, so if it's a mixing client or not. We haven't talked about mixing or non-mixing clients here, but maybe at this point, I think simply is the mixing client would be like a computer connecting over the Internet, whereas a non-mixing client would be like a phone connecting over the telephone network.

Q. And maybe it would be helpful to say what the mixing means just for a second. I know we'll get into it, but if you said a mixing client might be a computer, what is that mixing?

A. Well, I think we just talked about it briefly, but it would be -- mixing is the act of taking the

02:28 multiple audio signals and combining them together to form a single audio signal. That's mixing.

Q. And then from Box 312, we go to a different part of Column 5 in the specification. And here, you highlight the next box down 314?

A. Right. So this is -- if it is a mixing client, it goes down via the guess arrow there. And then it says Mux active speaker data, and the patent here says in Step 314, you can control flow multiplexes. Mux is just short for multiplex -- the audio stream data for all active speakers. And it says in this step, active speaker audio data for each and every active speaker is multiplexed.

However, as will be apparent to those skilled in the relevant arts, if Party J is an active speaker, this step will not include Party J's own audio data in the multiplexed packets. And it's talking about it being a form of echo suppression so you won't hear yourself speak.

I probably should explain multiplexing a little bit here at this point.

Q. Why don't we give it a shot?

A. Okay. So multiplexing is -- you have different streams of data, so we just have pieces of data basically over time, something to this effect.

Multiplexing is just taking the multiple streams of data and combining them together to transmit down, say, a single connection. But at the end, you need to be able to separate out those streams of data into their individual components at the other side. Okay.

So that's different than mixing that we talked about before which is just producing a single audio signal. Multiplexing puts them together, and then you can take them apart on the other side.

Q. And here we have, again, another part of the patent specification. Now we've taken a right -- a right turn over here to Box 316.

What's happening now?

A. Right. So this is -- let's see. If they are not a mixing client, right, it says, decode the active speaker data, and it describes that here. Decodes all the active speaker into raw, uncompressed data. As in the step we just looked at, 314, it will decode all active speaker audio data for each and every active speaker. However, as will be apparent to those skilled in the relevant arts, if it's an active speaker, then Step 316 will not include Party J's own audio data in the decoded data. This is going to, again, act as an audio suppression feature so that you'll not hear themself speak.

02:30 Q. And now the highlighting continues down to Box 318.

02:30 A. Right. So then it says the data's being mixed. And so the results of this and the results are, I guess, of previous processes as well is going to be that we're going to get sort of different audio streams going to different clients. And that's talking about the echo suppression. If you were to get back your own audio, you would hear yourself on the other end and that would be annoying. And so it's producing different streams. It's mixing and multiplexing.

02:31 MR. CAUGHEY: And, actually, Mr. Boles, can you go back to Slide 19 just momentarily before we proceed?

BY MR. CAUGHEY:

02:31 Q. I just want to put -- there was a lot of technical matter in that specification and a lot of right turns and left turns down the flowchart. Could you kind of reassemble those pieces for the jury in terms of how the overall system is depicted in Figure 1 of the '858 patent?

02:31 A. So those mixing clients were these over here connected over through the Internet, computers going through the Internet. The non-mixing clients of these phones connected through the phone network from before.

And what we were talking about, the stuff really that was happening here on the server side, getting audio from these clients, deciding whether to mix or multiplex the data and sending back to those clients.

Q. Great.

MR. CAUGHEY: Now let's go back to Slide 23, Mr. Boles.

BY MR. CAUGHEY:

Q. Now, what are the benefits of this hybrid audio system that's described in the '858 patent?

A. Well, there's a number of advantages. So one, both computer and phone users can participate together in the same audioconference. It's different networks could communicate, but this sort of puts them all together in the same audioconference.

There's also computational efficiency. That mixing action that's happening on the server, it's only doing that mixing for the clients that are not going to be able to mix. So for the other clients, it's sending the multiplex audio. It's not doing mixing for them. It's sending the multiplexed audio and making those clients, those other computers do the mixing instead of the server doing it. So it's distributing the computational work basically between these different devices.

02:33 And the other thing that happens is that you can get better sound quality with this as well. So when you multiplex, you're just sending these audio packets to the clients and making them do mixing. On the server, if you were to do this, you would have to decode the audio data, mix it, recode it, send it. It would have to be decoded again and played, and all of these different actions can cause artifacts to appear. So it affects the quality of the sound data at the other end. So by multiplexing the data, making it done at the client's side, you can get higher-quality audio.

02:33 Q. And just momentarily on the second benefit, computational efficiency, certainly you'd understand why the server companies, someone like Cisco, would want their computers to be efficient.

02:33 What sort of benefits would the end user gain from having the more efficient hybrid audio system?

02:34 A. Well, you could have a larger conference, for example. I guess you might be able to use less server hardware to have the same size conference, for example.

02:34 Q. Okay. Now, the next number of slides in particular deal with what are called "accused products."

02:34 We've been spending a fair amount of time on the patent and the intellectual property, but as I

understand, infringement involves a comparison -- I think we've heard this in opening -- of the accused products with what's claimed in the patent.

What's your understanding with the -- with the caveat there's a lot of words on this slide -- of what the accused Cisco Webex products are in this case?

A. Right. So there's a lot of products that I think are being used, and you're going to have to bear with me because I'm supposed to read all of these, I think, here.

So Webex App, Webex Suite, Webex Meetings, Webex Messaging, Webex Events, Webex Training, Webex iOS App, Webex Android app, Webex Meetings for iOS, Webex Meetings for Android, Webex Teams, Webex Meetings for MS Teams.

Q. Thank you.

I'm the one who made him do it.

So is there a common thread among these dozen Webex products that you've analyzed as the accused products?

A. Right. So these all use the same server back and forth, the audio processing, this thing called Webex Audio.

Q. And the '858 patent is focused on a server?

A. That's right.

02:35 Q. So here's -- you mentioned this before, but just to help the jurors get an understanding of what we're talking about, what is this next slide, 26, depicting?

02:35 A. This is just a demonstration of what Webex looks like, I guess, if you use it on a computer. There's four different people that joined into this conference here. Some of them are computer users. And you can tell some of them have video on, for example. One of them is a phone user that's called in.

02:36 Q. And now we're going to start diving into your binder. Could you please turn to PX-144?

02:36 A. Yes. Yes.

02:36 Q. Can you identify this document?

02:36 A. Yes. This is a public Cisco document.

02:36 Q. Did you review this document in forming your opinions in this case?

02:36 A. Yes. I did.

02:36 MR. CAUGHEY: Paltalk offers PX-144.

02:36 MR. SABRI: No objection.

02:36 THE COURT: Admitted.

02:36 BY MR. CAUGHEY:

02:36 Q. Now, in the next slide, we see PX-144, and you've given this slide the title How Webex Works. Server side.

02:36 So you just saw -- or the prior slide, let's go back there just for a second.

02:36 This is the perspective of a user of Webex, right?

02:36 A. Yes. That's right.

02:36 Q. And this slide shows a number of arrows sort of striking out from a cloud.

02:37 Can you describe what you're depicting with this image here?

02:37 A. Well, this is basically what I was just showing before really. It's a variety of different types of devices and products, all kind of sort of connecting through this Webex -- Cisco Webex cloud. This is the audio servers, basically.

02:37 Q. And just over -- it says PSTN on the right. Do you see it?

02:37 A. Yes. That's right.

02:37 Q. And what does it read below that?

02:37 A. It says: Webex hybrid VoIP and cloud-connected audio.

02:37 Q. And it says on the right -- or what does the sort of teal box on the right say?

02:37 A. On the right side?

02:37 Q. Yeah.

02:37 A. It's talking about up to 1,000 participants

02:37 with Cisco's Webex with 500 video and 500 audio. It's talking about the size of one of these meetings.

Q. Could you now turn to PX-37 in your binder?

A. Yes.

Q. And can you identify this document?

A. This is an internal Cisco technical document.

Q. Did you review this document in forming your opinions?

A. Yes. I did.

MR. CAUGHEY: Plaintiffs offer PX-37.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. Now, we see PX-37. There's a lot going on here.

But could you tell the jury -- and I think as a preview, we're going to see more of this document, but tell the jury initially at a high level what this is showing?

A. Yeah. So just at a high level, this is showing some of the audio processing flow between different types of clients and these boxes on the inside which make up the Webex servers, Webex Audio.

Q. And we'll return to the text later. I'll have questions about that, but I know you prepared a sort of

02:39 easier-to-view version without some of the noise around it.

So if you could just -- maybe starting at 12 o'clock on the top -- help the jury understand what this is depicting and what these various letters and boxes mean to you.

A. Well, so first, this is the Webex Audio that we're talking about. We're talking about these little boxes refer to sort of pieces of Webex Audio. And maybe I should start over here on the side and say that this is grayed out because this is not part of the accused functionality here. So we're not -- I'm not going to be talking about that an awful lot here.

These pieces here, this is showing different types of clients connecting to this piece of Webex Audio called MMP, multimedia platform. And so this M1, M2, and M3 are tablets or computers or something connecting to this piece.

And then these here, P1, P2, P3, these are phones connecting to a phone network to this piece of Webex, which is the CMS, and it stands for Cisco Media Server.

Q. And what this -- or I just want to make sure you're done with this slide, or do you have more explanation?

02:40 A. I mean, we could talk about audio being sent from these clients and then the sent -- but I think we're going to talk about this document more.

02:40 Q. Okay. Great. Whet your appetite for some audio flow diagrams.

02:40 So with that background in mind, I think the next portion of our presentation is this walks through the individual claim elements. We heard in opening this exercise is a comparison of claims with the accused products.

02:40 And have you done that analysis of comparing the claims to the accused products?

02:40 A. Yes. I have.

02:40 Q. And is that what the next number of slides show?

02:40 A. Yes.

02:40 Q. In Slide 31, we see something that's becoming familiar, which is the asserted claims in the patent.

02:41 Is this where you started with your infringement analysis?

02:41 A. Well, I certainly looked at the claims, but I also read the patent as well and analyzed all of the documents.

02:41 Q. And this slide is just an easier-to-read version of Claim 1 of the patent, right?

02:41 A. Yes. This is breaking out the different limitations of Claim 1, and we're going to process them sort of one by one.

02:41 Q. And the next slide is titled Person of Ordinary Skill in the Art.

02:41 Do you see that?

02:41 A. Yes.

02:41 Q. Is that synonymous with "expert in the field" to you?

02:41 A. Yeah.

02:41 Q. And did you review this patent as just a normal layperson, or did you apply your knowledge as an expert in the field or a person of ordinary skill in the art?

02:41 A. I applied my knowledge as an expert in this field.

02:41 Q. And what -- could you just read for the jury what your understanding of who an expert in this field would be?

02:42 A. Sure. So an expert would be a person with a bachelor's degree in computer science, computer engineering, or a related field with two years of experience working in the field of communication and networking. Of course if you have maybe more experience in the industry, that might make up for less

formal education or formal education, might make up for less industry experience.

Q. And I see below -- are those all the pages of the '858 patent?

A. I believe so.

Q. And did you -- how did you bring your expertise as an expert in the field as a computer scientist to bear as you interpreted this patent?

A. Yeah. I used my experience in the field when I was reading this patent and interpreting the terms of the patent.

Q. And just going back to the language of the patent, I think you saw in one of the opening statements that there's a fair bit of technical language in here: mixing, multiplexing, and so on and so forth.

Does your computer science background and expertise help you decipher the meaning and application of these claims as you do your infringement analysis?

A. Of course.

Q. And I think I also heard in opening a reference to an English major.

It is specifically with respect to your computer science background and skill in the field that you read this patent, right?

A. That's right.

Q. It's not an ordinary layperson reading it?

A. My understanding is you're supposed to read this as an expert in the field.

MR. CAUGHEY: And could you pull up the materials considered slide?

BY MR. CAUGHEY:

Q. Now, as you look through your lens as an expert in the field, I think you mentioned right at the outset all these different materials you considered, right?

A. Yes.

Q. And one of those or was one of those rulings of this Court?

A. Yes.

MR. CAUGHEY: All right. You can go back to where we were in the slides.

BY MR. CAUGHEY:

Q. And one more thing on the patents. I think we heard discussion in the opening statements about this term "each" right there. I tried to circle it. Hopefully I did so effectively. And it appears a few times.

Is that one of the words in this patent that you interpreted through this lens of being a person of

ordinary skill in the art?

A. Yes.

Q. Were there any rulings of the Court that were relevant to that analysis?

A. Yes.

Q. And I'd just like you to -- or what do you understand this to be on Slide 34?

A. My understanding is this was the ruling of the Court.

Q. So could you just read from: So here are my rulings?

A. Sure. So I guess after that, it says: I'm going to start with the first motion we had. I'm going to find that the plain and ordinary meaning of "each" -- "each" has a plain and ordinary meaning which can include "one or more."

Q. Okay. And was that ruling material to your infringement analysis?

A. Yes.

Q. Okay. Now, we're going to start -- as I said, we're going to break this patent up into lots of pieces. This is a very precise exercise. And it starts with a preamble.

What does the preamble say?

A. So the preamble says: A method of providing

audioconferencing for a plurality of clients using varying equipment and protocols. And then it says comprising the steps of, but we're going to go through those in a minute.

Q. What are varying equipment and protocols?

A. Clients might use different equipment and protocols. In the example we saw previously, it was like, say, computers and phones. Protocols might be like through the Internet or through the phone network.

Q. Could you please turn to your binder to PX-62?

A. Yes.

Q. Can you identify that document?

A. Yes. This is another Cisco document.

Q. Did you review PX-62 in forming your opinions?

A. Yes.

MR. CAUGHEY: Plaintiffs offer PX-62.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. PX-62 is now published on the screen.

You said this is a Cisco document?

A. Yes.

Q. And it's titled Webex Audio Supported Platforms. And then the first sentence is highlighted. Could you read that first sentence into the record for

02:46 the jury?

02:46 A. Yes. It says: Webex Audio, also known as hybrid audio, provides flexibility for attendees to join an audioconference using their computer, VoIP or a phone.

02:46 Maybe I should explain that term "VoIP."

02:46 Q. Yeah. Let's -- I think it was mentioned before, but we haven't -- we haven't paused on it yet. So why don't you -- why don't you help the jury understand what VoIP is?

02:46 A. So VoIP is just a shortening of the term "Voice over IP," so basically using a computer to, you know, send all your data basically over the Internet. So Voice over IP is VoIP.

02:47 Q. And why is this mention or discussion of hybrid audio in this Webex Audio document relevant to whether there's infringement of this preamble?

02:47 A. Well, it's talking about using varying equipment and protocols as well because they'll be connecting through different networks.

02:47 Q. And it says a computer or a phone?

02:47 See that?

02:47 A. Yes. Computer or a phone.

02:47 Q. Now, this is a document we've seen before, PX-144. I think the jury probably understands it, but

could you just match up PX-144 with the claim language?

A. Sure. So this is, again, talking about using a variety of different equipment, and you can see different equipment on this document here. So, for example, the computers or phones connecting all to the Cisco Webex cloud here or audioconferencing and through a variety of different protocols, whether that be through a telephone network or through the Internet.

Q. So in light of the materials you've reviewed, Cisco documents we've seen and the analysis you've done in this case, what is your conclusion with respect to whether this first part of Claim 1 is infringed?

A. Well, based on the documents that we've seen, my conclusion is that this limitation is met.

Q. Now, the next limitation is this 11, and I know these are broken out here, but does the text here match what's in the claims of the patent?

A. Yes. It's just a copy.

Q. What does this first subelement of Claim 1 require?

A. It says: Receiving an audio packet from each of the plurality of clients.

Q. And you mentioned this, but these are very technical, so maybe you can remind the jury of what an audio packet is.

A. We probably haven't talked about packets. So packets is just a -- sort of a chunk of data, basically. So the way that the Internet works is that you break data into subpieces called packets. You send them to the Internet, and those get routed through various places over the Internet before they get to their final destination.

This is different conceptionally from how like a telephone network works, which is a service which network -- you build a path basically between two points to communicate. So it's fundamentally just a different way to communicate.

Q. And we've seen this document in preview. We'll see it again. But where does -- or how is this audio flow active speaker document relevant to this element of receiving audio packet?

A. Right. So this document here is showing some of the audio processing that's happening. And let's see here. I don't know if I can have the mouse.

So here, for example, you can see that the different clients are speaking. So you remember M1, M2, M3? We talked about those from before. Those are those machines, the, you know, the tablets in this picture here. Then we have P1, P2, P3, and it says they're speaking. And it actually depicts the -- oh,

now I got the red thing here.

So now it depicts them sending audio data here and it being received by these various components of Webex. And those are the circled arrows that you see there.

Q. And the M1, M2, M3, P1 through P3, are those the clients?

A. Yes. Those are the clients.

Q. Okay. And now we come to the first instance of looking at some of Cisco's source code. We're going to do this source code presentation because it's in hard copy on the video device or the document camera device.

MR. CAUGHEY: Because you haven't seen it before, the first time it's shown, I'm going to ask, with Your Honor's permission, for Dr. Schaefer to come down and work the device himself.

THE COURT: Response?

MR. SABRI: No objection to that, Your Honor. I only stand because when we're talking about source code, we will just go on the confidential record and --

(Clarification by Reporter.)

MR. SABRI: I apologize. We'll need to go on confidential record to discuss the source code,

02:51  1    and I need the public to leave the courtroom for that,

02:51  2    of course.

02:51  3                    THE COURT:  And that's fine.  I just want

02:51  4    to let you know, it's your burden to make sure within

02:51  5    reason when he stops talking about things that are on

02:51  6    the private record, if you'll make sure because I won't

02:51  7    know.  And I want to keep the courtroom as open as

02:51  8    possible.

02:51  9                    That being said, if anyone in the

02:51  10   audience is not under the protective order in this

02:51  11   case, if you would excuse yourself for the next set of

02:51  12   questions, please.

02:51  13                   And, Doctor, you're welcome to...

02:51  14                   THE WITNESS:  Can I go up there now?

02:51  15                   MR. CAUGHEY:  Come on up.

02:51  16                   MR. SABRI:  I would add, Cisco -- it's

02:51  17   fine for Cisco to state it on the record?

02:51  18                   THE COURT:  Yes, absolutely.

02:52  19                   (Clarification by Reporter.)

       20                   (Sealed proceedings.)

02:52  21   ██████████████████

02:52  22    █        ████████████████████████████

02:52  23   ████████████████████████  ████████████████████████

02:52  24   ██████████████████████████

02:52  25    ██    █████



209





211



212



213



(Sealed proceedings end.)

BY MR. CAUGHEY:

Q. And just to close the loop here, what's your overall conclusion with respect to whether source code supports that Cisco Webex products receives an audio packet from each of a plurality of clients?

A. So in my opinion, the source code supports this limitation.

Q. And this -- we actually saw Mr. Buckles'

deposition I think a few moments ago, but you've also created a slide with testimony from Cisco's corporate representative Mr. Buckles.

How was Mr. Buckles' testimony relevant and work with this receiving an audio packet limitation?

A. So he's confirming the information that we've seen previously, I suppose. So he was asked -- and there are some situations that I'm looking at now: Part 1 here, or the first clause here, where Cisco Webex Meetings receives an audio packet from each of the plurality of clients who are participating in an audioconferencing; isn't that right?

To which he responded: Just to be clear, the question was Cisco Webex Meetings receives audio packets from each of the plurality of clients?

Question: Yes. There are situations where that happens?

And the answer was: Yes.

Q. So in light of your review of the materials, consideration as an expert in the field, what's your conclusion with respect to whether sub Element [1] has been infringed?

A. Right. So based off of all the information that we've just seen, it's my conclusion that this limitation is met.

03:01 Q. Now, can you turn in your binder to PX-206?

03:02 A. Yes.

03:02 Q. Can you identify this document?

03:02 A. Yes. This is another Cisco document.

03:02 Q. Did you rely on PX-206 in forming your

03:02 opinions?

03:02 A. Yes.

03:02 MR. CAUGHEY: Plaintiffs offer PX-206.

03:02 MR. SABRI: No objection.

03:02 THE COURT: Admitted.

03:02 BY MR. CAUGHEY:

03:02 Q. And the -- we'll take a look at PX-206 in a

03:02 moment, but first, I want to isolate this next Element

03:02 [2] of Claim 1. It says: Determining which of the

03:02 plurality of clients is an active speaker and forming

03:02 an active speakers list.

03:02 What -- can you explain to the jury what you

03:02 understand this element to mean?

03:02 A. Well, so the idea behind this element here is

03:02 that we need to -- there's several clients that are

03:02 connected to this thing. We have to identify some of

03:02 them that have active speakers and formed an active

03:02 speaker list. So that's what it says.

03:02 Q. Now we see PX-206, and there's a Cisco

03:03 document on the left and some images on the right.

03:03 How is this relevant to this active speaker question you just put forth to the jury?

03:03 A. So this is showing the client's side view of Webex, like what you would see utilizing these things. And it's showing here, for example, that you can specify an active speaker video view, an active speaker thumbnail view, and a grid view. So there's an identification of an active speaker happening in this case.

03:03 Q. But you said the patent and the infringement analysis is focused mostly on the server.

03:03 How is this sort of client-focused or user-focused view interactive? How is that relevant?

03:03 A. Yeah. So the data that the client and the user is getting here is coming from the server. So this idea that it's identifying this active speaker means that this data's available on the server as well.

03:03 Q. Could you now turn to PX-228 in your binder?

03:04 A. Yes.

03:04 Q. Can you identify this document?

03:04 A. Yes. This is another Cisco document.

03:04 Q. And did you rely on this document in forming your opinions?

03:04 A. Yes. I did.

03:04 MR. CAUGHEY: Plaintiffs offer PX-228.

03:04 MR. SABRI: No objection.
03:04 THE COURT: Admitted.
03:04 BY MR. CAUGHEY:
03:04 Q. Now -- whoops. Too far.
03:04 Now we see PX-228. I see a similar Hollywood Squares type diagram here and then some text at the top.
03:04 Walk the jury through how this is relevant to your analysis.
03:04 A. So again, this is similar to the previous document. You can see here, it's talking about different layouts. And in particular, it says: Switch between grid and active speaker layout.
03:04 And if you look a little bit further down this document. Yes. It says: Use the grid layout to see more participants at the same time and switch to the active speaker layout when you want to focus on the person speaking.
03:05 Q. Now, that was, again, the user side here, we see another server diagram.
03:05 Where on this audio flow document does it discuss this concept of determining active speakers?
03:05 A. Right. So here, you can see that it's talking about these different pieces here. It says: The top three loud will be switched to all clients, the piece

03:05 on top there. So the top three loud is identifying loudest speakers, active speakers. And it's saying the same thing here. CMS, it says: CMS selects the top three as well.

03:05 MR. CAUGHEY: And we again have some source code. This time I'm going to try to do my best to walk Dr. Schaefer through it from here so he doesn't have to get up and down, but I also suspect counsel wants to go on the confidential record.

03:06 MR. SABRI: That's right. We would need to go back on the confidential record.

03:06 THE COURT: Will do.

03:06 (Sealed proceedings.)

[redacted]

[redacted]

222



223



224



(Sealed proceedings end.)

BY MR. CAUGHEY:

Q. And from your review of Cisco's source code, what is your conclusion with respect to whether the Webex products determine or perform this element?

A. As we've just seen, it's determining and forming an active speaker list.

Q. Now, Mr. Buckles reappears. Again, we saw him on video. Mr. Buckles asked about this determining with respect to active speakers.

A. Yes. So he was asked, well, as Cisco uses the term, there are instances where Webex Meetings

determines which of the plurality of clients in an audioconference is an active speaker, right?

To which he responded, yeah. I think that -- that's reasonable to say.

Q. And here, he was asked additional questions about the active speaker list.

What did he say in this testimony?

A. So here he was asked: And there are also circumstances where Cisco Webex Meetings determines which of the plurality of clients in an audioconference is an active speaker and forms an active speaker list; is that right?

And the answer was there are -- there are instances where, yes, clients who are determined to be active speakers are grouped together in some way.

Q. And so what is your overall conclusion with respect to whether the Cisco Webex products infringe Element 2?

A. Well, based on all the information that we've just seen, my conclusion is this limitation is met.

Q. Now on to Limitation 3.

We see the word "determining" again. What does Limitation 3 talk about, from your perspective?

A. So Limitation 3 is determining a first subset of the plurality of clients that has the capability to

mix multiple audio streams.

Q. And what does it mean to mix multiple audio streams?

Let me step back.

There's a demonstrative on the screen. Can you describe what's being shown?

A. This is just a bunch of computers basically that are connecting through the Internet. It looks like we have two talking. One is sending blue data. Those are those little square things you see. Those are the packets that we were talking about. Remember how I said we break it up into different pieces and send?

So these are packets going to the Internet. The yellow is packets going into the Internet, and those are being delivered to the server here. The server is multiplexing this data and it's sending it back to the clients. And you can see that it's putting these sort of two streams of data into a single stream, if you will, right? It goes back.

So, for example, the listener that's in the middle is getting these boxes that are green on the outside, and they have this alternating moving yellow, for example.

Q. And then these multiplexed streams are being

mixed by the clients?

A. Right. You see the mixer on the different clients, so they're getting these individual audio streams. And they're the ones that have to do the mixing.

Q. But to know whether to send the multiplexed streams in the packet, the server has to determine which of those clients are capable of doing that, I assume?

A. That's what this limitation is about.

Q. And we see here the audio flow diagram, and this is a Cisco document.

Where is the determining occurring here?

A. So the determining is actually happening at the connection between the clients and the servers. The phone-based clients, the ones that you see on this audio flow document, P1, P2, P3, those devices are connecting through the phone network to the CMS, so those devices won't have the capability of mixing, okay? The ones that you see on top are the computerized twice, right, like the M1, M2, M3 tablets in this case. And those are connecting through the Internet for Webex's protocols and so forth to this MMP server.

So it's how clients are connecting. It's not

just the device, okay, because a client is -- you've seen varying equipment and protocols. So different devices, but also different ways of connecting to this Webex server. So depending on how they connect, this is the determining step. And you might ask, for example, like what about an iPhone?

Q. We might even see that on the next slide, so --

A. All right.

Q. -- don't spoil the surprise.

Could you turn in your binder to PX-154?

A. Yes.

Q. And can you identify PX-154?

A. This is an internal Cisco technical document.

Q. Have you reviewed this document in connection with forming your opinions?

A. Yes. I have.

MR. CAUGHEY: Paltalk offers PX-154.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. All right. PX-154 is a Cisco slide presentation. There's an excerpt from it on the screen.

First, can you describe what's being depicted?

03:18 A. So this is showing some audio moving between different parts of Webex servers and devices. So on this slide here, you have these computerized devices connecting through the Internet. Opus is an audio -- we call it an audio codec. It's just the way of coding and decoding audio here. So these connections are going to the MMP server that we've seen previously. These pieces of Webex Audio are communicating with each other at CMS, and you also see audio going through different audio codec to these phone-based devices.

03:18 Q. A few questions.

03:18 So on the left here, we have the computers.

03:19 There's some lines going down. I just circled them in green.

03:19 Are those the multiplexed streams going?

03:19 A. Right. So over -- I guess over here, you see the mixing happening. You see multiple arrows coming in and one arrow going out. This is like multiple audio streams coming in, and a single one coming out. And that's what's being sent to these phones over here. Okay. But on the other side here, we actually have multiple streams of videos, this multiplexed data across these connections to the computer devices.

03:19 Q. And then the computers mix those multiple

03:19 points of data into usable audio, essentially?
03:19 A. That's the idea, yes.
03:19 Q. And on the right, we see an iPhone or some
03:19 sort of smartphone.
03:19 A. Uh-huh.
03:19 Q. Could that device go on either side of this
03:19 diagram?
03:19 A. Right. So this -- the iPhone, for example,
03:19 could connect to the MMP. Say you have a Webex iPhone
03:19 app installed on your phone. You can connect through
03:20 the Internet to the MMP in this case. And so that
03:20 would be a client that would have the capability of
03:20 mixing.
03:20 If instead that phone were to dial in through
03:20 the phone network, PSTN in this case, it would connect
03:20 to the CMS. And in that case, it would not have the
03:20 capability of mixing. It's not just about the device
03:20 but also remember protocol as well. So how it's
03:20 connecting to the network and through what network it's
03:20 connecting makes a difference here.
03:20 Q. Now, would you please turn in your binder to
03:20 PX-86?
03:20 A. Yep.
03:20 Q. What is this document?
03:20 A. This is another internal Cisco document.

03:20 Q. Did you rely on PX-86 in forming your opinions?

03:20 A. Yes. I did.

03:20 MR. CAUGHEY: Paltalk offers PX-86.

03:21 MR. SABRI: No objection.

03:21 THE COURT: Admitted.

03:21 BY MR. CAUGHEY:

03:21 Q. Now we have PX-86 on the screen. See it titled Design Architecture Overview and then some neon-looking contraptions.

03:21 But we've pulled out some bullet points. And the bottom one says: Mixing of VoIP and PSTN audio is performed on the client side.

03:21 And I see you've highlighted the term "capability to mix" up in the claim term of the '858 patent.

03:21 Could you describe the relationship here?

03:21 A. So this is talking about the MMP server previously that we discussed, and it's saying that these clients are going to mix audio -- well, both the VoIP audio that we talked about, Voice over IP, if you remember, and PSTN, which is phone audio at the client. So it's these clients have the capability of mixing all the audio.

03:21 Q. And can you now turn to PX-26 in your binder?

A. Yes.

Q. Can you identify this document?

A. It's another internal Cisco document.

Q. Did you review this document in forming your opinions?

A. Yes. I did.

MR. CAUGHEY: Paltalk offers PX-26.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. PX-26 is a Cisco document titled Webex Media Conference System, Revision History. You've excerpted I guess Section 3.2.5 VoIP source selection and so on.

And why did you highlight the sentence that you did?

A. Yeah. This is just another reference showing that for the servers, that audio mixing's happening at the client side.

Q. And is their Cisco corporate representative testimony on this determining step?

A. Yes. So Mr. Buckles was asked: In what instances would a PC-based client require mixing?

He said: So the -- the determination to -- to use mixing or not is based on multiple factors, including the capabilities of the physical client

itself, the networks and systems in between that client, and Webex and the overall user experience that we want to deliver to that particular client.

Q. And you've mentioned this several times. I think we saw it in the patent itself, the notion of varying protocols.

Is that varying relationships between networks and systems that Mr. Buckles described?

A. Yes. That's right.

Q. And what's that relationship? Can you just build that out in two sentences?

A. Well, it's basically the same thing, basically. Right? The networks and protocols are different depending on what network and how you communicate.

Q. And based on your review of these materials and working the case, what's your conclusion with respect to Element [3] of Claim 1?

A. Based on all this information, my conclusion is the limitation's met.

Q. Now, Claim 1(4) is another determining claim. Do you see that?

A. Yes.

Q. And what's the difference between Claim 1(4) and Claim 1(3)?

03:24 A. So Claim 1(3) was determining a set that had the capability of mixing. This is essentially the opposite, determining the set of clients that do not have the capability of mixing.

03:24 Q. And I'm actually going to start here because I think it might depict it even easier.

03:24 So before Claim 1(3) was focused on those over here on the left that do have the capability to mix?

03:24 A. That's right. So that was the connections to the MMP that we were talking about previously.

03:24 Q. And now we're focused on 1(4) and those on the right. Is that --

03:24 A. Right. Now the connection's to the CMS.

03:24 Q. And is your analysis essentially the same to Claim 1(4) as it was with 1(3)?

03:24 A. Yes.

03:24 Q. And just to go back for -- oh, I got to get rid of these. Someone else did it.

03:24 With respect to patent Claim 1(4), you've also put this audio flow diagram on the screen?

03:24 A. That's right.

03:24 Q. And it supports your analysis?

03:24 A. Right. Showing the connections of those devices to the various servers.

03:25 Q. And PX-154, does that also show those

connections?

A. Again, the connections to the various servers.

Q. And here we have additional testimony from Cisco's own engineer and corporate representative.

What did Mr. Buckles say about this claim limitation?

A. So he was asked: I'm just asking, are there any instances where Cisco Webex Meetings makes a determination of whether one or more clients in the audioconference has the capability to mix multiple audio streams?

To which he responded: Yeah. Again, that -- that determination is based on multiple factors.

And question was: What determination?

And the answer was: The determination of whether the client should be delivered mixed or unmixed audio streams.

Q. Based on this evidence and your work in the case, what's your conclusion with respect to whether this Element [4] has been infringed?

A. Again, based on all things we've seen, my conclusion is the limitation's met.

Q. Now, Claim 1(5) reintroduces some terms we've heard about. Multiplexing, multiplexed stream, active speaker list.

03:26 What -- could you describe the best you can for this jury what Claim 5 requires?

03:26 A. Well, that -- you can just read it there. We talked about multiplexing, right, some multiplexing said packets of audio received from each client on said active speakers list -- we talked about the active speakers list in forming that previously -- into a multiplexed stream. And we talked about that, I think, as well, right?

03:26 Q. And here's a -- I think it's actually the same demonstrative we saw before. We talked before about the capability of mixing there on the left, but now I want to focus on this multiplexer over here.

03:26 What is this demonstrative depicting?

03:26 A. Right. So this is the actual act of multiplexing, taking those different streams of audio and putting them together into sort of a -- it's called multiplexing, putting them together into a single sort of network connection, if you will, and so that they can actually be separated out on the other side.

03:26 Q. And the next slide shows PX-154.

03:27 Could you describe here where this multiplexing is occurring and where the stream is being sent? And this is from a Cisco document?

03:27 A. Yes. We've seen it multiple times.

03:27 Q. And -- sorry. Go ahead.

03:27 A. The multiplexing in this case is happening inside the server here, the MMP, which is sort of depicted as multiple lines going back.

03:27 Q. And is this another page from the same document?

03:27 A. Same document.

03:27 Q. And what do you take from this page with respect to this multiplexing of active speakers into a multiplexed stream?

03:27 A. So here, it's talking about multiplexing. And it says: Support RTP. That's -- we've seen RTP before, right? We were talking about it with respect to audio data. Stream multiplexing in a single port connection, it's talking about selecting the top three streams or less and multiplexing those streams with either connection. There's that word "mux" that we saw. And remember that was just short for "multiplex" previously.

03:28 THE COURT: Counsel, are you at a place where you can take a break?

03:28 MR. CAUGHEY: Absolutely.

03:28 THE COURT: Ladies and gentlemen of the jury, we're going to take our afternoon recess. If you would please remember my instructions not to discuss

03:28 the case. We'll be back in 10 to 15 minutes.

03:28 THE BAILIFF: All rise.

03:28 (Jury exited the courtroom.)

03:29 THE COURT: You may be seated.

03:29 We're going off of the confidential record. Is there -- that's what Jen said, that we were on it.

03:29 And so is there anything we need to take up?

03:29 We're going to go till 6:00 today. Do we think Dr. Schaefer will be on direct or cross through then? I'm not holding you to it. I'm just --

03:29 MR. CAUGHEY: We will certainly finish his direct exam well before 6:00. I don't know how long --

03:29 THE COURT: Who do you have after he's done?

03:29 MR. CAUGHEY: We have a depo deposition to be played and then Mr. Bratic.

03:29 THE COURT: Okay. Very good.

03:29 THE BAILIFF: All rise.

03:29 (Recess taken.)

03:48 THE BAILIFF: All rise.

03:48 THE COURT: Please remain standing for the jury.

03:48 (Jury entered the courtroom.)

03:48 THE COURT: Thank you. You may be seated.

03:48 BY MR. CAUGHEY:

03:48 Q. Dr. Schaefer, where we left off, we were at Slide 62, and PX-154. I think we actually already covered that. Whoops -- but not that.

03:49 We're now on Page 6 of PX-154. And here we see some little Tetris-looking blocks down here. And it -- actually, you're much better off deciphering this than I am, truth be told. So why don't you tell us what we're looking at, and I can ask follow-up questions.

03:49 A. Right. So this is actually sort of a visual depiction of what was on the previous slide here. It's talking about multiplexing multiple streams. So it's the multiple streams here over a single port or connection. Actually, it's a decent description of how you might actually do multiplexing. There's many ways you can multiplex, but this is one way.

03:49 And so you see all the orange, yellow, and the green boxes moving over the server. And then it says: The CMS needs to demultiplex into individual streams. And we can see the individual streams that it breaks it down into.

So multiplexing, remember, was taking multiple streams, putting them over a single connection such that you could actually pull them apart in the end. So that's that demux, demultiplexing.

Q. And "mux," which we saw that, was that a term that appeared in the patent too?

A. Yeah. That's right. It appeared in the patent. If you remember when we went through Column 5, it said mux and multiplex interchangeably.

Q. Is that a known term to experts in the field?

A. Yes.

Q. Now, so we see our handy diagram again, and just to orient everybody, we're still at this multiplexing Element 5 to a multiplexed stream, and I see a couple of callouts. Here, it talks about switching audio to the clients. MMP switches audio from CMS to all mobile clients.

How does this concept of switching relate to the multiplexing or muxing that we saw on the prior slide?

A. So this is the multiplexing streams that are going to be sent to the different clients. He's talking about switching. It's really talking about this combined operation of multiplexing and sending.

MR. CAUGHEY: And next we have our next

frolic into source code. I assume counsel would want to seal the courtroom.

MR. SABRI: That's right. We would request to seal the courtroom for this and go on the confidential record, Your Honor.

(Sealed proceedings.)

THE COURT: Granted.



| | | |
|---|---|---|
| 03:53 | 1 | ████ ████████████████████████ |
| 03:53 | 2 | ██████████ |
| 03:53 | 3 | ████ ██████████████ |
| 03:53 | 4 | ████████████ ████████████ |
| 03:53 | 5 | ████████████████████████ |
| 03:53 | 6 | ████████ ██████ ████████ |

03:53   7        (Sealed proceedings end.)

09:42  7        (Sealed proceedings end.)

03:53  8        MR. CAUGHEY:  If you could pull back up

03:53  9  the slide, Mr. Boles.

03:54  10  BY MR. CAUGHEY:

03:54  11      Q.   And what conclusion do you draw from this

03:54  12  combining of, I guess, audio data that you referred to

03:54  13  in the source code?

03:54  14      A.   That it's multiplexing the audio data from the

03:54  15  active speakers into a multiplexed stream.

03:54  16      Q.   And was Cisco's corporate representative asked

03:54  17  about how Webex multiplexes?

03:54  18      A.   Yes.  So he was asked:  Do you have a

03:54  19  description in the way -- of the way that Cisco Webex

03:54  20  Meetings delivers multiplexed audio to clients?  Can

03:54  21  you describe that for me?

03:54  22      And the answer was:  Sure.  There's multiple

03:54  23  levels of multiplexing in a Webex meeting.  We, for

03:54  24  example, we multiplex the audio and video delivered to

03:54  25  a client on the same network.  So those are sent across

03:54 the same network between the server and the client. And we also multiplex multiple audio streams to -- again, to a receiving client.

Q. So in light of your work review of these materials, what is your conclusion with respect to Element [5]?

03:55 A. That the limitation is met.

Q. So we arrive at Element [6]. We've now seen the multiplexing and the sending of the multiplexed stream. Now we have -- or at least now we have the sending, Claim 1(6), what we've all been waiting for.

So explain what Claim 1(6) covers.

A. So this is -- remember we were multiplexing on the previous one. Now we have send. Those are two steps. So I think if you go to the very next slide -- yeah, there -- it shows the top 3 loud being switched to all clients, and you can see the clients here getting the multiplexed stream.

Q. So multiplexes around here and then sends them out to the clients?

A. Correct. Exactly.

Q. And then the clients ultimately, that's folks who are participating in Webex?

A. Yes.

Q. And allows them to hear the audio?

03:55 MR. SABRI: Objection, Your Honor. This is getting leading.

03:55 THE COURT: I couldn't understand.

03:55 MR. SABRI: Objection. This is getting leading now, Your Honor.

03:56 THE COURT: Overruled.

03:56 A. Yes. It does allow them to hear the audio.

03:56 BY MR. CAUGHEY:

03:56 Q. And for the clients who have -- just as a clarification, for the clients who are on computers or mixing devices versus the PSTN telephone devices, is there a material difference in how they experience the audio coming to them?

03:56 A. It's not necessarily a material difference, right, getting those multiplexed streams that we talked about. They have to demultiplex that demux that we talked about into the individual pieces, and then actually perform the mixing. So those are different audio signals, and they have to be combined together so that you can hear multiple people at the same time really coming out of the speaker. That's the mixing aspect, but it's happening with ease. It's happening at the device.

03:56 Q. And the next slide shows a familiar diagram from PX-154. Could you just explain briefly where the

sending's occurring here?

A. Right. I think we talked about this. So the multiplexing was happening in this MMP. And you see the multiple streams being multiplexed across a single connection back to those clients.

Q. And I -- oh, goodness.

And I think I mentioned before or probably jumped the gun in asking you before about how users experience this, but this is the demo we saw before, I think.

What does this depict about the multiplexed stream that's been sent?

A. So this has got -- it looks like there's three clients that are talking at the same time, so it's saying multiplexed stream. And again, you would have to mix it at the clients so that you could hear it, that you would hear all these people talking.

MR. CAUGHEY: And now we have a little bit of additional source code. And I assume counsel would want to go on the confidential record.

MR. SABRI: That's right. We should go back on the confidential record, please, sir.

THE COURT: Okay.

(Sealed proceedings.)

[redacted] [redacted]

03:58 [redacted]
[redacted]
03:58 [redacted] [redacted]
03:58 [redacted]
03:58 [redacted] [redacted]
03:58 [redacted]
03:58 [redacted]
03:58 [redacted] [redacted]
03:58 [redacted] [redacted]
03:58 [redacted] [redacted] [redacted] [redacted]
03:58 [redacted]
03:58 [redacted]
03:58 [redacted] [redacted]
03:59 [redacted]
03:59 [redacted] [redacted] [redacted]
03:59 [redacted] [redacted]
03:59 [redacted]
03:59 [redacted] [redacted]
03:59 [redacted] [redacted]
03:59 [redacted] [redacted]
03:59 [redacted]
03:59 [redacted] [redacted]
03:59 [redacted]
03:59 [redacted] [redacted] [redacted]
03:59 [redacted]



(Sealed proceedings end.)

BY MR. CAUGHEY:

Q. And so, Dr. Schaefer, what is your conclusion with respect to Element [6]?

A. Based on all the evidence we've seen, the limitation's met.

Q. Now, we've just spent considerable time talking about multiplexing. Now we move on to my second favorite topic, mixing.

What does Element [7] focus on?

A. So this is very similar to what we just saw for multiplexing but now for mixing. So we're -- it's -- instead of multiplexing from the active speakers list, we're going to be mixing. In the

next limitation, we'll send it to the non-mixing clients.

Q. And so were you referring to a parallel as in between Elements [5] and [6] on the one hand and [7] and [8] on the other?

A. That's right.

Q. Okay. Now, here's a demonstrative. And I see on -- why don't you walk the jury through how this demonstrative reflects a mixing aspect that we talked about?

A. Right. So we've got some people speaking like the blue one here and the yellow one here. It's going through the phone network to the server which is actually performing the mixing; that's the green that's coming out. So it's taking -- blue plus yellow is green, I guess, right. And so it's making a mixed audio signal. And like, for example, this one here is receiving the green signal, and it's hearing both people at the same time. Right. So two people talking. They'd be able to hear both of them, but it's in a single audio signal.

Q. And now we have the audio flow -- whoops -- diagram. Before we were focused up here. Where can we find the mixing on this document?

A. Now we're looking at the CMS here. And you

04:01    1    can see here it says the CMS selects the top 3 and

04:01    2    mixes them.

04:02    3        Q.    And this is a Cisco document?

04:02    4        A.    Yes.  It is.

04:02    5        Q.    Now, on Slide 75.  We have -- we have PX-154.

04:02    6        A.    This is another depiction of what's going on

04:02    7    here.  So you can see right here this is a mixer.  It's

04:02    8    got three arrows indicating that there's multiple audio

04:02    9    signals going in and then one coming out.  Except I

04:02    10   guess it's going this way to the phone.  So...

04:02    11       Q.    And now we're going to see how source code is

04:02    12   relevant to mixing in PX-245.

04:02    13               MR. SABRI:  I do think that means we need

04:02    14   to go back on the confidential record and seal the

04:02    15   court.

04:02    16               THE COURT:  Okay.

04:02    17               (Sealed proceedings.)

04:02    18   ███████████████

04:03    19    ██   ████   ██████████████████████████

04:03    20         ████████████████████████

04:03    21    ██   ████

04:03    22    ██   ████████████

04:03    23    ██   ████   ████

04:03    24          ████████   ███████████

04:03    25          ████████   █████████████████



04:04
04:04
04:04
04:04
04:04
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05
04:05

09:42 (Sealed proceedings end.)

04:05 BY MR. CAUGHEY:

04:05 Q. And what conclusion did you draw from review

04:05 of the source code with respect to Element [7]?

A. That it's met.

Q. And what did Cisco's corporate representative say that you found important with respect to this Element [7]?

A. So he was asked -- and there are -- just to be clear, and I think this is one -- this one is probably asked and answered: But there are instances where Cisco's Webex Meetings does mix audio before transmitting the audio in a packet back to some or all clients in a conference, right?

And the answer was: Yes. I think that's an accurate answer.

Q. And based on that and everything else you've seen in the work you did, what was your conclusion about whether Cisco Webex, the accused products mix audio packets in the manner described in Element [7]?

A. That the limitation was met.

Q. I see a check next to Element [7]. We're now on Element [8]. Whereas we just saw I guess in 5 and 6, we saw multiplexing and sending. And 7 we saw mixing. And now 8, we're back to sending.

Could you explain to the jury what this Element [8] covers?

A. So this is taking that mixed audio that was just created and sending it to the clients that don't

04:06 have the capability of mixing.

04:06 Q. And here we have this familiar document, and I think you've explained how this depicts sending, but why don't you do so briefly once more for the jury?

04:07 A. Right. So we talked about the mixing that was happening here and then the audio data being sent to the phones.

04:07 Q. And how about here as well on the audio flow diagram? PX-37?

04:07 A. Can you click one more?

04:07 Q. Oh, yes. Of course.

04:07 A. There you go.

04:07 So it says: Step 8, that's CMS, that piece we've been looking at, sends mixed audio to phones.

04:07 And we can see that happening right here with the phones receiving the audio.

04:07 Q. And just to be clear, the claim here doesn't use the word "mixing."

04:07 How is the concept of mixing incorporated in Element [8]?

04:07 A. Sorry. It says "combined packet." And that was the result of mixing the previous limitation.

04:07 Q. Thank you, sir.

04:07 And we have I think our perhaps second-to-last source code moment. So we may need just a couple more

times to go on the confidential record.

MR. SABRI: That's right. Request to go on confidential and clear the courtroom.

THE COURT: Okay.

(Sealed proceedings.)

BY



09:42 (Sealed proceedings end.)

04:09 BY MR. CAUGHEY:

04:09 Q. And, Dr. Schaefer, so what conclusion did you draw with respect to Element [8] of Claim 1?

04:09 A. That limitation's met.

04:09 Q. And Element [9] starts with "whereby." And it's -- this kind of brings us right back to the beginning. Whereby said plurality of clients can simultaneously participate in a single audioconference application.

04:09 What's being shown here in this demonstrative?

04:10 A. This is the multiple people participating in that single audioconference. We have a phone user and other computer users at home participating in an audioconference.

04:10 Q. And we see PX-144 again. I think, again, the symmetry. We saw this with the preamble. We see it again with the end of Claim 1.

04:10 What's this depicting?

04:10 A. Again, multiple devices with computer-based devices or phone-based devices participating in a single audioconference.

04:10 Q. And here, we now come to the end of Claim 1.

04:10 What is your conclusion with respect to this last "whereby" clause in Claim 1?

A. That it -- the limitation's met.

Q. And so what is your conclusion with respect to Claim 1, whether Claim 1 as a whole has been infringed by the Cisco Webex accused products?

A. Well, we've gone through all the limitations and shown they've all been met. So my conclusion is that Claim 1 is -- that Webex infringes Claim 1.

Q. And we're going to move on. And you've heard this 2 through 5 infringed.

MR. CAUGHEY: Charitably, that analysis is much, much shorter, but before we get there, I do want to pause for a second. Because I think it was very sharply presented in the opening statements a dispute about how each works and each of these -- in every one of these claims.

And it appears a number of times. And Dr. Schaefer mentioned it previously, but I just -- given the issue raised in opening, I do want to pause on it for Dr. Schaefer here.

BY MR. CAUGHEY:

Q. And, Dr. Schaefer, could you remind the jury of the lens you applied as you looked at each -- and with respect to the other language in the claims as well?

A. Right. So I'm looking at this as an expert in

the field, essentially, as I'm reading the patent and looking at it in light of the specification of the patent.

Q. And I'd also like to -- there was a suggestion that this is a nonsensical interpretation by the other side. I think you mentioned before that you also relied on some guidance from the Court on this issue.

MR. CAUGHEY: Could you put the Court's ruling back up, Mr. Boles?

BY MR. CAUGHEY:

Q. And just again, start with "I'm going to," if you don't mind, sir. Dr. Schaefer.

A. You want me to read that?

Q. Yes, if you don't mind.

A. Oh, sorry. It says: Each has plain and ordinary meaning which can include "one or more."

Q. And now I'd love for you to explain a little bit more -- well, before we do that, I suppose, why was it that you relied on this ruling as called in forming your infringement analysis?

A. Well, one, I'm supposed to interpret it in terms as an expert in the field but also utilizing the Court's claim constructions.

Q. Now, we just looked at the ruling from the Court. Now I'd like to hear your understanding in

04:13 light of what you said is an expert in the field, a person of ordinary skill. And I think you mentioned before you read the patent claim language in light of the specification.

What did you mean by that?

MR. SABRI: Object, Your Honor. This is getting into something not addressed in this expert's report.

MR. CAUGHEY: I would refer Your Honor to what I referred to before, which is that Dr. Schaefer says explicitly in Paragraphs 24 and 34 of his report that he interprets all claim language in light of the specification.

He specifically references Your Honor's ruling, and he specifically says that he interprets "all" to mean "one or more." And then counsel in deposition questioned Dr. Schaefer at length about this Column 5.

MR. SABRI: Your Honor, he presents no opinion in his report in how a POSITA would interpret the term "each" or why, much less cites this column. There's just nothing in there.

THE COURT: If you can bring his report up here and show me where he discusses this specific issue.

MR. CAUGHEY: Yes, Your Honor.

(Bench conference.)

MR. CAUGHEY: So I'll try to be a little quieter.

Your Honor, so -- Your Honor, first, in Paragraph 21, he references Your Honor's ruling.

THE COURT: Okay. Got it.

MR. CAUGHEY: It has been shown. And then I believe he mentions Paragraph 34 at the end of -- hold on. I apologize. Where he discusses his method of construing the claims. There certainly was reliance on Your Honor's ruling.

In addition, Your Honor, I did bring up his deposition with one example of where he was asked specifically about Column 5, which is what's on the screen in light of this "each," "one or more." And there's more examples from his deposition, but that's one of them.

MR. SABRI: Your Honor, the issue is in his report, he actually applied Your Honor's language as a construction. He didn't say P&O, which means -- and I can show you. He said court's constructions. And he listed as a construction "each," which can include "one or more." And then in the body of his report, he just substitutes "one or more" in for

"each" a few times, which he would do if it were a construction.

But of course, as Your Honor clarified, it's not. And he presents zero opinion in the report on how a POSITA would interpret it, why that's what the P&O is, citing Column 5 none of that. So the most he does at the depo, you know, he says a couple of times, what's one or more, I applied the Court's construction. I applied one or more. So we know that. He can, of course, say that and he said it already.

What he can't do now is go outside the four corners of the report and say, well, now I'm going to teach you what a POSITA would think when in his report, he just applied it as a construction.

MR. CAUGHEY: Your Honor, first of all, we were not sure when the report was issued that it was going to be such an argument to the jury about what this term was meaning. And there was a clarification just a couple of weeks ago, long after expert reports were closed. We think if they're going to present expert testimony, which they are, about the meaning of this term, we should be allowed to as well, particularly in light of the disclosure, realizing --

THE COURT: Is what they're going to say in a report?

04:16 MR. CAUGHEY: It is, Your Honor. It's in Mr. Willis' report. And at this most recent hearing, you may recall you asked Paltalk if they needed to adjust their reports, and Mr. Tribble said no. We don't.

So Mr. Willis did explicitly address, here's what it means to a POSITA. Dr. Schaefer decided not to, and then at the recent hearing, he doubled down and said, I don't need to revise it.

MR. SABRI: And I would just say in response, his entire -- I mean, entire report obviously relies on the patent. He recites specifically to the specification in Your Honor's ruling. And they asked him in two depositions, including a second seven-hour deposition, had an opportunity to ask him questions about this. And I do think it's helpful to the jury.

THE COURT: Did the second deposition take place after my recent ruling?

MR. SABRI: No. Let me show you, just if I could, Your Honor. Here is what he said in the supplemental report. You've got Court's construction. He's got P&O on a couple of them, which is right, and then "each," he says "each which can include." So he doesn't even say it's P&O.

Then, of course, that means in his report

04:17 he doesn't say what that means to a POSITA as P&O because in his report, it wasn't P&O; it was in construction. He chose not to address it, not to disclose it as Mr. Willis did, and then not to try to take another shot until after August 1 of this year, which Your Honor gave him the chance to do.

MR. CAUGHEY: And at the risk of repeating, I would say there is a very clear disclosure in a part of what he's relying on, which is the patent specification and Your Honor's order, and -- I'm sorry -- in the infringement opinions, in light of his reliance on the specification in the patent and Your Honor's order, and then testified about his views in light of the patent, the specification and Your Honor's order.

And we ask only that he be allowed to testify to this jury about his view of the patent claim language, as he's frankly done already today in light of Your Honor's order, the patent and the specification.

MR. SABRI: Your Honor, I think the most he can say is, I applied "any," and "each" is "one or more," and I did that by looking at the specification of the claims. I don't think he can explain what a POSITA means I think through the specification explain

this when he didn't do it in his report, and he didn't do it in the depo. But the real important thing here is the report because that's what we had when we deposed him. And if he had said what Mr. Willis said, I think its P&O is this, here's why, we would have asked him questions on that, but he didn't.

THE COURT: Well, here's the problem. It is the P&O because that's what I said. So your argument's a little circumvent isn't to say that I don't think he has anything in his report where he explains how he did the analysis under what P&O meant. So to the extent he is parroting what I said and what that means, he can talk about that. But beyond that, and I think because of this language in the deposition, I think to the extent he asks if he wants to parrot what he said there about Column 5, he can do that too.

I'll give you a little leeway in terms of -- because someone's got to explain to the jury or it doesn't make any sense -- him explaining what it means for one to be a person of skill in the art the plain and ordinary meaning. But he needs to make clear that his analysis relies primarily, if not exclusively on my Court instruction and not any analysis that he did because you didn't provide any of that in his report.

04:20 MR. CAUGHEY: So just to make absolutely sure I do this properly.

04:20 THE COURT: Right.

04:20 MR. CAUGHEY: Your Honor can make that clear, what you just said that his analysis relies principally on -- I mean, I think I've done that.

04:20 THE COURT: My construction is my construction. And he can talk about that.

04:20 MR. CAUGHEY: Exactly.

04:20 THE COURT: But he can explain because he knows -- and the jury needs to understand what it is -- what a person of ordinary skill in the art is. And also what he explained what plain and ordinary meaning is, so that he can lay a groundwork for the jury to understand what he's saying when he's saying what I said. Underline of what I said though. Hopefully properly.

04:21 What you can't do is give the impression to the jury that he did some analysis himself of whether or not this meant the plain and ordinary meaning, why it would, other than if he wants to -- I can't tell -- y'all wouldn't know what's in Column 5. If he needs to talk about what's in Column 5 --

04:21 MR. CAUGHEY: That's all I want to talk about is what's in -- a snippet of Column 5 around

04:21 Lines 40 through --

04:21 THE COURT: I'm going to allow him to do that too. But beyond that, he can't talk about anything else that he did.

04:21 MR. CAUGHEY: That's all I'm going to do is Column 5.

04:21 MR. SABRI: Well, that's not talking about yours. This is talking about a particular limitation, Your Honor.

THE REPORTER: I can't understand you because you're talking so fast.

04:21 MR. SABRI: I'm sorry.

04:21 THE COURT: Anything else?

MR. CAUGHEY: No, Your Honor. Thank you.

04:21 MR. SABRI: I just want to make clear. Does this mean he can use this slide where he's walking through Column 5 to explain why in his view this is what it means?

04:22 THE COURT: He can explain -- he needs to go back through and explain what the basis was. And if he wants to show in Column 5 there's support for that opinion, then he can do that.

04:22 MR. CAUGHEY: Excellent. Thank you.

04:22 (Bench conference concludes.)

04:22 MR. CAUGHEY: Can we back up to the

Court's ruling one more time?

BY MR. CAUGHEY:

Q. And I think you mentioned before we spoke with the Judge that you rely on the Court's claim construction.

Did you say that?

A. Yes.

Q. And if this assertion where it says each has a plain and ordinary meaning which can include one or more is something that you relied on in reaching your conclusion, then in the '858 patent, "each" means one or more?

A. That's correct.

Q. Okay. Did you also review the patent's specification with respect to your understanding of the word "each"?

A. Yes. I did.

MR. CAUGHEY: Can we go to the slide we were before?

BY MR. CAUGHEY:

Q. Okay. And so first we see this magnifying glass or lens where, at the risk of telling the jury something they've already heard before, but you applied a particular approach to analyzing the patent claim language; is that right?

A. Right. I did so as, one, as an expert in the field, and I did so in light of the specification of the patent.

Q. And here we have Column 5, and this language was on the screen before. And it's, I think, Lines 44 to 52.

Is this language taken from the specification of the '858 patent?

A. That's right.

Q. And how is this relevant to your reading of "one or more" as a person of ordinary skill in the art?

A. It's talking about the multiplexing that we were previously discussing in terms of limitations here. So it says in Step 314, the active speaker data for each and every active speaker is multiplexed. And if you remember, we looked at the limitation that looked pretty similar to that.

The next line that's highlighted, yep, says: As will be apparent to those skilled in the relevant arts, if the one you're sending it to is an active speaker, then the multiplexed stream, the multiplexed packets will not include the speaker's own data, right. And that's that echo suppression that we talked about there.

So what does that mean? It's going through a

loop. Okay? Every time it goes through this loop, it's checking to see if it's an active speaker. If it's an active speaker, it's building a different multiplexed stream for all of those active speakers. So Speaker 1 would get something different than Speaker 2 and Speaker 3 in that case.

Q. And as a person of ordinary skill in the art, how do you draw the relationship between the sort of teal or green sentence in the yellow one?

A. Right. So when it says each speaker is multiplexed and then it says the result of that will not include if it's different for the different speakers that are on here, then each needs to be one or more in that case. It's not the same thing that you sent to all the speakers. It's not including, as it says here, the speaker's own data, so it's not including all of the data.

Q. Do these sentences make sense if each means all?

A. I mean, each can include one or more, but it's not going to -- the "however" line makes -- it would be difficult to do.

Q. Let me ask the question in the opposite.

Do these sentences make sense if each can't mean one or more?

A. No. It doesn't.

Q. And what does the last sentence say here?

A. So this is talking about the -- you know, how the active speaker's data that they're sending it to is not being included in multiplexed packets. This is the echo suppression so that their audio data is not sent to themselves. So they don't hear themselves. You want to hear the other people, not yourself. You can already hear yourself. You're in the room with yourself.

Q. And so when you saw "each" in these patent elements, you took them to mean one or more?

A. That's correct.

Q. As a person of ordinary skill in the art?

A. That's right.

Q. In light of the Court's ruling?

A. Yes.

Q. Now, on to Claim 2. Now, once again, try to make this a touch more readable. And this says -- starts off with saying something we haven't seen. It says: The method of Claim 1.

How does Claim 2 relate to Claim 1?

A. So this is a dependent claim. So what that means is that it says method of Claim 1. So all the limitations of Claim 1 need to be met as well as the

04:27 limitation of Claim 2.

04:27 Q. Okay. And what -- could you describe for me -- we'll get a look at some source code in a minute. But actually, don't describe for me, describe for the jury what is encompassed or being taught here by this Claim 2.

04:27 A. Well, this is talking about before sending, okay, to the people who can mix removing from the multiplexed stream said packets of audio data received from the -- one of the people on the active speakers list, right? So it's related to that phrase that we were just looking at in Column 5 of the patent, right, where it's saying you won't be able to hear yourself.

04:28 MR. CAUGHEY: And now I think we have our last but possibly somewhat more extended source code for it. So I might ask Dr. Schaefer again to come down and get a little closer to the jury. And I think we're also going to need to go on the confidential record.

04:28 MR. SABRI: Yes. I would request that we go on the confidential record.

04:28 THE COURT: Sure.

04:28 (Sealed proceedings.)

[redacted]

[redacted]





04:34 [redacted]

04:34 [redacted] [redacted]

04:34 [redacted]

04:34 [redacted] [redacted]

04:34 [redacted]

09:42 (Sealed proceedings end.)

04:34 BY MR. CAUGHEY:

04:34 Q. And in light of the source code, I think we already covered Claim 2.

04:35 But now for Claim 3, in light of the review of Cisco Webex source code, what did you conclude with respect to whether Claim 3 has been infringed?

04:35 A. Well, that Webex, it infringes Claim 3.

04:35 Q. And we have a checkmark.

04:35 Claim 4, our shortest yet. This one starts: The method of Claim 1. And then we'll make it easier to read. And then this mentions a session initiation protocol.

04:35 Could you please tell the jury what this claim element -- or I guess this claim covers?

04:35 A. Well, it's talking about PC-based equipment and utilizing a particular way of transmitting data called the SIP protocol.

04:35 Q. Could you please turn in your binder to PX-55?

04:35 A. Yes.

Q. And can you identify PX-55?

A. Yes. This is another Webex document.

Q. Did you rely on this document in forming your opinions?

A. Yes.

MR. CAUGHEY: Paltalk offers PX-55.

MR. SABRI: No objection, Your Honor.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. PX-55 is Webex SIP addresses and control hub is on the screen.

Does that SIP refer to in a Cisco document the same SIP that's in the claim?

A. Yes. That's correct.

Q. And what is the significance of the highlighted text that you called out?

A. Well, it's indicating that it utilizes the SIP protocol here.

Q. And could you just put a little more meat on the bone of what it means to connect using the SIP protocol?

A. Well, it's just a way of communicating, basically, in that case. So it's -- as I said previously, it's transmitting data, utilizing a particular way of doing that that's defined by this

04:36 protocol.

04:36 Q. And can you go to PX-229 in your binder?

04:36 A. Yes.

04:36 Q. Can you identify this document?

04:37 A. This is another Cisco document.

04:37 Q. You relied on this document?

04:37 A. Yes.

04:37 MR. CAUGHEY: Paltalk offers PX-229.

04:37 MR. SABRI: No objection.

04:37 THE COURT: Admitted.

04:37 BY MR. CAUGHEY:

04:37 Q. PX-229 is displayed on the screen.

04:37 Why was this document relevant to your
04:37 analysis of Claim 4?

04:37 A. Right. So here, you see a variety of
04:37 endpoints. Think of endpoints as clients using the SIP
04:37 protocol. See a computer here, for example, and
04:37 linking to Webex.

04:37 Q. And so your conclusion is with respect to --
04:37 oh, no. We have Mr. Buckles again. I apologize.

04:37 What did Cisco's corporate representative say
04:37 about SIP?

04:37 A. So he was asked -- and talking now about Webex
04:37 Meetings, there are instances where audio clients use
04:37 SIP to connect with Webex Meetings, right?

And he responded: Yes. Audio clients, audio/video clients, different. Yeah. Clients have different levels of capability.

Q. So your conclusion on Claim 4?

A. That Webex infringes on Claim 4.

Q. And at last, we hit Claim 5, which also begins the method of Claim 1. And we see again PX-229. Before we were focused on SIP, but what does this claim cover?

A. Well, it's talking about telephone equipment and H.323. And you can see H.323 in parallel to what we saw previously to SIP.

Q. And now we see, I think -- or I guess we now see the summary. And what's your conclusion with respect to Claim 5 then?

A. That Webex infringes Claim 5.

Q. And we've now reached the end of the asserted claims, Claims 1 through 5, and just -- we hit a slide that we hit before.

What is your conclusion and summary of your opinions with respect to infringement?

A. That Cisco directly infringes Claims 1 through 5 of the '858 patent.

Q. We've now arrived at the second question.

Now that you found infringement, there's a

04:39 second question that says: What are the benefits of the invention?

04:39 And then in quotes you have "apportionment."

04:39 Can you explain to the jury, I guess, first what this inquiry was, what you were getting at here?

04:39 A. Right. So we just looked at whether Webex infringes on the '858 patent. But we want to look at -- you know, there's -- Webex has features that infringe upon the '858 patent and features also that don't infringe on the '858 patent. And so this is looking at what's called apportionment.

04:39 Q. Dividing between infringing features and noninfringing features?

04:39 A. Correct.

04:39 Q. Why did you undertake this analysis, to the best of your knowledge, or why were you asked to undertake this analysis?

04:39 A. I think it's used in damages. But I don't think --

04:40 Q. You're not a damages expert?

04:40 A. No.

04:40 Q. You're not the royalty and damages guy?

04:40 A. No. I'm not.

04:40 Q. Okay. You're a computer scientist?

04:40 A. Yes.

Q. Okay. And you have a number of steps you took to perform this exercise. Can you -- and we'll march through them, but could you tell the jury a little bit about how you performed this division of infringing functionalities as a benefit versus noninfringing functionalities?

A. Sure. So the first part was really isolating what is this Webex Audio. Then it was identifying the key features of Webex. Those features, I looked at the novelty, design-around potential workings. And then for Step 4, I looked at the weighting of those features, based off of novelties designed around potential and importance.

Then for those features, I took -- for all those features, I computed a percentage of that feature that would be attributable to the '858 patent. And then the last step was to sort of add it all up together, and I compute the relative contribution of the '858 patent to Webex Audio.

Q. You mentioned before, I think we saw that Webex has video and maybe some other features that are not audio. You mentioned that Step 1 was pinpointing the audio functionality.

Was that a challenging step for you?

A. No. It was not.

Q. Why?

A. Because Cisco has evidently already done this and separated out the piece that is Webex Audio.

Q. And we heard from Mr. Boyles, who's a corporate representative of Cisco's, a moment ago. And what did Mr. Boyles say about this?

A. Okay. So he was asked: Mr. Boyles, do you have an understanding of what topic is meant by accused functionalities as it appears in Topic 30?

And he responded: Again, I have a broad understanding as to what it relates to.

And the question was: And what is that broad understanding?

He answered: That it pertains to the audio portion of sales.

And the question was: What do you mean by audio portion, Mr. Boyles?

Then he responded: Well, when referring to, I guess, Webex products, it's the audio portion of the product functionality as opposed to the meetings or polling or visual portions or anything else that's not related to sound.

Q. And in Step 2, once you sort of pinpointed audio, what was the next task?

A. So the next task was identifying the key

features of Webex Audio.

Q. And as was done, I think, a couple other times, we're going to start at the end.

Is this the list of key features you identified?

A. That's correct.

Q. Okay. And now I think you put together some examples of where you found these features in Cisco documents, but could you tell the jury just generally how you went about determining that hybrid audio, global access, scalability, conference management, compatibility with other Webex products and remaining features were key features relevant to your analysis?

A. So I looked at a lot of different documents. Some of them were public; some of them were internal Cisco documents. I looked at technical documents, source code and so forth to come up with this list of features.

Q. And the first one is support for hybrid audio. Could you turn to PX-109 and -- or, I'm sorry. I jumped the gun here.

First we're going to start at PX-62 which is already in evidence. Slide 109 -- and then it says Slide 109, PX-109. That was confusing. But PX-62 talks about hybrid audio in the first sentence, right?

A. That's right.

Q. And what was the significance of this document identifying hybrid audio as a key feature?

A. So it's talking about Webex support for hybrid audio. It provided these flexibilities for people to join the audioconference; it's a computer or a phone in this case.

Q. You can now turn to PX-109 in your binder.

A. Yes.

Q. Can you identify this document?

A. This is a survey of a -- sort of a -- it was conducted by a third-party company on the app of Cisco.

MR. CAUGHEY: Paltalk offers PX-109.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. And you mentioned PX-109 is a survey. You said it's relevant to hybrid audio. Why is that?

A. Right. So it's talking here about native audio calling through VoIP or PSTN. And it's looking at the support compared to various different platforms indicating that Webex has better support than the rest of the platforms.

Q. And the next feature's global access. What features are encompassed within global access?

A. So global access is really the ability to join these audio conferences using different types of equipment like, you know, phones, voice, but also sort of in a global sense. So to connect globally. You know, there's 1-800 numbers that are provided so that people -- well, the equivalent of 1-800 numbers perhaps so that people can join this from this audioconference from all over the world really. So it's the ability to connect. And that can be important because, you know, some countries might restrict Voice over IP or not have good telephone service or something like that.

Q. And could you please turn to PX-145 in your binder?

A. Yes.

Q. And now identify the document.

A. This is another Cisco document.

Q. Did you rely on it in forming your opinions in this case?

A. Yes.

MR. CAUGHEY: Paltalk offers PX-145.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. PX-145 is now on the screen. And you've called out part of the text on Page 5 of this Cisco

04:46 document. What's -- why did this speak to you?
04:46 A. So it's talking about part of this global access feature. It says: Only Cisco offers a global architecture. Some providers only support a specific country or region which affects the video and meeting quality for remote team members. Others only support certain video devices, restricting who can join or how they can participate.
04:46 Q. The next feature is scalability. What is that?
04:46 A. It's the ability to support larger audio conferences to scale.
04:46 Q. More people in an audioconference?
04:46 A. Yeah.
04:46 Q. And if you could turn to PX-129.
04:46 A. Yes.
04:46 Q. And can you identify this document?
04:46 A. This is another Cisco document.
04:46 Q. You relied on it?
04:47 A. Yes.
04:47 MR. CAUGHEY: Paltalk offers PX-129.
04:47 MR. SABRI: No objection.
04:47 THE COURT: Admitted.
04:47 BY MR. CAUGHEY:
04:47 Q. And you say your key feature is scalability,

and then you've called out a portion of this document that mentions scalability.

Could you explain for the jury what you've called out here?

A. Right. It's talking about the number of people that can be part of the single meeting, 1,000 participants, up to 1,000 on phones and 1,000 on Voice over IP, VoIP.

Q. And the next feature is conference management. And what is conference management?

A. So conference management is the ability to join different conferences, to mute people, to make breakout rooms. It's also described as the ability to identify an active speaker.

Q. And we see PX-109, again, a different portion of this -- well, I guess, here with respect to conference management, you called out a different portion. What's the relevance of this portion of the third-party survey?

A. So it's talking about meeting and session management, conference management, audience management, having breakout rooms and so forth, managing the conference.

Q. The next feature's compatibility with other Webex products. What does this refer to?

04:48 A. So we saw very early on that there's lots of different Webex products all utilizing the same sort of back end as Webex Audio that we've been talking about, this time able to communicate with one another. That's the compatibility that we're talking about.

04:48 Q. And we return to PX-129 which refers to compatibility. Is this a Cisco document?

04:48 A. Yes.

04:48 Q. And what is this Cisco document referring to?

04:48 A. So it's talking about compatibility as one of the features, benefits, works with all Cisco Webex services, mobility clients, network-based recording and so forth.

04:49 Q. And then we reach remaining features. What's the significance of the remaining features in your analysis?

04:49 A. So there's other features that are identified in the documents, and so the idea is to -- you know, I tried to create a set of features, but I recognized that there's some features that I'm just not going to capture with these different categories. And that's the idea behind the remaining features, things like, you know, talk about TCP and -- support or having a chime that played when someone enters a conference or exits a conference and so forth. So this is a category

basically to encompass those remaining features.

Q. And once you identified those features, what was -- what did you do next?

A. So I started with sort of a simple model which is just having them all equal, for example.

Q. Did you stop there?

A. No. I then adjusted those percentages.

Q. And how did you adjust those percentages initially?

A. So I looked at the novelty of different features. Is this a novel feature or not? The design-around potential. In other words, were there multiple ways of implementing this, you know, at a low cost?

And then I really looked at the importance of Webex -- the feature to Webex's overall function. And so a critical piece of Webex Audio or something more optional, for example.

Q. And for novelty and design-around, what did you rely on?

A. I talked with Dr. Madisetti, who we're going to hear from, I think, later, and I also looked at his report as well.

Q. And for importance to Webex's overall function, what's the basis of your analysis there?

A. Documents again and, you know, related to the documents that we've seen so far, more documents, other technical documents, that source code and so forth.

Q. And we just see a demonstrative here, those that we've seen, and some fake, non-Cisco confidential source code, just an image of -- I think we got it from Google or something.

But how did your review of technical materials contribute to your assessment of the importance of these features?

A. Well, it's helping me to adjust these different categories in terms of reports, Webex.

Q. And now could you turn to PX-145?

A. Yes.

Q. Can you identify this document?

A. This is a Cisco document. I think we've seen it before.

Q. All right. Maybe we have.

You're right. It's already admitted.

And here you've underlined: Connect any time, anywhere on any device and meetings for up to 1,000 attendees.

Can you tell the jury how these align with the categories you've identified?

A. Right. So this is getting meetings for up to

1,000 attendees, is getting a scalability. It's one of the things being advertised here: Connect any time, anywhere on any device related to global access.

Q. And now could you go to PX-149 in your binder?

A. Yes.

Q. All right. You're there. Thank you.

Can you identify this document?

A. It's another Cisco document.

Q. And did you rely on this document?

A. Yes.

MR. CAUGHEY: Plaintiffs offer PX-149.

MR. SABRI: No objection.

THE COURT: Admitted.

BY MR. CAUGHEY:

Q. PX-149 is a Cisco document titled Webex For Government -- whoops. Too fast. It says: Global Access.

What did you take from this material?

A. So this is specifically marketing global access to, I guess, governments in this case and providing different ways to call in. And it's talking about Voice over IP available where regulators allow. I guess where they don't allow, you could use phones to connect. It's also talking about the scalability of the conference, audio capacities up to 1,000 in a

single meeting.

Q. And I think you mentioned before that this -- the purpose of this analysis was to adjust this equal weighting.

Could you describe for the jury the way that you ended up, which I think is in the technical weight on the right-hand side?

A. Well, and you can see the numbers here, but basically, things that were more novel and less design-around potential and more importance to Webex Audio received greater adjustments up. And the things that were less important, more adjustments down.

So things like hybrid audio and global access are getting that sort of very core functionality of Webex Audio, and they received the biggest movement upwards.

Scalability is very important, which in many documents as well, the ability to host these different conferences. And that was moved up.

Conference management, something that has lower -- more design-around potential and less critical connection importance to Webex Audio, received the greatest movement downward.

Compatibility with other Webex products is important but maybe not the most core functionality of

what is Webex Audio in the end. So that was the remaining features set to be 15 percent.

Q. And I apologize to do this for the record, but I don't know that you read each of those percentages in.

Can you just read the final technical weights you assigned these different features?

A. So hybrid audio's 25 percent. Global access, 25 percent. Scalability, 20 percent. Conference management, 5 percent. Compatibility with other Webex products, 10 percent. And remaining features, 15 percent.

Q. Did you stop there?

A. No.

Q. What did you do next?

A. So next, I looked for these different categories, how much of these categories were attributable to the patents-in-suit.

Q. And describe that analysis.

A. So hybrid audio is -- well, it's what this patent is about. I was trying to be quite conservative here. You can argue that hybrid audio should be more towards the patent itself, but this is a recognition that there may be some features in this category that are not covered by the '858 patent. But again, this

04:55 is, you know, what the patent is really about. So that's why it received the largest contribution there at 75 percent.

Global access, we have connections, maybe PSTN to PSTN or VoIP to VoIP happening in different countries. There's an infrastructure needed to make that happen.

There's some aspect of the '858 patent being used here. It talks about being connected through a variety of different types of devices together. And if you can't connect in one way in one country, you can connect maybe through another in that case. So there's some contribution of the '858 patent here, but it's not the majority. And so that's why I set it to be 20 percent.

04:56 Scalability, the '858 patent talks as one of its benefits is scalability, right, the ability to host larger conferences to distribute that computational workload to different devices, but it's also about quality.

So when we talked about quality from before, it's improved quality on some devices, which actually may allow it to reduce the amount of bandwidth that's extending audio. It's actually maybe lowering the quality, knowing that it's going to be better at the

endpoint in that case.

So those all factor into scalability, but there's other things that go into scalability as well. And so this was set to be less than a half, which is why you received the 45 percent.

Conference management, most of these features are not related to the '858 patent, but conference management does talk about the ability to identify active speakers, which is something that we talked about in the '858 patent. And that's why I gave it 20 percent.

Compatibility with other Webex products, I set that to zero. The '858 patent didn't really talk about that.

And the remaining features, there might be something from the '858 patent in there, but I just conservatively set it to zero.

Q. And it sounds like part of this analysis was an analysis of the patent itself. Is that fair?

A. Yes. Yes.

Q. And so I just -- I think you pulled one example. Here's Column 2 and 3 from -- or I guess this cuts over Columns 2 to 3 in the '858 patent.

Is this an excerpt from the specification of the patent?

04:57 A. Yes.
04:57 Q. And what is this describing and how is it relevant -- I guess let's start one question at a time.
04:57 What is this describing?
04:57 A. This is talking about one of the advantages of the patent itself. And it's talking about distributing what it calls a computational burden. I called it workload, but, you know, the amount of work that you have to do of mixing audio streams to the active speakers themselves, reducing the workload on the server.
04:57 Q. Is that relevant to scalability?
04:57 A. Yes.
04:57 Q. Now, Step 6, why don't you explain for the jury what Step 6 involves in this effort enlarging table we're looking at?
04:58 A. Yes. So we're almost done here. How to read this. So this is just a simple computation. Take the weight on the left-hand column, multiply it by the middle column. That's equal to the right column.
04:58 So 25 percent times 75 percent is 18.75 percent. 25 percent times 20 percent is 5 percent. Okay. And repeat for all of the columns there. And adding up those columns, the 18.75, 5, 9, 1, and then let's say 0 and 0 gets you 33.75 percent.

04:58 Q. And what does the 33.75 percent represent?
04:58 A. That's the total contribution of the '858 patent to Webex Audio.
04:58 Q. And what we didn't talk about was an analysis of usage data, how often folks are using Webex.
04:59 Did you have any Webex usage data available to you?
04:59 A. I was provided some Webex data. It went from, I think, August 2021 to August '22.
04:59 Q. And what did that data refer to? What was that data?
04:59 A. I have to think back. I think it was number of minutes that were in conference between VoIP and PSTN users versus the total number of minutes.
04:59 Q. And there's a portion in this slide that's green. I guess it looks like between 2021 and 2022.
04:59 What does that represent?
04:59 A. So that's the -- the green is where we had data for.
04:59 Q. And what does the red represent?
05:00 A. The red is the rest of the relevant period that we're supposed to be looking over. There was no data available at all.
05:00 Q. And this is Cisco data?
05:00 A. I believe so.

Q. Is it publicly available?

A. No. I don't think it's publicly available.

Q. And did you analyze the data that you did have and come to any conclusions about whether it would have been helpful for your analysis?

A. Well, I did look at the data. Having one year of data at the end of this period and over -- it would have even went beyond the period that we're interested in this case. It wasn't super useful. It -- it doesn't necessarily represent the ability for clients to make other connections.

So, you know, if I can't call someone, right, then that -- that makes the system much less useful in that case.

So there are calls that I don't make on a daily basis, for example, right? And so those calls might still be important for me to make, but they wouldn't show up in just regular usage data in this case.

And this is related to a concept, actually, called Metcalfe's law. It's a well-known way, actually, of valuing a network so effectively that the value of the network is proportional to the number of connections that you could possibly make, not the number of connections that we typically make on a

day-to-day basis.

And so, you know, it may be very important to call someone that you don't normally call, for example, you know, your doctor or something like that.

I don't normally call my doctor, but it's important for me to make that call. I just don't do it very frequently. So the value of the network is really proportional to the number of connections that are possible.

Q. How -- do you recall, Dr. Schaefer, approximately the -- what this data showed with respect to how many -- I guess, the proportion of conferences had a VoIP to PSTN hybrid aspect of it?

A. Yes. I believe it was 22 percent and -- if you go to the minutes where VoIP to PSTN minutes for this green data that we have out here.

Q. And your technical apportionment was 33.75 percent, so was it your conclusion that that 22 percent wasn't, didn't fully represent the value of these functionalities that you have found to be accused?

A. Well, I -- I looked at a more holistic view of the Webex product when I did my apportionment. This data is only for a very small time period. And so I was looking at it more as a whole as opposed to this

little piece.

Q. And finally, there's an end piece to your apportionment analysis. Did you do a separate apportionment analysis as well?

A. I did. An alternative apportionment.

Q. This mentions Webex, but I don't see Webex Audio. What was this alternative apportionment?

A. So this one is now looking at just the Webex. We looked at Webex Audio previously. This is looking at the entire Webex system.

Q. And explain for the jury what is being depicted on top here where it says Webex Videoconferencing, Webex Audioconferencing, and remaining features.

A. So again, following like the exact same type of thing that we did previously, I'm coming up with list of features. This is a video- and audioconferencing product, and so the features were videoconferencing, audioconferencing, and then the remaining features. Started off with all of them being equal, but, of course, for me features cannot possibly be the same way as the individual and audioconferencing that are listed here.

So I had to break down video- and audioconferencing into different pieces, you know, what

are the weights associated with them? And given that it's a video/audio conferencing product, set that weight to be 90 percent. And then how I partitioned it, I partitioned it equally. You could actually argue that audioconferencing is more important than videoconferencing because a videoconference without audio is not super useful. But conservatively, I set them to be the same value, which is the 45 percent, each one.

Q. And then what did you do next?

A. So then I looked at the percent that is attributable to the patents-in-suit, and the videoconferencing, I conservatively just set that to zero. The audioconferencing is 33.75 percent. That's actually the number we just generated from the previous analysis, 33.75. So I put it in there. And all of the, you know, remaining features and so forth, I set those to zero. And then I multiplied, that gave me 0, 15.18 and 0, and I added those three numbers together, and that gave me 15.18 percent.

Q. Even I can do that math, I think.

And why -- and so whereas I think you explained the 33.75 related to the audio functionalities specifically, this 15.18, what does that relate to?

A. That relates to Webex as a whole.

Q. And we have reached the conclusion of my examination, but if you could, just so the jury is left with a bow on the present, could you explain and summarize your three opinions you've offered today?

A. Right. So as we talked about in the No. 1, the Cisco Webex products infringe upon Claims 1 through 5 of the '858 patent.

No. 2, the relative contribution of the infringing functionalities of Webex Audio is 33.75 percent.

And then No. 3, the contributions of the infringing functionalities to Webex as a whole is 15.18 percent.

MR. CAUGHEY: Thank you very much for your time, Professor.

THE WITNESS: No problem.

MR. CAUGHEY: Pass the witness.

CROSS-EXAMINATION

BY MR. SABRI:

Q. Good afternoon, Dr. Schaefer.

A. Good afternoon.

Q. It's good to meet you. I don't think we've met before. My name's Nathan Sabri, and I'll be questioning you on behalf of Cisco this afternoon.

I'd like to start with the meaning of words. So I'm going to put the claim language back up and walk through some of this with you.

Do you agree with me that you're not interpreting all the words in this claim under their normal reading, right?

A. I'm not sure what you mean by that.

Q. Well, let's start from the top. Let's start with "each," so the very first element, [1]. Sometimes we'll call it 1[A]; the first line, receiving an audio packet from each of a plurality of clients.

Your view of the term "each" is that it does not require "every," right?

A. It could include, but "one or more" I think was the way I was interpreting it.

Q. Right. Your view is that it does not require "every," right?

A. Not require.

Q. And you cited some language from the Court on your direct examination, right?

A. Yes.

Q. Let's bring that back up, if we could. It was your Slide 34.

So you said that you relied on this. Pointed out that it says, "each" has a plain and ordinary

05:08 meaning which can include "one or more." Right?

05:08 A. That's correct.

05:08 Q. The Court didn't say "each" means one or more, you'd agree with me, right?

05:08 A. I said can include.

05:08 Q. The Court didn't say "each" means one or more, right?

05:08 A. Right. It didn't. No. Not in those words.

05:08 Q. You also didn't address the Court's more recent statements on this issue, did you?

05:08 A. I don't think so.

05:08 Q. Let's pull that up. This is from the August 1st, 2024 pretrial conference.

05:08 You didn't consider this transcript in evaluating what "each" means, right?

05:08 MR. CAUGHEY: Your Honor, I object.

05:08 MR. SABRI: May we approach, Your Honor?

05:08 THE COURT: You bet.

05:08 (Bench conference.)

05:09 MR. SABRI: Your Honor, this is goose for the gander stuff, as you were saying this morning. If they can stand up there and put up --

05:09 THE COURT: You're not going to use what I said at a hearing.

05:09 MR. SABRI: This was -- so the problem

right now is they got a thumb on the scale.

THE COURT: Let me be clear. You're not going to -- I was just waiting. If he hadn't objected, I would have told you you can't do it. So what I said at the hearing was to clarify a Markman construction. That's all that's coming in from that hearing.

MR. SABRI: Right. So can I show you what I'd like to -- the problem right now is it's --

THE COURT: There's nothing --

MR. SABRI: -- very prejudicial.

THE COURT: -- from that hearing coming in.

MR. SABRI: So the statement's saying it can but it doesn't have to. That's all I'm going for is that it's a dispute here because right now this jury thinks that is what it means and that their expert's blessed and ours isn't.

THE COURT: I said very clearly what it means. He's within what it means, and that's what we're going with. If you all wanted to fight over this sooner, you could have, but for right now where we're at is you're not going to use what's in there. He's been faithful to the sentence that I used, and that's what we're going to do.

MR. SABRI: Okay. So nothing from the

August 1st. I'm clarifying here.

THE COURT: I don't know how I can be any clearer.

MR. SABRI: I understand, Your Honor. Thank you. I appreciate it.

(Bench conference concludes.)

BY MR. SABRI:

Q. I might refer to your reports in this case a couple of times, so I just want to make sure everyone knows what I mean when I refer to those.

You wrote a couple of reports in connection with this case, right?

A. That's correct.

Q. And those reports set out the opinions that you then came to your conclusions and how you arrived at those opinions in this case, right?

A. I think that's the idea. Yes.

Q. You didn't provide any opinion in your reports as to why, in your opinion, a person of skill would view "each" as meaning one or more in this patent, did you?

A. Well, I did refer to what you were just talking about, the claim construction.

Q. Right. But you've got your report there, Tab 3. Right? You didn't provide any explanation in

your report about why, in your opinion, a person of ordinary skill would view "each" in the context of this patent as meaning one or more, correct?

A. I don't think it's in the report.

Q. So let's turn back to the claim language starting on 1. Let's look at Element [3]. Determining that a first subset of a plurality of clients has the capability to mix multiple audio streams.

You think first subset can consist of no clients, right?

A. I mean, a subset could consist of no clients.

Q. Right. So in this limitation, you think it's possible for the first subset to consist of no clients, right?

A. Well, it has to do with the term. It could be empty.

Q. Sorry. I just want to make sure I'm clear.

You agree your opinion is that in that limitation, a first subset can consist of no one, right?

A. Right. In this limitation, the subset could be in there.

Q. And the first subset consists of clients with a capability of mix, right?

A. Yes.

05:12 Q. So it's your view that it's possible for this limitation to be met given that there are no clients capable of mixing on a call, right?

05:12 A. For the determining, yes.

05:12 Q. And the next element, [4], determining that a second subset of the plurality of clients does not have the capability to mix multiple audio streams.

05:12 Do you see that?

05:12 A. Yes.

05:12 Q. You think this limitation can be met where a second subset also includes no one, right?

05:13 A. That's right. It's still determining.

05:13 Q. And so to be clear, if the second subset includes no clients, that would mean there are no non-mixing clients on the call, right?

05:13 A. For this step, yes. That's what it would mean.

05:13 Q. Your opinion is that the '858 patent teaches a method to allow mixing and non-mixing clients to participate in a single audioconference, right?

05:13 A. That's what it says. Yes.

05:13 Q. Let's go on to Elements [5] and [6]. Let's kind of group these together. You've got multiplexing said packets of audio data received from each client on said active speakers list into a multiplexed stream.

You analyzed that element, right?

A. Yes.

Q. And sending said multiplexed stream to each of said first subset of a plurality of clients.

You see that, right?

A. Yes.

Q. And you understand that in order to show infringement, Paltalk has to show that Webex performs every one of these elements, right?

A. Yes.

Q. That's a requirement of the law, right?

A. As I understand it.

Q. And you agree, though, that in Webex, if a client is an active speaker that has a capability to mix audio, it does not receive the same multiplexed stream as the other mixing clients.

You agree with that, right?

A. Could you repeat that? That was complicated.

Q. Sure.

You'd agree that if you have a client who's both an active speaker and can mix audio, that client does not receive the same multiplexed stream as the other clients that can mix audio.

You agree with that, right?

A. Right.

05:14 Q. You agree that Webex does not send the same multiplexed stream to all clients, right?

05:14 A. Right.

05:14 Q. For listeners, in your opinion, the same multiplexed stream is sent to each listener, right?

05:15 A. I'm sorry. The same for the listeners?

05:15 Q. Right.

05:15 A. Yes. It is sent to those.

05:15 Q. However, for endpoints on the speaker list, so the active speakers, their packets are admitted for multiplexed stream, right?

05:15 A. Which multiplexed stream?

05:15 Q. Well, the multiplexed we were just talking about, right? You said for the listeners, you agree that the same multiplexed stream is sent to each listener, right?

05:15 A. Yes.

05:15 Q. However, from that multiplexed stream, speakers' packets are admitted, right?

05:15 A. Right.

05:15 Q. So in other words, in Webex, each active speaker receives a unique multiplexed stream, right?

05:15 A. Yes.

05:15 Q. With the interpretation you used to determine infringement is that "each" does not require "all,"

right?

A. One or more.

Q. "Each" in your mind means one or more, correct?

A. That's correct.

Q. You'd agree with me that if "each" means "all" in Claim 1, Webex does not infringe, right?

A. I'd have to think about it, but I was using "one or more." So --

Q. So I guess I can put it this way: You did not provide an opinion in your reports that Webex meets these claim elements by sending a set of multiplexed stream to all clients with a capability to mix audio, right?

A. I don't believe I did.

Q. And you provided the jury with no opinion today that Webex meets these elements by sending a said multiplexed stream to all clients with the capability to mix audio, right?

A. Well, we just talked about the listeners.

Q. Right.

A. In that case, they do do the same.

Q. Well, listeners do, right?

A. That's right.

Q. You'd agree with me that the -- half the

05:16 speakers are getting a unique multiplexed stream as we said a moment ago, right?

05:16 A. Well, with the caveat the active speaker has to be one of the multiplexed, the clients that can mix.

05:17 Q. I'm not sure I understand. I'll just try to ask it as directly as I can.

05:17 You agree with me that at Webex, each active speaker receives a unique multiplexed stream, right?

05:17 A. Yes.

05:17 Q. I'd like to move to the code you discussed during the direct examination, and I'm not going to pull it back up. We don't have to close the courtroom for this.

05:17 You had access to Cisco's source code and confidential documents, right?

05:17 A. Yes.

05:17 Q. You'd agree that on your direct examination, you talked about a lot of code, right?

05:17 A. Not nearly as much as I reviewed.

05:17 Q. You talked about a lot of code in connection with receiving audio packet, right?

05:17 A. I talked about some code.

05:17 Q. You talked about code in connection with determining an active speaker in forming an active speaker list?

05:17 A. Yes.
05:17 Q. I just want to highlight one of the files you called out. So I -- when it came to multiplexing into a multiplexed stream, I think you discussed with the jury MmMixer.Api.h.
05:18 Does that sound right?
05:18 A. Sounds right.
05:18 Q. In case you want to double-check, I'm not trying to catch you here. I'm looking at Paragraph 86 of your supplemental report at Tab 3.
05:18 A. What was the paragraph, 86?
05:18 Q. 86. That's right.
05:18 A. Thank you. Yes.
05:18 Q. So fair to say that for the multiplexing into a multiplexed stream, you said to the jury MmMix.Api.h, right?
05:18 A. That was one of the things listed. The one we talked about here.
05:18 Q. And in your reports, you also cited an Mm.Mix.Api.cpp, right?
05:18 A. That's correct.
05:18 Q. Those two files?
05:18 A. Yes.
05:18 Q. Let's pull the claim back up and look at Claim 2 now. Claim 2 adds, among other things, the language:

05:18 Removing from said multiplexed stream.

05:19 Do you see that?

05:19 A. That's correct.

05:19 Q. And then if we can move that up, please, so it'll be -- and pull up Claim 3 just to deal with them together.

05:19 Claim 3 adds: Removing from said combining packets at packets of audio data?

05:19 A. That's correct.

05:19 Q. You think the plain meaning of "removing" includes "not including," right?

05:19 A. In light of the specification of the patent, yes.

05:19 Q. Let's go ahead and take this down. I'd like to turn to the second part of your direct examination, talking about opinions you -- opinions you came to support the damages expert.

05:19 A. Yes.

05:19 Q. You attempted to determine what you called the date of first infringement in this case, right?

05:19 A. I did in my second report. Yes.

05:19 Q. That would be the first date when the accused functionality was implemented in Cisco's products?

05:19 A. That's my understanding.

05:19 Q. And you ran searches in an attempt to

determine the dates of individual files, right?

A. Approximate dates of infringing files. Yes.

Q. And your best estimate after that was that the functionality you accused of infringing was in Webex in 2010, right?

A. That was my estimate based off that data.

Q. And then you spent a fair amount of time on your direct talking about apportionment, right?

A. Well, I spent time talking about it. Sure.

Q. And you attempted to apportion the allegedly infringing features from what you would agree are noninfringing functionalities from Webex, right? Correct?

A. That's correct.

Q. Because you agree that Webex has some things that you accuse of infringement but then other features that you do not accuse of infringement, right?

A. Of course.

Q. You never performed this sort of apportionment before, right?

A. When I did it for this case?

Q. Right.

A. Yeah. No. I've not.

Q. This was the first time?

A. This was my first time. Yes.

Q. You didn't use any sort of guide or treatise to help you with the analysis, right?

A. No.

Q. Let's talk about what you attempted to devalue. You attempted to devalue the ability to join a conference through a telephone or desktop-based VoIP, right?

A. I tried to -- I'm not sure what phrasing you just used. The amount attributable to the '858 patent.

Q. Well, let me walk through it this way: You took the view that Cisco's support for the Webex Audio feature coincided with the exact scope and teachings of the '858 patent, right?

A. The -- which feature?

Q. Cisco's support for Webex Audio, hybrid audio.

A. Oh, hybrid audio. I did say that, but I did not assign 100 percent.

Q. Right. But you expressed the view that that feature, support for Webex Audio feature, coincides with the exact scope and teachings of the '858 patent, right?

A. I did say that. Yes.

Q. And you also described Cisco's hybrid audio feature as the flexibility to join the conference through telephone or desktop-based VoIP, right?

05:22 A. Yes.

05:22 Q. So in other words, you took the view that flexibility to join a conference through telephone or desktop-based VoIP was the exact scope and teachings of the '858 patent, right?

05:22 A. It fell within the scope, yes.

05:22 Q. You also said in your report that at the time of the '858 patent, there were no readily available alternatives.

05:22 THE COURT: Counsel, can I have y'all up here a second?

05:22 (Bench conference.)

05:22 THE COURT: He may do it in other courts. That's not the way we do it here. Just ask him a question. You go to church on Sunday. Whatever he says, that's it. If it's not somewhere in his report, use it to impeach him.

05:22 MR. SABRI: Got it.

05:22 THE COURT: It's not a quiz over what he said.

05:22 MR. SABRI: Understood, your Honor.

05:22 THE COURT: The report doesn't come up again unless --

(Simultaneous speakers.)

05:22 THE COURT: And it's not in the report or

05:23 it's inconsistent.

05:23 MR. SABRI: Understood, Your Honor.

05:23 (Bench conference concludes.)

05:23 BY MR. SABRI:

05:23 Q. You take the view, Dr. Schaefer, that there 05:23 were no readily available alternatives to the 05:23 '858 patent that taught this support for Webex Audio 05:23 hybrid audio features, right?

05:23 A. That's -- yes.

05:23 Q. But you would agree that there are, in fact, 05:23 ways to do hybrid calls, VoIP to PSTN calls, without 05:23 infringing the '858 patent, right?

05:23 A. There are -- there are ways.

05:23 Q. You agree that it was possible prior to the 05:23 '858 patent to have a VoIP and PSTN call?

05:23 A. I believe so.

05:23 Q. And it's your understanding that prior to the 05:23 '858 patent, there were ways to have VoIP and PSTN 05:23 calls that wouldn't have infringed the '858 patent, 05:23 right?

05:23 A. Right.

05:23 Q. On direct examination, you discussed usage 05:24 data. Do you remember that?

05:24 A. Yes.

05:24 Q. And you said that if Webex only offered VoIP

or only offered PSTN, it would be less valuable, right?

A. Uh-huh.

Q. But again, you agree there were other ways prior to the '858 patent to offer VoIP -- VoIP and PSTN calls, right?

A. Yes.

Q. Let's talk now about how you apportioned value.

You identified what you considered to be six categories of key features in Webex Audio, right?

A. That's correct.

Q. You explained -- on direct examination, you started with the assumption that each of those six categories had more importance, so --

THE COURT: Counsel, maybe it's just me. But when you read, you're going really fast. And I don't know if -- are you having a problem? -- but I'm having a problem keeping up with you.

MR. SABRI: I understand. I apologize, Your Honor.

THE COURT: I want to make sure the jury hears you, so -- and maybe it's just me.

MR. SABRI: I appreciate it.

BY MR. SABRI:

Q. You started with an assumption that the six

features had equal value, right?

A. Yes.

Q. But then as you discussed, you adjusted some up and you adjusted some down, right?

A. That's correct.

Q. For example, you increased global access on your categories from 16.7 percent to 25, right?

A. That's correct.

Q. You didn't base that change on any math or calculation, right?

A. Nothing.

Q. And you didn't show the jury why you decided to make it 25 as opposed to 27 percent, right?

A. No.

Q. Or 23?

A. No.

Q. Let's take another example. Scalability.

You adjusted that category from 16.7 to 20 percent, right?

A. That's correct.

Q. And again, you didn't show the jury a calculation of why you ended up at 20, fair?

A. Not in the calculation.

Q. And you also presented an alternative apportionment section, right?

05:26 A. Yes. I did.
05:26 Q. And you'd agree that the same six factors you discussed in connection with your -- the first part of your opinion, those were also part of your alternative apportionment, right?
05:26 A. That's correct.
05:26 Q. And in your opinion, they retained their relative importance to each other?
05:26 A. I just used the same apportionment number.
05:26 Q. All right. Now, as part of your apportionment analysis, you considered each feature's novelty, design-around potential, and importance to Webex's overall function, right?
05:26 A. That's correct.
05:26 Q. Let's talk about those three factors. First, novelty.
05:26 You did not determine novelty yourself, right?
05:26 A. That's right.
05:26 Q. You relied on Dr. Madisetti?
05:26 A. That's correct.
05:27 Q. You're not personally versed in all of the prior art in this case, right?
05:27 A. I hadn't done the analysis.
05:27 Q. You haven't done an in-depth analysis of what technologies existed prior to the '858 patent, right?

A. No.

Q. In the audioconference field, you did not do an analysis of what technologies existed prior to the '858 patent, right?

A. That's right.

Q. So you relied on a phone call with Dr. Madisetti, right?

A. And his report. Yes.

Q. You don't remember when you had that call, right?

A. Sometime before my supplemental report, but that was some time ago.

Q. Let's focus on your global access category for a moment. Like we just discussed a moment ago, that was one of the categories you gave the highest importance to, right?

A. Yes. That's right.

Q. The 25 percent?

A. That's right.

Q. And you relied on Dr. Madisetti to determine the novelty of your global access category, right?

A. That's right.

Q. But you don't know if you described to him the feature of global access, right?

A. I don't know that I described verbally to him.

Q. You don't know if you provided a description that you used in your report, for example, right?

A. He may have had a copy of my report, but I don't know.

Q. You don't know if you talked about it with him on the phone call, right?

A. I don't remember.

Q. And you don't know if Dr. Madisetti's entire understanding of what global access means came from you or not, right?

A. I don't know.

Q. You don't know what he was defining as a "mean" when he told you it was a novel feature, right?

A. I thought we were talking about the same thing, but I don't know what he thinks.

Q. And if the global access category was not in fact novel at the time of the invention, you don't know how that would impact your total contribution number, right?

A. Well, it could lower the contribution of that particular category.

Q. Let's talk about the second of those three factors, design-around potential. You said on direct examination that you relied on Dr. Madisetti to form the opinion as to whether or not there was

design-around potential for each of those categories, right?

A. That's correct.

Q. And you relied on Dr. Madisetti rather than your own opinion because you believed he was more versed in that particular area?

A. He'd done the analysis.

Q. You hadn't done the analysis like he had, right?

A. I wasn't looking at prior art.

Q. So we're not evaluating design-around potential based on your own technical experience?

A. I was relying on Dr. Madisetti for that aspect.

Q. You weren't evaluating the design-around potential based on your role as a person of ordinary skill?

A. Not at the time that -- the time period you were looking at.

Q. And you were not evaluating design-around potential yourself using testimony from Cisco's witnesses?

A. No.

Q. Or publicly available and pre-asserted?

A. Not for design-around potential.

05:30 Q. Marketing documents?

05:30 A. Not that particular one. No.

05:30 Q. And you didn't use technical documents to evaluate design-around potential yourself?

05:30 A. I relied on Dr. Madisetti.

05:30 Q. That's not what you said in your report, is it?

05:30 A. I'm not sure I agree.

05:30 Q. Let's take a look. Let's pull up Paragraph 198 of your supplemental report. We can get it on the screen.

05:30 So in your report, you wrote: Based on my technical experience, role as a POSITA, testimony from Cisco's witnesses, and publicly available and produced surveys, marketing documents, and technical documents, I have evaluated the design-around potential.

05:31 That's what you wrote in your report, right?

05:31 A. It does say that.

05:31 Q. Let's look at Paragraph 158.

05:31 Based on my technical experience, role as a POSITA, testimony from Cisco's witnesses, and publicly available and produced surveys, marketing documents and technical documents, I have evaluated the design-around potential.

05:31 That's what you said in your reports, right?

05:31 A. It does say that. Yes.

05:31 Q. You didn't present any such analysis to the jury today, did you?

05:31 A. No. I actually relied on Dr. Madisetti here.

05:31 MR. SABRI: No further questions, Your Honor.

05:31 REDIRECT EXAMINATION

05:31 BY MR. CAUGHEY:

05:32 Q. Dr. Schaefer, we spent several hours talking about infringement today.

05:32 A. Yeah.

05:32 Q. You talked about source code with the jury.

05:32 Do you recall that?

05:32 A. Yes.

05:32 Q. We saw -- give your best guess of how many internal Cisco documents we talked about today during your presentation.

05:32 A. That we talked about today?

05:32 Q. Uh-huh.

05:32 A. I don't know. Maybe 30 or 40. I don't know, something like that.

05:32 Q. You used internal Cisco -- did you use internal Cisco technical materials and source code to evaluate whether Cisco's Webex servers infringe the '858 patent?

A. Yes.

Q. Did Cisco's lawyers show you a single Cisco document during their cross-examination?

A. I don't believe so.

Q. Not one, right?

A. No.

MR. CAUGHEY: No further questions.

MR. SABRI: No further questions, Your Honor.

THE COURT: You may step down, sir.

Next witness, please? I know it's a deposition. How long is the deposition?

MR. SIEGMUND: It'll be our -- Your Honor, Mr. Bratic will be our next --

THE COURT: I thought you had a deposition next.

MS. SRINIVASAN: No, Your Honor. We do not have another deposition.

MR. JONES: May we approach, Your Honor?

THE COURT: Sure.

(Bench conference.)

MR. JONES: I would just note, we haven't exchanged. He was --

THE COURT: Just make sure you speak in the mic.

05:33 MR. JONES: I apologize to the Court. And I'm not being critical of anybody. He was not designated for today. We haven't exchanged demonstratives. So...

05:33 MS. SRINIVASAN: I could present his qualifications. I'm assuming there wouldn't be objections to those slides anyway. Get through that, and then we could serve the rest of his slides and continue his testimony in the morning.

05:33 THE COURT: Is he your last live witness?

05:34 MS. SRINIVASAN: Yes.

05:34 THE COURT: Then let's do that then. We'll just qualify him up and then we'll go home for the day. And then after him, we'll have a deposition from whom?

05:34 MS. SRINIVASAN: We're not going to play the deposition given the time we've expended.

05:34 THE COURT: That's fine. So...

05:34 MS. SRINIVASAN: So we will rest.

05:34 THE COURT: That'll be your last witness?

05:34 MS. SRINIVASAN: Yes, Your Honor.

05:34 THE COURT: So we're running ahead. That's great. Let's go ahead and qualify him up.

05:34 MS. SRINIVASAN: Okay.

05:34 THE COURT: And then, like I said, let's

05:34 go ahead and get that done and start fresh tomorrow.

05:34 MS. SRINIVASAN: Yes. I imagine you've seen those slides before, so you'll be fine. It's in his background.

05:34 MR. JONES: I trust you. Don't worry about it.

05:34 (Bench conference concludes.)

05:35 MS. SRINIVASAN: Paltalk calls Mr. Walter Bratic.

05:35 (The witness was sworn.)

05:35 MS. SRINIVASAN: Thank you.

05:35 DIRECT EXAMINATION

05:35 BY MS. SRINIVASAN:

05:35 Q. Good afternoon, Mr. Bratic.

05:35 Could you please introduce yourself to the jury?

05:35 A. Sure. My name's Walt Bratic. And my last name is spelled B-r-a-t-i-c.

05:35 Q. Mr. Bratic, where do you live?

05:35 A. I live in Houston.

05:35 Q. And where do you work?

05:35 A. I work for a consulting firm, an accounting consulting firm called Whitleypenn.

05:35 Q. What is Whitleypenn? What does it do?

05:35 A. So they're a Texas-based accounting and

consulting firm. They do auditing, books and records for companies. They do issue annual reports for companies. They do tax returns for companies' partnerships and individuals, and they do a variety of strategic consulting and consulting like the type of consulting I do.

Q. And what's your role at Whitleypenn, Mr. Bratic?

A. So what I do at Whitleypenn is I provide a variety of accounting, economic, financial, statistical consulting services. They can be for a wide variety of clients. Can be large corporations, could be partnerships, could be individuals.

So my analysis involves looking at different aspects of businesses. Some of that involves strategic analysis, marketing analysis, financial projections for different kinds of companies in different industries. For example, offshore drilling, as an example, to medical devices. There's a lot of medical technology. Houston is the largest hospital complex in the world. So that's part of what I do.

And part of that analysis, of course, involves coming to court and testifying in a lawsuit and in patent lawsuits, like the one I'm here to testify about today and tomorrow.

Q. Now, before we get to the substance of your testimony, I just want to talk a little bit about your qualifications in this area.

For purposes of your testimony, did you prepare some slides for us to talk about with the jury?

A. I did.

Q. Okay. All right. Mr. Bratic, can you tell the jury about your educational background?

A. Yes. So I have two formal college degrees. They're both from the same school, the University of Pennsylvania. Like Mr. Katz, I also went to the University of Pennsylvania.

I have an undergraduate degree there, and I have an MBA, or master's of business administration, degree from The Wharton School of Business.

Q. Following your time there, can you tell us about your work experience?

A. Yes. So a significant portion of my career has been spent in public accounting working for some of the world's largest accounting firms. For example, I spent a few years at a firm called Ernst, Ernst in the old days, which eventually became known today as Ernst and Whinney.

Then I went into industry. I was a chief financial officer of a company that made equipment for

the energy industry, and that's where I started doing work on licensing technology, including patents and trade secrets. That's the primary focus of the technology, that company, when I worked there back in the early '80s.

And then after that, I joined Pricewaterhouse. And I was there for about 23 years, Pricewaterhouse and PricewaterhouseCoopers, where I was a partner. And for the last few years before I left, my time was global director of intellectual property consulting for the entire firm worldwide.

And I had over 500 people. I was working within different offices around the world. Mostly in Europe, some in Asia, and in the United States and Canada. Oh, and Australia. Can't forget Australia.

Q. Now, Mr. Bratic, do you have any credentials that are relevant to your work in licensing?

A. Yes. So I have several certifications. First of all, I'm a certified public accountant. I've been licensed by the State of Texas since 1981 as a CPA. So that's a long time. So over 40 years.

I also am a Certified Licensing Professional. That's a designation I obtained from the Licensing Executive Society of the United States and Canada, involving about 8- or 9,000 members. The focus of the

05:39 Licensing Executive Society is really to promote knowledge and skills in the area of licensing of technology, largely patents, trade secrets, sometimes copyrights and trademarks. But the main focus is patents and trade secrets.

And I didn't normally have to take an exam, but I was given a document from them for many years of licensing I've been doing in intellectual property going back to the early 1980s when I was chief financial officer of a company called Advanced Energy Supply Company.

And so I received that certification by being able to document all my years of experience in licensing of patents and trade secrets primarily.

Q. And --

A. I'm sorry.

Q. Go ahead.

A. I have other certificates, certifications.

I'm certified in financial forensics, which you can only get if you're a licensed CPA. That's a designation you receive by the American Institute of Certified Public Accountants.

And then finally, I'm a certified fraud examiner, which is an organization -- national organization based out of Austin, Texas.

And every year, just like for my CPA, I have to take courses to get my license renewed. For a CPA in Texas, you need 40 hours. And for the certified fraud examination, you need ten hours.

Q. Thank you, Mr. Bratic.

I've been about to ask you because you sort of mentioned it, that you've been the chief financial officer for a company, and I see on your slide you talked about your real-world licensing experience.

If you could tell the jury a little bit about that.

A. Well, yes. So going back to Advanced Energy Supply Company, so we had somewhere on the order of 30 to 40 engineers and draftsmen. We were designing equipment for the energy industry, everything from gear boxes to torque drives and so forth, so on, that were being used in the energy industry.

We weren't a manufacturer, though. We were a design company. What we did is we contracted out the manufacturer to put our logo on it. It's what they call the white-labeling products.

But because we had this group of engineers and designers, draftsmen designing our equipment, we came to learn that we needed to license in technology from other people, because they had things we need and it

was cheaper for us to get their technology than spend years trying to figure it out on our own.

So I cut my teeth learning how to negotiate licenses for intellectual property back in 1982, for example.

Now, we also -- some -- as we grew as a company, as people got to know us, some people came and knocked on our doors and said they thought we had some interesting technology and would we like to license it to them.

And so during my tenure at Advanced Energy Supply Company, I worked on somewhere between 10 and 15 licenses and then patents and trade secrets.

And then I joined Pricewaterhouse. And I was one of the only people there who was doing intellectual property. Of course, that was the early days where people were being focused on intellectual property in the early 1980s.

And so I was the go-to person at Pricewaterhouse on licensing of intellectual property, dealing with clients. Mostly at that time in the energy sector because Pricewaterhouse had a huge footprint. Exxon, Chevron were big clients. Shell. Pricewaterhouse.

And then we -- you know, then Pricewaterhouse

started getting large clients like Intel, out in California, some other very, very large technology companies. So I started gravitating towards that and towards pharmaceuticals and medical devices.

Q. And I'm going to ask you about one last thing on this slide here. It references that you have been a court-appointed expert and examiner.

Can you tell the jury about that?

A. Yeah. So I've been hired by judges here in the State of Texas, where -- as a court-appointed expert and examiner. And the difference between the two is sometimes there are issues that come before the Court, and there's not enough evidence to put before the Court.

So basically, I go to get hired. I've been hired to go out and do a quest to go out and find this information for the Court as an examiner and report my findings to the Court of the missing information.

And then as a court-appointed expert, for example, I've been involved in disputes involving software where two companies are -- have been suing each other over the value of their stock in the software company and they both hire experts to give -- determine the value of the software. And there's a dispute about that, so the Court would hire me as an

05:44 independent expert by the Court.

05:44 I would determine what the value of the software company was, and then a client -- the Court would accept my findings, and it was binding on all the parties. So that's an example of the type of courts.

05:44 MS. SRINIVASAN: And at this time, I'd like to offer Mr. Bratic as an economic expert on damages analysis in patent cases.

05:45 MR. JONES: No objection, Your Honor.

05:45 THE COURT: He'll be admitted as such.

05:45 Ladies and gentlemen of the jury, I think this is a good time for us to take a break because he's about to get into more substantive information. If you all would be here by -- can everyone get here by 8:15? Does that work?

05:45 Okay. If you all will be here by 8:15 in the morning, we'll get started by 8:30. And plan on going tomorrow evening till about 5:30. I think we're going to do fine in this case getting it to you by either Thursday or Friday. So be safe out there, and we'll see you.

05:45 THE BAILIFF: All rise.

05:45 (Jury exited the courtroom.)

05:45 THE COURT: Okay. So we'll finish with Mr. Bratic tomorrow and the plaintiff will rest?

05:46 MS. SRINIVASAN: Yes, Your Honor, subject to our rebuttal.

05:46 THE COURT: You may be seated.

05:46 I'm sorry?

05:46 MS. SRINIVASAN: Subject to our rebuttal case, Your Honor.

05:46 THE COURT: So what's going to happen, I know Mr. Jones knows this, but someone can speak for the defendants for a second. But when the plaintiff finishes, we'll break and I'll ask for a Rule 50 motion.

05:46 And so if you want, we'll do it orally. And if you want to submit something in writing, that's fine too. Then I'll say, who's your next witness? And the answer will be? Tomorrow?

05:46 Yes, ma'am?

05:46 MS. PIEPMEIER: Your Honor, it will be Mr. Amit Barave.

05:46 THE COURT: Who could we expect tomorrow? If you could kind of give me a lineup.

05:46 MS. PIEPMEIER: Sure thing, Your Honor.

05:46 We will have Mr. Amit Barave, and we will have Mr. Nathan Buckles. We will have Mr. Aaron Belcher. And then I believe, assuming there's time, we would have Mr. Dean Willis.

05:47 THE COURT: Okay. I can't imagine that we would finish before the end of the day Wednesday, but if we do, we do that, I can't imagine. So for right now -- and we'll see tomorrow how we go at the end of the day, but I'll plan on -- we'll plan on Wednesday evening at around this time, 5:00 or 5:30, doing the charge conference.

05:47 Where are you all at in terms of working on the jury charge? Are there problems? Not problems? I haven't heard anything about the case that would lead me to believe y'all should be having difficulties.

05:47 MR. SIEGMUND: We just have a few things, Your Honor, but it's pretty manageable.

05:47 THE COURT: Okay. I'm thinking very seriously this time -- I haven't had the energy to do it, but I regret it every time. I'm thinking very seriously this time about maybe going through and crossing out some of the things I say 16 times and getting you all -- it would be a change in the charge, but it would make it shorter. And, you know, they only need to hear -- I think I say what preponderance of the evidence is at least 33 times, and I don't think they need to hear it 33 times.

05:48 But if someone's unhappy, we'll talk about it. But I'm -- actually, if someone could

05:48 tomorrow morning get me -- I'm not going to be judging on, you know, accepting or not accepting, but if you would get me the draft of where we are at, and I may go through tomorrow and actually line through some stuff, redline through some stuff and see if you all will agree to let me not say it.

05:48 And, for example, if there aren't any stipulations, you can leave out the page on stipulations. It's that type of stuff I'm trying to accomplish.

05:48 So it seems to me that we're in good shape, though, in getting the trial done.

05:48 Any issues to take up?

05:48 MR. TRIBBLE: Nothing from plaintiff, Your Honor.

05:48 MS. PIEPMEIER: Nothing from us at this time, Your Honor.

05:48 THE COURT: Very good. I will see you all tomorrow morning at about 8:15.

05:49 THE BAILIFF: All rise.

05:49 (Hearing adjourned.)

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 6th day of September 2024.

*/s/ Kristie M. Davis*
KRISTIE M. DAVIS
Official Court Reporter
PO Box 20994
Waco, Texas 76702
(254) 666-0904
kmdaviscsr@yahoo.com

05:49